IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS D. KIMMETT, | : | CIVIL ACTION NO. **4:CV-08-1496** |
| | : | |
| Plaintiff | : | (Judge Caldwell) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| THOMAS CORBETT, et al., | : | |
| | : | |
| Defendants | : | |

## REPORT AND RECOMMENDATION

## I. Background.

On March 3, 2009, Plaintiff, Thomas D. Kimmett, a former Pennsylvania Senior Attorney

General, filed , through counsel, a 41-page, 156-paragraph Second Amended Complaint ("SAC")[1]

asserting a First Amendment retaliation claim under 42 U.S.C. § 1983, as well as claims of

defamation and state law Whistleblower violations against his former employer, the Pennsylvania

---

1.   On August 11, 2008, Plaintiff filed his original Complaint initiating this action. (Doc. 1).  The
original Complaint named only individual Defendants and asserted a claim of First Amendment
retaliation.  Defendants' Answer to the original Complaint (Doc. 2) was filed on September 5, 2008.
Plaintiff subsequently filed an Amended Complaint on October 2, 2008, adding two (2) new
individual Defendants and an additional Plaintiff, Sherry E. Bellaman, an employee of the OAG.
(Doc. 13).  Defendants' Answer to the Amended Complaint was filed on November 3, 2008.  (Doc.
17).  Plaintiffs changed counsel, and with the consent of the Defendants and permission from the
Court (Doc. 34), Plaintiff Kimmett filed his own SAC.  (Doc. 35).  Plaintiff Kimmett's SAC removed
two (2) previously named Defendants, added as Defendants the Office of the Attorney General and
John Does, and it added state law claims. (*Id*.)  Plaintiff Bellaman filed her own separate Complaint.
(1:09-CV-00470, M.D. Pa.).
    In Plaintiff Bellaman's case, we issued an R&R on March 4, 2011, and recommended that
Defendants' Motion for Summary Judgment  (Doc. 30) be granted with respect to Plaintiff's federal
claims under §1983, and that judgment be entered in favor of Defendants Corbett, Roman,
Sarteschi and Keiser and against Plaintiff Bellaman.  We also recommended that the Court decline
to exercise its pendent jurisdiction over Plaintiff Bellaman's state law claims.

Office of Attorney General ("OAG"), its agents and officials.  (Doc. 35).  Jurisdiction of this Court is pursuant to 28 U.S.C. § 1331, § 1343(a), and § 1367.

Defendants named in Plaintiff's SAC are the OAG, Attorney General Thomas W. Corbett, Jr., First Deputy Attorney General William H. Ryan, Jr., Chief of Staff Brian Nutt, Executive Deputy Attorney General Louis J. Rovelli, Chief Deputy Attorney General Michael A. Roman, former Chief Deputy Attorney General Stephen Brandwene, Administrative Officer Jill Keiser, and John Does ("Does") numbers 1-10, identified only as persons employed by the OAG (Does 1 through 5) and persons employed by other state agencies  (Does 6 through 10). (*Id.*, ¶¶15-19 ).  All of the individual Defendants were sued in both their official and individual capacities. (*Id.*).

Plaintiff asserted a First Amendment retaliation claim against all of the seven named individual Defendants as well as Defendants John Does 1-10 . (*Id.*, ¶¶129-140).  Plaintiff also raised a claim against all Defendants for violation of Pennsylvania's Whistleblower Law, Title 43 P.S. §§ 1421, *et seq*. ("Whistleblower Law").  (Doc. 35, ¶¶141-149).  Plaintiff's third and final claim against all Defendants was for defamation.  (*Id.*, ¶¶150-156).

On March 17, 2009, Defendants (both individuals and OAG) jointly filed a Motion to Dismiss Portions of the Plaintiff's SAC. (Doc. 39).  Defendants filed their Memorandum in support of their Motion on March 30, 2009. (Docs. 41).  Plaintiff filed his Opposition Brief with exhibits on April 17, 2009. (Doc. 42).   Defendants filed a Reply Brief on May 1, 2009.   (Doc. 43).

On September 29, 2009, we issued an R&R regarding Defendants' Partial Motion to Dismiss.[2]  (Doc. 52).  Specifically, we recommended as follows:

---

2.    The undersigned has been assigned his case for pre-trial matters.

that Defendants' Partial Motion to Dismiss (**Doc. 39**) be granted in its entirety.  Specifically, it is recommended that all of the Plaintiff's claims in his SAC (Doc. 35) against Defendant OAG (Counts II and III) be dismissed and that Defendant OAG be dismissed entirely from this action.  It is  recommended that all of the Plaintiff's claims seeking monetary damages (both compensatory and punitive) against the Defendants in their official capacities be dismissed.  Further, it is recommended that all of the Plaintiff's claims seeking equitable relief, as well as any claims for prospective relief in the form of an injunction, based on state law (*i.e.* Counts II and III), against all Defendants in their official capacities be dismissed. It is also recommended that Plaintiff's federal claim (*i.e.* Count I, §1983) in which he seeks prospective relief in the form of an injunction preventing the individual Defendants from violating his constitutional rights, namely his First Amendment right (*See* Doc. 35, p. 40, Wherefore Clause, ¶ 1.), be allowed to proceed since it is not barred by the Eleventh Amendment. Additionally, it is recommended that Plaintiff be allowed to seek injunctive and equitable relief with respect to his state claims against the Defendants in their individual capacities, but as stated, that he not be allowed to seek injunctive and equitable relief with respect to his state law claims against the Defendants in their official capacities.  It is also recommended that Plaintiff's claims for equitable relief for violation of federal law (*i.e.* Count I, § 1983) in the nature of his requests for reinstatement, back pay, seniority rights, sick days, vacation time and other benefits against Defendants in their individual capacities be dismissed.

Moreover, it is recommended that Plaintiff's defamation claims (Count III) against Defendant Corbett be dismissed.  It is also recommended Defendants' Partial Motion to Dismiss be granted in favor of Defendants Ryan, Nutt, Rovelli and Roman with respect to the defamation claims against them in the SAC's Count III.  Further, it is recommended that Defendants' Motion to Dismiss be granted to the extent that it seeks the dismissal of Defendant Brandwene from Plaintiff's Count II, Pennsylvania Whistleblower Law claims, and from Plaintiff's Count III, state law defamation claims.

Finally, it is recommended that the ten (10) Doe Defendants named in Plaintiff's SAC be dismissed without prejudice under Rule 4(m), and that this case be recommitted to the undersigned for further proceedings.

On December 1, 2009, the Court issued an Order and adopted our R&R in part.  (Doc. 61). The Court dismissed Plaintiff's Whistleblower claim against Defendant OAG (Count II) based on Eleventh Amendment sovereign immunity.  Plaintiff's Whistleblower claims against Defendants

3

in their official capacities were dismissed.  Plaintiff's Defamation claim against Defendants Corbett, Ryan, Nutt, Rovelli and Roman (Count III) was dismissed.  Plaintiff's claims against Defendant Brandwene in Counts II and III were dismissed.

The Court rejected our R&R only to the extent we recommended that Plaintiff's state law claims for injunctive relief be allowed to proceed against Defendants in their individual capacities, and the Court dismissed these claims.

The Court also remanded this case to the undersigned for all further pre-trial proceedings.

By Order of April 27, 2010, the case management deadlines were extended . (Doc. 72). The discovery deadline was set at July 1, 2010, and the dispositive motion deadline was extended to July 16, 2010.

After the close of discovery, on July 16, 2010, Defendants jointly filed a Motion for Summary Judgment on Plaintiff's First Amendment and Whistleblower Law claims pursuant to Fed.R.Civ.P. 56(b).  **(Doc. 79).**  Also on July 16, 2010, Plaintiff filed a Rule 56 Motion for Partial Summary Judgment on Liability regarding his First Amendment claim under §1983.  **(Doc. 86).**

The cross Summary Judgment Motions of the parties were briefed, Statements of Material Facts ("SMF") and responses were filed, and voluminous exhibits were submitted.  (Defendants' Motion, Docs. 80-85, 160, 161, 168 and 169; Plaintiff's Motion, Docs. 87, 130, 157, 159 and 170). The exhibits of the parties are found at Docs. 82 - 85, 89 - 129, 131-155, 158, 162-167, 169, and 171.

4

## II. Allegations of Second Amended Complaint.

The parties agree that Plaintiff was hired on or about November 2006, as a Senior Deputy Attorney General in the Financial Enforcement Section ("FES") of the OAG. (Doc. 35, ¶23; Doc. 41, p. 5). Plaintiff alleges that he "accepted that position with the understanding that he would be replacing Defendant Keiser and that he would eventually succeed Defendant Brandwene as Chief of FES." (Doc. 35, ¶23). Plaintiff avers that shortly after his employment with FES, he discovered instances of "waste, wrongdoing, and mismanagement," and that he in turn made "good faith" reports of these issues to Defendants, requesting further investigation and remediation of these issues. (Doc. 35, ¶24 and 29). Plaintiff alleges that his constitutional rights were violated when, in response to his reports of "waste, wrongdoing, and mismanagement," Defendants took retaliatory action against him, culminating with the termination of his employment with the OAG on November 28, 2008. (Doc. 35, ¶'s 30 and 130). Plaintiff also alleges that, following the filing of his original Complaint in this action (Doc. 1), Defendants Corbett, Nutt, Ryan, Rovelli and Roman "orchestrated" a press conference to purposefully defame him in order to persuasively deny his allegations of waste and wrongdoing by the OAG. (Doc. 35, ¶¶ 69-74).

*A. First Amendment Retaliation, Count I*

Pursuant to 42 U.S.C. § 1983, Plaintiff alleges that Defendants Corbett, Ryan, Nutt, Rovelli, Roman, Brandwene, Keiser, and Does 1-10, cooperated in retaliatory actions against him "in violation of his First Amendment rights for speaking out on public matters of public concern and for seeking a redress of grievances." (Doc. 35, ¶¶ 129-140). Plaintiff avers that Defendants knew he discovered wrongdoing, waste and mismanagement  in FES which led to the loss of millions of

dollars in public funds and revenue, as well as violations of procurement and HIPAA laws . Plaintiff alleges that, as matters of public concern, he was speaking out against the wrongdoing and reporting it within and outside of the OAG.  As a result, Plaintiff alleges that Defendants took repeated adverse actions against him, including denying him his promised promotion, embarrassing him and humiliating him, and terminating him from the OAG in November 2008.

### B. Violations of the PA Whistleblower Law, Count II

Plaintiff alleges that in response to his reports of "substantial" waste, wrongdoing, and mismanagement of funds and resources belonging to the Commonwealth of Pennsylvania, all Defendants, *i.e.* Pennsylvania Office of Attorney General, Corbett, Ryan, Nutt, Rovelli, Roman, Brandwene, Keiser, and Does 1-10, retaliated against him by "discriminating against him in his employment and ultimately terminating his employment" in violation of the PA Whistleblower Law, 43 P.S. §1421, *et seq.*  (Doc. 35, ¶¶ 141-149).

### C. Defamation, Count III

In his final Count (III), Plaintiff alleges that all Defendants, *i.e.* OAG, the seven (7) named Defendants, and the Doe 1-10 Defendants, made or otherwise authorized the use of false and defamatory statements about him to co-workers, colleagues, and to the public at large, that injured his personal and professional reputation and negatively affected his ability to find new employment. (Doc. 35, ¶¶ 150-156).

By way of relief with respect to all three Counts, the Plaintiff seeks monetary damages, both compensatory and punitive, from Defendants in their official and individual capacities, as well as equitable and injunctive relief.  (Doc. 35, Wherefore Clause, pp. 40-41, ¶¶ 1-9). Plaintiff also

asks the Court to impose civil penalties against Defendants as authorized under Section 1426 of the PA Whistleblower Law. (*Id.*, ¶7).

Thus, Plaintiff has remaining a constitutional claim (Count I, § 1983) under the First Amendment based on alleged retaliation for protected speech.  Plaintiff also has a remaining state law claim for violation of the Whistleblower Law (Count II).  As stated, remaining Defendants are as follows: Corbett; Ryan; Nutt; Rovelli; Keiser and Roman.

Jurisdiction of this Court over Plaintiff's action is pursuant to 28 U.S.C. § 1331, § 1343(a), and Plaintiff seeks to invoke the Court's supplemental jurisdiction over his state law Whistleblower claim under 28 U.S.C. § 1367.

## III. Motion for Summary Judgment Standard.

In *Allen v. Fletcher*, 2009 WL 1542767, *2 (M.D. Pa.), the Court outlined the applicable standard to apply when considering a summary judgment motion as follows:

> Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
>
> Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Id.* An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.*
>
> Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact;

and (2) the moving party is entitled to judgment as a matter of law. *See* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2D § 2727 (2d ed.1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson,* 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

"Material facts" are those which might affect the outcome of the suit. *Justofin v. Metropolitan Life Ins. Co.,* 372 F.3d 517, 521 (3d Cir. 2004).

## V.  Material Facts.

As stated, the parties filed SMF in support of their respective summary judgment motions and they responded to the SMF of the opposing party as required by Local Rule 56.1, M.D. Pa. They also submitted numerous exhibits both in support of their SMF and in response to the SMF of the opposing party.

1. *Defendants' SMF (Doc. 81)*

With respect to Defendants' Summary Judgment Motion, Defendants filed their SMF with 246 paragraphs (Doc. 81) and they properly cite to the record to support each paragraph. Plaintiff has responded to each of Defendants' paragraphs with citation to the record where required. (Doc. 161).

Since the following paragraphs of Defendants' SMF are not disputed by Plaintiff or are admitted in part with a counter statement by Plaintiff, we quote both Defendants' SMF and Plaintiff's counter statement below, along with their respective cites to the record. For the paragraphs of Defendants' SMF which we find are disputed by the evidence, we so state below after the corresponding SMF number.

1. Plaintiff is Thomas D. Kimmett who was employed as a Senior Deputy Attorney General in the Financial Enforcement Section (FES) of the Office of Attorney General (OAG). Docket, Doc. 35, 2nd Amend. Cmplt. ¶13. (Doc. 81).

2. Defendants named in Plaintiff's SAC were Attorney General Thomas W. Corbett, Jr., First Deputy Attorney General William H. Ryan, Jr., former Chief of Staff Brian Nutt, Executive Deputy Attorney General Louis J. Rovelli, FES Chief Michael Roman, former FES Chief Stephen Brandwene, and FES Administrative Officer Jill Keiser. Docket, Doc. 35, 2nd Amend. Cmplt. ¶15-17; Docket, Doc. 63, Answer to 2nd Amend. Cmplt. ¶16. (Doc. 81).

3.       The Commonwealth Attorneys Act authorizes the Attorney General to collect "all debts, taxes and accounts due the Commonwealth" which are referred to the Attorney General for collection by any Commonwealth agency. 42 Pa.C.S. §732-204(c); Rovelli dep. 14-15. (Doc.  81).

4.       At the time relevant to this case, that authority was exercised through the FES, in the Civil Law Division of the OAG. Doc. 63, 2nd  Amend. Cmplt. ¶20; Rovelli dep. 15-16.  (Doc. 81).

6.       Approximately 200 agencies, boards, commissions and universities refer debt to the FES.  Kimmett dep. 159-160; Keiser dep. 44; Roman dep. 447.  (Doc.  81).

7.        Accounts receivable placed with the FES vary in between $300 million and $500 million at any given time; the Department of Revenue ("Revenue") is the primary source of such accounts, with receivables placed with the FES at times exceeding $300 million. Doc. 35, 2nd Amend. Cmplt. ¶20.  (Doc.  81).

8.       In recent years, the OAG has collected annually on average $69.1 million. Roman Decl. ¶6.  (Doc.  81).

9.       The FES is divided into two parts, informally termed the legal side and the administrative side or administrative collections unit. Rovelli dep. 33-34.  (Doc.  81).

10.       We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶ 10., that there are disputed facts as to this paragraph of Defendants' SMF, Doc. 81.

11.       Revenue is the source of most of the bankruptcy claims. Rovelli dep. 17-18.  (Doc 81).

Plaintiff states that ¶ 11 of Defendants' SMF is  Admitted, with the clarification that the Department of Revenue ("DOR" or "Revenue") has its own section that administers its involvement in bankruptcy matters, and DOR decides how involved its unit will be in a bankruptcy matter vis-à-vis the FES Law unit's involvement. Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 18:10-22.  (Doc.  161).

12.      The administrative side [of FES] is composed of non-attorneys who receive accounts from state agencies ("referring agencies"), run them through an internal dunning process, and refer the accounts that remain uncollected to private collection agencies ("PCAs"). Rovelli dep. 34-37; Kimmett dep. 159-160.  (Doc. 81).

Plaintiff states it is Denied that ¶ 12 of Defendants' SMF fully describes the tasks of the Collections Unit. Plaintiff states that "in addition to the tasks described by Defendants, Administrative Unit employees also handle calls from debtors who wish to make payment arrangements for their debt or who wish to enter into a compromise involving a compromised amount of less than $1000. *See* Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 413:2-420:10 (expressing concerns that, after Kimmett's departure, PCAs were once again receiving "free money" because of Keiser's resumption of the practice of referring cases to PCAs after payment arrangements or compromises had already been reached with debtors).  Employees in the Administrative Unit also handled the flow of funds to and from FES, which amounted to hundreds of millions of dollars. Pl.'s MSJ SOF ¶ 14. Indeed, irregularities in these fund flows in the Collections Unit led to an audit by OAG's Comptrollers section and the eventual removal of Keiser (at least in title) from her position as Collections Unit supervisor when it was determined

11

that supporting  financial documentation was missing. *Id.* ¶¶ 18-19, 23; *see also id.*  ¶¶ 20-21

(Keiser and another employee trashed accounting documentation prior to the audit)."  (Doc.

161).

13.        Historically, the administrative side was managed by an administrative officer, who

was neither an attorney nor an accountant. Rovelli dep. 66, 68-69.  (Doc 81).

14.        The OAG contracts with PCAs to pursue collections on accounts referred to them.

Kimmett dep. 152-153; *see also* Roman dep. 58, 224-225.  (Doc.  81).

15.        By agreement with the OAG, Revenue also refers accounts to the PCAs.  Rovelli dep.

36, 39-41, 50, 55-56.  (Doc.  81).

         Plaintiff states that ¶ 15 of Defendants' SMF is Denied. Plaintiff states that "DOR

currently also refers accounts directly to PCAs, which represents a change in the process that

occurred sometime prior to Kimmett's arrival at FES. Pl.'s Opp'n Ex. 67 (Ottenberg Dep.)

195:12-196:20. The change was made because DOR became increasingly concerned about

mismanagement and possible wrongdoing at FES, and the change was accomplished only after

argument between OAG and DOR on the matter. Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 237:22-

239:13; Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 316:8-317:1 (after DOR investigation revealed that

cases sent by DOR to FES were missing, DOR took their accounts away from FES)."  (Doc.  161).

16.        The administrative side manages the contracts with the PCAs and handles payments

received through the PCAs. Rovelli dep. 35-36; Kimmett dep. 128.  (Doc 81).

         Plaintiff admits that the facts stated in paragraph 16 of Defendants' SMF  are

undisputed, but adds for sake of completeness that the Collections Unit managed the contracts

with PCAs even prior to Kimmett's arrival at FES. *See* Pl.'s Opp'n Ex. 69 (Furlong Dep.) 28:4-31:1.  (Doc.  161).

17.        PCAs receive commissions on the amounts they collect. Gill dep. 16; Roman dep. 224-225; Rovelli dep. 90.  (Doc 81).

          Plaintiff states that ¶ 17 of Defendants' SMF is Denied. Plaintiff states that "there are certain circumstances in which PCAs are not entitled to receive a commission. For example, by contract (as revised by Kimmett), if the PCA receives a payment within the first fourteen days after a case is referred to it, it is not entitled to that commission. Pl.'s Opp'n Ex. 69 (Furlong Dep.) 401:8-403:16; Pl.'s Opp'n Ex. 70 (Gill Dep.) 52:5-53:6. A PCA also is not supposed to receive a commission payment for debts collected prior to the case being referred to it, *id.* 54:16-21, though Kimmett identified multiple cases in which this had previously occurred. Pl.'s MSJ SOF ¶¶ 58-60; Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 416:1-15. In addition, if a PCA receives a case that is being appealed by a taxpayer, it knows it must return the case to FES. Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 393:10-19; 530:8-12. And where a PCA was unsuccessful in obtaining payment during the contractual time period during which it holds the debt for collection, it is not entitled to a commission. Pl.'s Opp'n Ex. 67 (Ottenberg Dep.) 166:23-167:18; Pl.'s Opp'n Ex. 70 (Gill Dep.) 53:7-20." (Doc.  161).

18-19.     Sometimes a debtor submits a payment directly to the creditor state agency instead of to the PCA working on the account. Kimmett dep. 128-129; Rovelli dep. 89-90; Roman dep. 224. (Doc.  81).

Such payments are referred to as "direct pays" or "pay directs." Kimmett dep. 128-129; Rovelli dep. 90.  (Doc.  81).

Plaintiff states that ¶'s 18-19 of Defendants' SMF are  Denied, insofar as "pay directs" "is a term that also includes instances in which a  debtor submits payments directly to FES (and not the referring creditor agency) at a point when the debt had already been referred to a PCA. Pl.'s Opp'n Ex. 67 (Ottenberg Dep.) 14:23-15:6; Pl.'s Opp'n Ex. 71 (Brandwene Dep.) 42:19-43:9. FES would often receive cash, checks, or money orders from debtors who were sending payments directly to OAG in satisfaction of debts or as part of a proposed compromise. *See* Pl.'s Opp'n Ex. 72."  (Doc.  161).

20.     We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶20, that there is support for both parties' statement of facts as to this paragraph.    Defendants state in ¶ 20 that "even when payment is made directly to the referring agency, the PCA working on the account is entitled to a commission.  Kimmett dep. 129; Rovelli dep. 90-92." (Doc. 81, ¶ 20).   Plaintiff responds that ¶ 20 is  Denied.  Plaintiff states that "there are a number of circumstances in which a PCA would not be entitled to a commission on a pay direct, even if the PCA had been referred a case on which a pay direct was received by FES or the creditor agency.  *See* response to paragraph 17, *supra*."  (Doc. 161, ¶ 20).

21.     When a pay direct occurs, the OAG pays the commission to the PCA and bills referring agency for the amount paid. Rovelli dep. 91-92; Gill dep. 16.  (Doc.  81).

Plaintiff admits that the facts stated in paragraph 21 are undisputed insofar as they describe the process that occurs once a determination is made that the PCA is entitled to a

payment on the pay direct. Plaintiff further states that "when a pay direct occurs but falls within one of the various exceptions listed above (*see* response to paragraph 17, *supra*), or if a pay direct is received on a case that never was referred to a PCA, then the PCA is not supposed to receive any commission payment for a pay direct. *See* Pl.'s MSJ Ex. 40 (identifying instances in which PCAs wrongly were paid commissions on pay directs). When commissions are paid to PCAs on pay directs that should not have earned a commission, the referring agency is still billed for the commission even though the commission should not have been paid." (Doc. 161).

22.        Debts referred to the FES are sometimes compromised. Kimmett dep. 150; Furlong dep. 66, 103-104; Keiser dep. 155-160. (Doc. 81).

23.        We find, based on Plaintiff's responses and his citation to the record, Doc. 161, ¶23, that there is support for both parties statement of facts as to this paragraph. Defendants state:

> 23.  Compromises may be proposed by referring agencies, by PCAs or
> by FES employees working on the account. Furlong dep. 66, 103-104;
> Keiser dep. 155-16.

(Doc. 81, ¶ 23).

> Plaintiff responds:

> 23.  Denied. Although PCAs, when attempting to collect a debt,
> may respond to a debtors request for a compromise, a PCA is not
> supposed to be the one to propose a compromise. *See* Pl.'s Opp'n
> Ex. 73 (detailing, at length, the rule that PCAs may not request or
> suggest a compromise with a debtor prior to receiving approval to

15

do so).  The debtor, not the PCA, must propose a compromise.

(Doc. 161, ¶ 23).

24.        FES employees have varying levels of authority to approve compromises, depending

on the amount of the debt compromised. Rovelli dep. 38, 116-120.  (Doc.  81).

25.        In carrying out their responsibilities, FES employees, including members of the

administrative collections unit, and the PCAs have access to confidential taxpayer information.

Kimmett dep. 288; see also Rovelli dep. 142-145; Rovelli dep.  Ex. 2.  (Doc.  81).

26.        In March 2006, the administrative collections unit was managed by defendant Keiser,

an administrative officer who was neither a lawyer nor an accountant. Rovelli dep. 69; Keiser

dep. 20-22.  (Doc.  81).

27.-28.    We find, based on Plaintiff's responses  and his citation to the record, Doc. 161,

¶'s 27.-28., that there are disputed facts as to these paragraphs.

29.        On March 1, 2006, Gill abruptly resigned. Keiser dep. 22; Gill dep. 23, 65-66;

Rovelli dep. 62.  (Doc.  81).

30.        In the aftermath of Gill's departure, defendant Keiser discovered that she was behind

on paying commissions to the PCAs for pay directs and also on billing the referring agencies for

commissions paid. Keiser dep. 26-28.  (Doc.  81).

Plaintiff states that ¶ 30 of Defendants' SMF is Denied and that the Comptroller's

office noticed fund flow irregularities in the Collections Unit, which led to an audit of the

Collections Unit by the Comptroller's office. Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 62:5-65:4.

Plaintiff states that "the Comptroller's office had never previously audited FES. *Id.* 84:15-85:20." (Doc. 161).

31.      We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶31, that there are disputed facts as to this paragraph of Defendants' SMF.

32.      Defendants omitted ¶ 32 from their SMF.  (*See* Doc. 81, p. 5).

33.-37.    We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶'s 33.-37., that there are disputed facts as to these paragraphs of Defendants' SMF.

38.      Continuing to work with the FES on administrative collections, Ottenberg, between April and September of 2006, identified several problems and issues with the administrative collections operation. Ottenberg dep. 24-26.  (Doc.  81).

39.      We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶39, that there are disputed facts as to this paragraph.

40.      Ottenberg concluded that a new collections management software 7 system was needed. Ottenberg dep. 25.  (Doc.  81).

41.      We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶41, that there are disputed facts as to this paragraph.

42.      White agreed that the FES software system needed to be replaced and assigned Janey Gunn of the IT Section to work with Ottenberg to assess the collections operation. Ottenberg dep. 35.  (Doc.  81).

43.      During this period, Ottenberg also reviewed the PCA contracts and raised issues regarding enforcement of contract provisions. Ottenberg dep. 26.  (Doc.  81).

44.     On June 1, 2006, Ottenberg summarized his concerns about the PCA contracts to Sherry Phillips, Director of the OAG Management Services Division, and Edward Banco, the OAG Comptroller. Ottenberg dep. 26-27. (Doc. 81).

45.   We find, based on Plaintiff's responses and his citation to the record, Doc. 161, ¶45, that there is support for both parties statement of facts as to this paragraph.   Defendants state as follows:

> 45.  Ottenberg raised concern about enforcement of the contract provision that required PCAs to pay interest on collections they held for the Commonwealth.  Ottenberg dep. 25.

(Doc. 81, ¶ 45).

> Plaintiff responds as follows:

> 45.  Denied.  Although Ottenberg claims to have raised a concern about the PCA's non-payment of interest, nothing was done to remedy that situation or to enforce that contractual provision until it was addressed by Kimmett.  *See* Pl.'s MSJ SOF ¶ 61.  Even then, Kimmett's superiors refused Kimmett's request to seek years of previously unpaid interest payments from the PCAs.  *Id.*; Pl.'s MSJ Ex. 44.

(Doc. 161, ¶ 45.).

46.     We find, based on Plaintiff's responses and his citation to the record, Doc. 161, ¶46, that there is support for both parties statement of facts as to this paragraph.  Defendants state as follows:

18

46.  Ottenberg raised concern about enforcement of the contract

provision that required audits of PCA financial statements.  Ottenberg

dep. 25.

(Doc. 81, ¶ 46).

Plaintiff responds as follows:


46.  Denied.  Although Ottenberg claims to have raised this concern,

no action was taken until such time as Kimmett took steps to create an

RFI to seek a firm to perform an audit at the PCA's expense, as provided

by their contracts.  Pl.'s Opp'n Ex. 77; Pl.'s Opp'n Ex. 78 (Roma Dep.)

327:16-330:6; Pl.'s Opp'n Ex. 79.

(Doc. 161, ¶ 46).

47.      We find, based on Plaintiff's responses  and his citation to the record, Doc. 161,

¶47, that there are disputed facts as to this paragraph.

48.      The problems brought to light by Gill's departure led defendant Rovelli to conclude

that management of the administrative collections unit needed to be professionalized. Rovelli

dep. 62-64, 68-74; Kimmett dep. 97, 99.  (Doc.  81).

Plaintiff states that ¶48 of Defendants' SMF is Denied, and that in the wake of Gill's

 departure, Rovelli came to the realization that Keiser,  the then-supervisor of Administrative

collections, was "a major issue and a major problem," leading him to replace her. Pl.'s Opp'n

Ex. 65 (Rovelli Dep.) 96:7-98:20; 254:5-8.  (Doc.  161).

49.      We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶49,

that there is support for both parties statement of facts as to this paragraph.  Defendants state as

follows:

> 49.  Defendant Rovelli wanted to hire an attorney with financial
>
> experience to manage the administrative collections unit, attend
>
> to current problems, identify any additional problems, and propose
>
> and implement solutions.  Rovelli dep. 72-74.

(Doc. 81, ¶ 49).

Plaintiff responds as follows:

> 49.  Denied.  Rovelli wanted to hire someone with a financial
>
> background as the next Collections unit supervisor.  Pl.'s MSJ SOF
>
> ¶ 27.

(Doc. 161, ¶ 49).

50.      In the spring of 2006, defendant Nutt told defendant Rovelli that he had a candidate

for employment that he wanted defendant Rovelli to take a look at. Rovelli dep. 69-70.  (Doc.

81).

Plaintiff states that ¶48 of Defendants' SMF is Denied, and that Nutt asked Rovelli to

consider Kimmett for a position in OAG, and Kimmett was initially interviewed for a litigation

position. Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 69:18-71:3. Plaintiff states that "in Rovelli's opinion,

Kimmett did not have sufficient litigation experience. *Id.* 111:22-112:9."   (Doc.  161).

51.      Plaintiff had been recommended to defendant Nutt for OAG employment by Rich Hudic, Executive Director of Team Pennsylvania and a former employee of the Department of Community and Economic Development. Kimmett dep. 89; Nutt dep. 76-78.  (Doc.  81).

52.      The Civil Law Division had a vacancy in the Litigation Section, so defendant Rovelli arranged an employment interview for plaintiff with Greg Neuhauser of the Litigation Section. Rovelli dep. 70.  (Doc.  81).

53.      Observing that plaintiff was an attorney with financial experience who had been working in the Revenue legal office for a number of years, defendant Rovelli joined the interview in progress. Rovelli dep. 70-71, 74-75.  (Doc.  81).

54.      Following the interview, defendant Rovelli sought and received permission from defendant Ryan to interview plaintiff for an attorney position to be created in the FES to manage administrative collections. Rovelli dep. 110-112.  (Doc.  81).

Plaintiff states that ¶54 of Defendants' SMF is Denied, and that "he was an attorney and an accountant, who was hired to become the 'new Jill Keiser,' *i.e.* the new Collections unit supervisor. Pl.'s Opp'n Ex. 71 (Brandwene Dep.) 62:11-63:15; *see* Pl.'s Opp'n Ex. 81 (Ryan Dep.) 109:17-111:9 (Kimmett replaced Keiser)."  Plaintiff states that "although the Collections unit supervisor was not an attorney position, Kimmett, who had been in Revenue for the past 10 years in an attorney position, was to be given the classification 'Deputy Attorney General IV.' *See* response to ¶¶ 58, 59 *infra*."  (Doc.  161).

55.      Defendant Rovelli called plaintiff back to interview with defendants Rovelli and Brandwene for a position in FES. Rovelli dep. 130-131.  (Doc.  81).

56.-57.    Defendant Rovelli explained that the position for which plaintiff was interviewing would present opportunities for advancement. Rovelli dep. 135; Kimmett dep. 100.  (Doc.  81).

Defendant Rovelli did not promise plaintiff a promotion if he accepted the position. Kimmett dep. 148-49.  (Doc. 81).

Plaintiff states that ¶'s 56-57 of Defendants' SMF are Denied, and that "Rovelli made it clear to him, when inducing him to take the position at FES, that the Chief position would be a likely promotion for him. Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 147:10-149:15.  Rovelli informed Kimmett that the Collections unit supervisor position 'brought with it some genuine opportunities' because Brandwene was nearing retirement.  Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 134:15-135:13. Ryan recalled that, when Rovelli hired Kimmett, Kimmett was in line for promotion to the position of Chief of FES. Pl.'s Opp'n Ex. 81 (Ryan Dep.) 166:3-167:4. Once he was hired, Brandwene had conversations with Kimmett about Kimmett needing to get a feel for the 'chief chair.' Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 148:5-11." (Doc.  161).

58.    Plaintiff was hired as a Senior Deputy Attorney General in the FES and placed in charge of the administrative collections unit. 2nd Amend. Cmplt. ¶13; Kimmett dep. 101-102, 134-136. (Doc.  81).

Plaintiff states that ¶58 of Defendants' SMF is Denied, and that "although he was categorized as Deputy Attorney General IV ("DAG IV"), his position as the Collections unit supervisor did not involve legal work (other than to be aware of the laws relevant to the Collections unit, as was required of all Collection unit employees (*see, e.g.*, Pl.'s Opp'n Ex. 82), and did not involve supervision over any of the attorneys in the Law unit of FES. *See* Pl.'s MSJ

SOF ¶ 29. In fact, neither Kimmett's predecessor in that position, Keiser, nor his successor,

Ottenberg, are lawyers. *See* Pl.'s Opp'n Ex. 74 (Keiser Dep.) 6:16-7:3; Pl.'s Opp'n Ex. 67

(Ottenberg Dep.) 13:3-14:4." (Doc.  161).

59.     We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶59,

 that there are disputed facts as to this paragraph.

60.     Defendant Rovelli expected plaintiff initially to devote himself to revamping

administrative unit's systems and procedure. Rovelli dep. 72-74, 114-117.  (Doc. 81).

61.     Defendant Rovelli expected plaintiff eventually to also assume a bankruptcy caseload

and handle select collection matters, the same as do other FES attorneys. Rovelli dep. 72-74,

114-117.  (Doc. 81).

62.     Plaintiff began work at the end of September, 2006. Kimmett dep. 106 5. Plaintiff's

Job. (Doc.  81).

63.     Plaintiff replaced defendant Keiser as manager of the administrative collection unit.

Kimmett dep. 101-102, 134-136.  (Doc.  81).

        Plaintiff states that ¶63 of Defendants' SMF is Admitted that he was supposed to

replace Keiser, but he denies ¶ 63, in part, and states that "although Keiser was supposed to

report to him, she refused to do so, and she refused to relinquish her role as a supervisor to the

staff. *See* Pl's MSJ SOF Ex. 11 (Kimmett Decl.) ¶¶ 12-13; Ottenberg Dep. 328:6-330:9

(Ottenberg testified he did not realize Kimmett was the Collections unit supervisor and that, in

2007, he was advocating for Kimmett to take over Keiser's role as supervisor)." (Doc.  161).

64.      During plaintiff's tenure, the unit's staff varied in size from 8 to 12 members. Kimmett dep. 493-494; Kimmett dep. Ex. 32, p. 2; Roman Decl. ¶9.  (Doc.  81).

65.      For the first several months, defendant Keiser was among the staff that reported to plaintiff. Kimmett dep. 140, 266; Rovelli dep. 384.  (Doc.  81).

Plaintiff states that ¶65 of Defendants' SMF is Denied, and he cites to his response to ¶ 63, *supra*.  (Doc.  161).

66.      Plaintiff reported to defendant Brandwene who reported to defendant Rovelli. Kimmett dep. 102; Rovelli dep. 99-100.  (Doc.  81).

67.      We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶67, that there are disputed facts as to this paragraph.

68.      In performing his duties, plaintiff reviewed the operations of the unit and developed processes and procedures to increase the unit's efficiency. Kimmett dep. 108, 110, 157-158, 250-257, Kimmett dep. Ex. 14; Pl. Resp. Req. for Adm. 1.  (Doc.  81).

Plaintiff states that ¶68 of Defendants' SMF is Admitted, with the clarification that he "met stiff resistance to the various processes and procedures that he was implementing, especially in the area of compromises. Pl's MSJ SOF ¶¶ 47-48; Pl's MSJ Ex. 11 (Kimmett Decl.) ¶¶ 10-21; Pl's MSJ Ex. 56 (Feb. 27, 2008 Memorandum from Kimmett to Roman defending compromise review procedures)."  (Doc.  161).

69.      We find, based on Plaintiff's deposition testimony, that he managed contracts with the  PCAs to ensure they were being complied with.  Kimmett dep., p. 154.

70.       Eventually plaintiff redrafted the PCAs contracts, tightening various provisions. Kimmett  dep. 153; see also Sarteschi decl. ¶8; Sarteschi decl. Ex. 2.  (Doc.  81).

Plaintiff states that ¶70 of Defendants' SMF is Admitted, with the clarification that "in redrafting the contracts, he  experienced resistance from the PCAs, especially regarding the rates. Pl.'s Opp'n Ex. 69 (Furlong Dep.) 399:22-400:22. Although DOR knew as early as April 2007 that the rates would be reduced, DOR's Furlong delayed reducing the commission rates on DOR referrals to PCAs for months after the new PCA contracts with reduced rates had been put into effect. Pl.'s Opp'n Ex. 69  (Furlong Dep.) 250:123-251:15, 393:4-17, 397:9-399:5." (Doc.  161).

71.       Plaintiff also managed the process of entering into the revised contracts with the PCAs, ensuring that the contractual documents were transmitted to and signed by the necessary parties. Kimmett dep. 154; see also Sarteschi decl. ¶8; Sarteschi decl. Ex. 2.  (Doc.  81).

72.       Plaintiff developed procedures for the review and approval of commission payments for pay directs, and signed off on those payments. Kimmett dep. 127-131.  (Doc.  81).

Plaintiff states that ¶72 of Defendants' SMF is Admitted that after he "started at FES, he and Bellaman would review and sign off on the commission payments made for pay-directs. Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 127:11-129:25."  Plaintiff also states that he "instructed Ottenberg to run certain programs to help ensure that commissions were not paid on cases where payments were received outside the PCAs' holding periods. *See* response to ¶ 47, *supra*. Diane Burman, who worked closely with Kimmett, drafted at Kimmett's request a list of recommendations relating to the payment of pay-direct commissions. Pl.'s Opp'n Ex. 76

(Burman Dep.) 153:14-162:16; Pl.'s Opp'n Ex. 84. The PCAs would often question the decision to withhold such unearned commissions from them. Burman Dep. 174:1-14." (Doc. 161).

73.     Plaintiff developed criteria and procedures for the review and approval of compromises. Kimmett dep. 152; see also Sarteschi decl. ¶8; Sarteschi decl. Ex. 2. (Doc. 81).

        Plaintiff states that ¶48 of Defendants' SMF is Denied, in part, and that he "was met with stiff resistance by Roman, Furlong, representatives of the PCAs, and others when he and his team attempted to apply the developed criteria and procedures for review of compromises. *See* Pl's MSJ SOF ¶ 77; Pl's MSJ Ex. 56; response to ¶ 128, *infra*." (Doc. 161).

74.     Plaintiff approved or denied compromises, including compromises proposed by Revenue, within the limits of his monetary authority. Kimmett dep. 150- 151; Furlong dep. 197-198; *see also* Sarteschi decl. ¶8; Sarteschi decl. Ex. 2. (Doc. 81).

75.     In performing his duties, plaintiff interacted with employees of the referring Commonwealth agencies. Kimmett dep. 155-156, 158-160, 167-168; Furlong dep. 193-194, 197-198. (Doc. 81).

76.-77.     We find, based on Plaintiff's deposition testimony, that ¶'s 76-77 of Defendants SMF are supported by their citation to the record.  Defendants state as follows:

        76.  Plaintiff discussed problems with the collections process with employees

        of the referring agencies.  Kimmett dep. 156, 159-160; Furlong dep. 194.

        77.  Plaintiff discussed ways in which the collections process could be improved

        with employees of the referring agencies.  Kimmett dep. 156, 168-160;

        Furlong dep. 194.

78.      In particular, plaintiff worked closely with James Furlong, Revenue liaison to the OAG

for collections. Kimmett dep. 167-168; Furlong dep. 14-16, 194-195, 197-198.  (Doc.  81).

79.      Furlong reported to Robert Coyne, Revenue Deputy Secretary for Compliance and

Collections. Coyne dep. 23, 54.  (Doc.  81).

80.      We find, based on Plaintiff's deposition testimony, that his position with the

Collections Unit required him to perform some legal work, and that he did research issues and

write various memos which sometimes offered opinions of law or advice as to what the law is.

Kimmett dep. 143-144.

81.      Plaintiff identified numerous oral and written communications which he claims gave

rise to retaliation against him. Pl. Ans. 1st Interrog. 3; Pl. 2nd Supp. Ans. Interrog. 3.  (Doc.  81).

82.      Defendants state, "nearly all the communications [Plaintiff]  identified were with his

supervisors and colleagues within the OAG, or with employees of referring agencies, about FES

operations, the collections process and his own performance.  *See e.g.* Kimmett dep. 175-176,

209, 221-229, 250-257, 355-357, 372-373, 466-469, 479; Kimmett dep. Exs. 14, 15, 46;

Roman dep. 356-357; Roman dep. Ex. 2, 7, 15, 16, 23, 24, 30; Pl. Ans. 1st Interrog. 3, pp. 8, 9,

12, 13; Pl. Resp. Req. Adm. 9, 10, Ex. 8."  (Doc. 81).

Plaintiff responds that ¶ 82 is Denied.  Plaintiff states that he "communicated the

waste, wrongdoing, and gross mismanagement he had discovered to persons such as Roman

and Rovelli within his chain of command; to Ryan, who was a few rungs up the chain of

command (leapfrogging Roman and Rovelli); to Nutt, Ottenberg, and Bianco, who were all

completely outside his chain of command in OAG; to Furlong, Curz, and other Revenue

employees; to employees of other Commonwealth agencies; to persons who do not work for the Commonwealth; to federal agents; and to his attorneys, who filed suit on his behalf.  *See* Pl.'s MSJ SOF ¶¶ 64, 79-86; Pl.'s MSJ Ex. 11 (Kimmett Decl.) ¶¶5-9, 27-32.  Kimmett's communications dealt not only with problems within FES, but also problems he had discovered in DOR's operations.  Pl.'s MSJ SOF ¶¶ 58-78."  (Doc. 161).

83.       In November of 2006, plaintiff told his immediate supervisor, defendant Brandwene, that Revenue employees told him that an employee under plaintiff's supervision, defendant Keiser, had been engaged in wrongdoing in carrying out her work responsibilities.  Kimmett dep. 102, 169, 171, 175-176. (Doc. 81).

          Plaintiff states that ¶ 83 is Denied, insofar he "informed not only Brandwene, but also Ottenberg, Rovelli, Ryan, Nutt, Hudic, Kane, Brandler, and the FBI agent with whom he has had several meetings, of the wrongdoing that was alleged by Revenue employees.  *See* response to ¶ 82, *supra*."  (Doc. 161).

84.       Plaintiff was told by the Revenue employees that defendant Keiser moved cases to PCAs immediately before a payment was received from a debtor so that a commission would be paid to the PCA. Kimmett dep. 171, 201.  (Doc. 81).

85.       Plaintiff was told by the Revenue employees that defendant Keiser instructed Revenue personnel to pay commissions for pay directs that were not substantiated. Kimmett dep. 172. (Doc. 81).

86.      Plaintiff was told by the Revenue employees that files were in disarray in FES and that Revenue employees were not sure how many Revenue accounts were being worked by the OAG. Kimmett dep. 172-173.  (Doc.  81).

87.      Plaintiff was told by the Revenue employees that defendants Brandwene and Rovelli were aware of and acquiesced in these practices. Kimmett dep. 174.  (Doc.  81).

88.      Plaintiff informed defendant Brandwene of the allegations made by Revenue employees. Pl. Ans. to 1st Interrogs. No. 3, p. 8; Kimmett dep. 175-176, 209; Kimmett dep. Ex. 15.  (Doc.  81).

89.      Plaintiff expected to receive evidence from the Revenue employees to support the allegations the Revenue employees made, but the evidence was not provided.  Kimmett dep. 122-123, 268. (Doc. 81).

      Plaintiff states that ¶ 89 is Denied, and that "after confirming for Kimmett that the issues reported to him by Revenue involved wrongdoing and malfeasance, Furlong told Kimmett that Kimmett would not be able to find documentary evidence of that wrongdoing in FES's computer system or records.  Pl.'s MSJ SOF ¶ 41.  Furlong said he possessed records of the wrongdoing that the Revenue employees had described, but when Kimmett pressed to get that information, Furlong subsequently informed Kimmett that a deal had been reached between higher-ups at OAG and DOR that DOR would not provide Kimmett with any information damaging to OAG employees.  Pl.'s MSJ SOF ¶45.  Upon learning that Furlong would not provide the documentation, Kimmett informed Ottenberg so that the Comptroller's office

would know that the information was with DOR, but was not going to be forthcoming voluntarily.  Pl.'s MSJ Ex. 31."  (Doc. 161).

90.        At the end of 2006, plaintiff contacted Rich Hudic, the individual who recommended him to the OAG for employment, Mike Kane, a former Revenue Deputy Secretary, and his pastor. Kimmett dep. 177-182, 185.  (Doc.  81).

Plaintiff states that ¶ 90 of Defendants' SMF is Denied insofar as he "also communicated the problems and issues he had discovered with Hudic and Kane (and others) in the late spring of 2008, at which time he had found more instances of waste, gross mismanagement, and wrongdoing in both FES and DOR. *See* Pl.'s MSJ SOF ¶¶ 79-86 (communications); *id.* ¶¶ 29-33 (problems discovered at DOR)."  (Doc.  161).

91.        Plaintiff shared his concerns about the operation of the FES and possible wrongdoing in the FES with Hudic and Kane. Kimmett dep. 177-181, 185.  (Doc.  81).

Plaintiff states that ¶ 91 of Defendants' SMF is Admitted, with the clarification that he also reported wrongdoing in DOR to those individuals.  (Doc.  161).

92.        Plaintiff believes he told his assistant, Dianne Burman, about his contact with Hudic, but he does not know if his contacts with Hudic or Kane were revealed to anyone else in the OAG. Kimmett dep. 182-183, 199-200.  (Doc.  81).

Plaintiff states that ¶ 92 is  Admitted that he "told a number of people, including Diane Burman, various Revenue employees, and Tom Armstrong, a policy director for Governor Ridge who worked out of Revenue who now works for DCED, about his communications with

persons outside of OAG regarding the problems at FES. Pl.'s Opp'n Ex. 68 (Kimmett Dep.)

198:11-200:18."  (Doc.  161).

93.      There is no evidence that the defendants knew of plaintiff's contacts or conversations

with Hudic or Kane.  Kimmett dep. 182-183, 199-200; Ryan dep. 265-266; Rovelli dep. 547;

Corbett dep. 205-207; Nutt dep. 194; Hudic decl. ¶¶ 23, 25.  (Doc. 81).

          Plaintiff states that ¶ 93 is Denied.  Plaintiff states that "there is evidence that

Defendants knew that Kimmett was communicating  with persons outside of OAG, including

but not limited to Hudic and Kane, about his findings of waste, wrongdoing, and gross

mismanagement in OAG and DOR.  *See* response to paragraphs 138-39 and 141-42, *supra*."

(Doc. 161).

94.      Plaintiff worked with Doug Ottenberg to identify issues and problems in

administrative collections. Kimmett dep. 217-220, 225; Ottenberg dep. 42-43. (Doc.  81).

          Plaintiff states that ¶ 94 is Denied to the extent that, by the time he  began working at

FES, Ottenberg was   no longer working out of FES's offices on FES-related matters.  (Doc.  161).

95.      Plaintiff shared with Ottenberg the allegations made by Revenue employees. Pl. Ans.

1st Interrog No. 3, p. 9.  (Doc.  81).

96.      On January 5, 2007, plaintiff and Ottenberg met with their supervisors to report on

the issues they had identified. Kimmett dep. 221, 223-229; Ottenberg dep. 51-52. (Doc.  81).

97.      Attending the meeting were defendants Brandwene and Rovelli, plaintiff's

supervisors, and Sheri Phillips and Edward Bianco, Ottenberg's supervisors; Ottenberg

presented the report.  Kimmett dep. 224-227; Ottenberg dep. 52-53. (Doc. 81).

98.     The issues Ottenberg spoke about at the meeting included discrepancies in account inventories between the referring agencies and the FES and between the FES and the PCAs, contractual provisions that were not being enforced, inactive and unassigned accounts, control of referrals to PCAs, and missing documentation for past commission billings and receipts. Kimmett dep. 221, 226-227, Kimmett dep. Ex. 10; Ottenberg dep. 54-55; Ottenberg dep. Ex. 9. (Doc. 81).

        Plaintiff states that ¶'s 97-98 are Denied.  Plaintiff states that "because of email traffic between Ottenberg and Phillips discussing the issues Kimmett was discovering in FES, *see* Pl.'s MSJ Ex. 37, Phillips requested a meeting in early January 2007.  Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 225:21-226:6.  Kimmett and Ottenberg put together the report to be presented at the meeting.  *Id.* 226:22-227:6.  At the meeting, Rovelli, Brandwene, Phillips, and Bianco, were told of the 'issues that were starting to arise in the review of FES.' *Id.* 224:4-12.  Kimmett and Ottenberg decided that Ottenberg should take the lead in presenting at the meeting because the presentation wold 'put [Kimmett] in an uncomfortable position with Steve [Brandwene] and Lou [Rovelli].' *Id.* 227:18-228:4.  In fact, both Ottenberg and Bianco had warned Kimmett that 'there's a good possibility if [he] start[ed] to pursue these issues [he was] going to get fired.' *Id.* 226:22-227:12; *see also id.* 227:24-228:17."  (Doc. 161).

99.     The meeting resulted in Kimmett preparing a plan of action to address the issues. Kimmett dep. 228-229, 242-243; Kimmett dep. Ex. 12.  (Doc.  81).

100.      At the request of defendant Rovelli, plaintiff made some revisions to the plan, after which he proceeded to implement all but one of the solutions he proposed to the short-term issues he identified in the plan.  Kimmett dep. 250-258; Kimmett dep. Ex. 14; Pl. Resp. Req. for Adm. No. 1. (Doc. 81).

       Plaintiff states that ¶ 100 is Denied.  Plaintiff states that "Rovelli was upset with Kimmett when he saw that the initial draft of the Plan of Action indicated wrongdoing had occurred in FES.  *See* Pl.'s MSJ SOF ¶ 57; Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 258:10-22 ("Lou started off the meeting by saying, 'I read this draft and you're telling me that somebody here is a crook.'").   Rovelli ordered Kimmett to revise the Plan of Action to eliminate those statements.  Pl.'s MSJ SOF ¶ 57; Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 259:14-260:10.  At that meeting, Rovelli talked for 35 minutes straight, while Kimmett just listened because he was afraid he was going to be fired.  Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 258:23-259:2; 260:14-18."  (Doc. 161).

101.      Plaintiff took steps to reconcile discrepancies in the inventory of accounts held by the FES, the PCAs, Revenue and other Commonwealth agencies.  Kimmett, 251-253; Kimmett dep. Ex. 14, TDK 001526-TDK 001527; Pl. Resp. Req.  for Adm. No. 1.  (Doc.  81).

       Plaintiff states that ¶ 101 is Admitted, with the clarification that, insofar as he would discover that the issue regarding the inventory discrepancies was "much worse than it appears here [in the Plan of Action]."  (Doc.  161).

102.      With respect to accounts that had not been assigned to a collector, plaintiff assigned the accounts deemed collectible and closed the rest.  Kimmett dep. 252; Kimmett dep. Ex. 14, TDK 001527; Pl. Resp. Req. for Adm. No. 1.  (Doc. 81).

Plaintiff states that ¶ 102 is Denied.  Plaintiff states that "throughout his tenure at FES and on multiple subsequent occasions after he had drafted his Plan of Action, Kimmett or members of his team discovered thousands of cases that had never been assigned or that had been abandoned in an incomplete state.  *See* Pl.'s Opp'n Ex. 92; *See* Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 392:20-23 (240 cases found in Keiser's office).  Kimmett even discovered cases in which payments had been received, but where there was no record of what happened to those payments.  *See* Pl's MSJ SOF ¶ 66; Pl.'s Opp'n Ex. 90 (Furlong Dep. Ex. 39) at 000036; Pl.'s Opp'n Ex. 69 (Furlong Dep.) 470:17-473:12.  Kimmett met resistence, Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 375:3-13, and he was criticized by Roman for his focus on resolving such issues. Pl.'s Opp'n Ex. 78 (Roman Dep.) 537:8-539:4."  (Doc. 161).

103.      Plaintiff reviewed an audit of the FES that had been conducted by PennDOT to determine if there were systemic problems with case assignments and tracking.  Kimmett dep. 252; Kimmett Ex. 14, TDK 001527; Pl. Resp. Req. for Adm. No. 1. (Doc. 81).

Plaintiff states that ¶ 103 is Denied.  Plaintiff states that he "had serious concerns relating to his review of the PennDOT audit and the request that he 'sign off' on the audit response.  *See* Pl.'s MSJ SOF ¶¶ 64-65.  After reporting his concerns, which included concerns of potential wrongdoing, Roman told Kimmett to 'get past' the fraud issue.  Pl.'s MSJ Ex. 45; Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 115:2-13 (Roman told Kimmett to "get over" the fraud issue and to stop identifying problems and issues); Pl.'s Opp'n Ex. 78 (Roman Dep.) 274:9-15."  (Doc. 161).

104.    Plaintiff put procedural safeguards in place to ensure accountability any time the automatic referral of accounts to PCAs was overridden by FES staff.  Kimmett dep. 353; Kimmett dep. Ex. 14, TDK 001528; Pl. Resp. Req. for Adm. No. 1. (Doc. 81).

Plaintiff states ¶ 104 is Admitted that he put in safeguards to stop subsequent misconduct, but denied insofar as he "was never able to determine why a massive amount of cases had been referred manually by Keiser to Linebarger.  Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 296:6-299:18; Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 417:23-418:23.  Although this may have been fraud, Kimmett was told by Roman to 'get past' the fraud and was told to stop identifying problems and issues.  Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 115:2-13; Pl.'s Opp'n Ex. 78 (Roman Dep.) 274:9-15."  (Doc. 161).

105.    PCAs could request extensions of the contractual periods they were allowed to work on accounts.  Kimmett dep. 253-254.  (Doc. 81).

Plaintiff states that ¶ 105 is Denied.  Plaintiff states that he "determined that PCA employees working on-site at OAG were routinely and automatically granting their employer PCAs extensions on cases beyond the period provided in the contract.  Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 416:3-25.  Kimmett discovered that the PCA employees were granting extensions even if there had been no activity on the case.  *Id.* 417:1-5.  In essence, the PCAs were granting themselves thousands of unilateral extensions.  *Id.* 417:6-418:8."  (Doc. 161).

106.    Plaintiff instituted procedural safeguards to ensure that extensions were granted for cause and that proper approvals for the extensions were given. Kimmett dep. 254; Kimmett dep. Ex. 14, TDK 001529; Pl. Resp. Req. for Adm. No. 1.  (Doc.  81).

107.      Plaintiff identified provisions in the contracts with the PCAs that had not been

enforced, such as the requirement that the PCAs pay interest on collections held for the

Commonwealth, and took steps to enforce those contract provisions.  Kimmett dep. 254-256;

Kimmett dep. Ex. 14, TDK 001529-TDK 001530; Pl. Resp. Req. for Adm. No. 1. (Doc. 81).

        Plaintiff states that ¶ 107 is Denied, and that "although [he] identified that the PCAs

had not been making interest payments for years, Rovelli (with Roman's assent) told Kimmett

that he should not attempt to recover any of the unpaid interest, but seek interest only on a

going forward basis.  Pl.'s MSJ Ex. 44; *See* Pl.'s MSJ SOF ¶ 62-63.  Similarly, although Kimmett

sought to recoup the hundreds of thousands of dollars in commissions that had been paid to

PCAs for payments received outside the PCAs' contractual holding periods (both before such

periods began and after they had expired), Rovelli and Phillips told Kimmett not to seek to

recoup those commissions that had been improperly paid.  Pl.'s Opp'n Ex. 68 (Kimmett Dep.)

457:5-458:22, 459:15-18."   (Doc. 161).

108.      Plaintiff was concerned about the accountability of PCA employees who worked

on-site in the FES and had access to FES and Revenue databases and systems.  Kimmett dep.

250, 257; Kimmett dep. Ex. 14, TDK 001530; Pl. Resp. Req. for Adm. No. 1. (Doc. 81).

        Plaintiff states that ¶ 108 is Denied because "the issues relating to the PCA employees

working on-site at FES were greater than simply 'accountability.'  Kimmett had determined that

PCA employees were routinely granting extensions to the PCAs for whom they worked without

justification.  *See* response to paragraph 105, *supra*.  In addition, Kimmett learned that the on-

site PCA employees would keep tabs on activity occurring in specific debtors' cases that had

previously been assigned to their PCA, which violated their confidentiality agreements.  Pl.'s

Opp'n Ex. 93."  (Doc. 161).

109.        The practice of PCA personnel working on-site in the FES was discontinued. Kimmett

dep. 257.  (Doc.  81).

110.        Plaintiff was concerned about a lack of oversight in the system for paying

commissions for pay directs. Kimmett dep. 257; Kimmett Ex. 14, TDK 001530-TDK 001531; Pl.

Resp. Req. for Adm. No. 1.  (Doc.  81).

111.        Plaintiff implemented safeguards to ensure proper review and oversight of the pay

direct process. Kimmett dep. 257; Kimmett Ex. 14, TDK 001530-TDK 001531; Pl. Resp. Req.

for Adm. No. 1.  (Doc.  81).

        Plaintiff denies ¶ 111 insofar as he states that his efforts were met with resistance by

PCAs, Roman, and Furlong.

112.        Plaintiff took steps to recoup commissions that were paid that should not have been

paid. Kimmett dep. 270-271.  (Doc.  81).

113.        While implementing the plan, plaintiff met with employees of the referring agencies

and discussed with them the issues he had identified and the steps he was taking to address

them.  Kimmett dep. 158-160; Pl. Ans. 1st Interrogs. No. 3, p. 9; Pl. Resp. Req. for Adm. 9, Ex.

8. (Doc. 81).

        Plaintiff states that ¶ 113 is Denied.  Plaintiff states that he "met with the referring

agencies to get their input regarding any issues or problems they had with FES and to ask them

how FES could do a better job for them.  Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 158:15-159:4."

(Doc. 161).

114.      Plaintiff did not implement the solution he proposed relating to cases being handled

by FES attorneys, whom he did not supervise. Kimmett dep. 252; Kimmett dep. Ex. 14; Rovelli

dep. 45.  (Doc.  81).

        Plaintiff states that ¶ 114 is denied insofar as Defendants fault Kimmett for the failure

to implement this solution. No one implemented Kimmett's proposed solution relating the FES

attorneys' caseload, despite its serious nature.  (Doc.  161).

115.      In early January 2007, [former] defendant Brandwene informed defendant Rovelli

that he  intended to retire at the end of March. Rovelli dep. 264; Brandwene dep. 127.  (Doc.

81).

116.      Defendant Rovelli recommended to defendants Ryan and Corbett the promotion of

defendant Roman to Chief of the FES. Rovelli Resp. 1st Interrog. No. 9, p. 14.  (Doc.  81).

        Plaintiff states that ¶ 116 is Admitted that Defendant "Rovelli passed over Kimmett to

appoint Roman, who had no prior role in FES and who Rovelli had re-hired into OAG's Tax

Litigation Section as a staff attorney after Roman had been terminated from a private practice

position. *See* Pl.'s Opp'n Ex. 78 (Roman Dep.) 14:17-18:20; Pl.'s Opp'n Ex. 65 (Rovelli Dep.)

431:7-433:20."  Plaintiff states that when informing him of this decision, "Rovelli explained to

him that his reports about prior wrongdoing in FES were inconsistent with OAG's 'culture.' Pl.'s

MSJ SOF ¶ 47; Pl.'s MSJ Ex. 11 (Kimmett Decl.) ¶¶ 14-15."  (Doc.  161)

117.     At the time, defendant Roman was a Senior Deputy Attorney General in the Tax Litigation Section of the OAG; he had served previously, before a period of private employment, as Chief of that Section. Rovelli Resp. 1st Interrog. No. 9, p. 15; Roman dep. 8-9, 21.  (Doc.  81).

118.     Defendant Corbett approved Defendant Roman's promotion to Chief of the FES, which was effective immediately upon defendant Brandwene's retirement in March 2007. Corbett dep. 195; Roman dep. 21; Brandwene dep. 127.  (Doc.  81).

119.     Soon after defendant Roman became Chief of the FES, plaintiff provided him with the plan of action he had prepared to address deficiencies in the operation of the administrative collections unit. Pl. Ans. 1st Interrog. 7, p. 11; Roman dep. 147-148; Roman dep. Ex. 2.  (Doc. 81).

          Plaintiff states that ¶ 119 is admitted that he provided the Plan of Action to Roman very early in Roman's tenure as Chief, but "Roman indicated no interest in the document to him, did not inquire of him about any specifics detailed in the document, and requested a status update about the Plan of Action only after he filed suit. *See* Pl.'s MSJ Ex. 11 ¶ 16; Pl.'s Opp'n Ex. 95."  (Doc.  161).

120.     Plaintiff also shared his concerns about the administrative collections operation with defendant Roman in connection with an audit of the FES that the Pennsylvania Department of Transportation was conducting. Roman dep. 216-217, 266-268, 271-272.  (Doc.  81).

          Plaintiff states that ¶ 120 is Denied. Plaintiff states that he "provided two memoranda to Roman (and he sent the more detailed one to Bianco also) describing his opposition to

signing off on the response to PennDOT's audit of FES without qualification and pointing out specific instances of serious problems he had discovered in FES. Pl.'s MSJ SOF ¶ 64; Pl.'s Opp'n Ex. 96 at TDK 002464; *id.* at TDK 002465-67. Plaintiff expressed his opinion to Roman, Ottenberg, and Bianco that it would be inappropriate to provide an unqualified signature to the PennDOT audit because of the 'significant deficiencies in the operation' that he had discovered. *See* Pl.'s MSJ Ex. 45 at 2. In response, Roman became annoyed with Plaintiff and told Plaintiff that he 'needed to get past the wrongdoing that has occurred.' *Id.* at 1; *see also* Pl.'s Opp'n Ex. 78 (Roman Dep.) 274:9-15 (Roman acknowledges that, at some point, he told Kimmett to "get past this fraud issue"); Pl.'s MSJ Ex. 11 (Kimmett Decl.) ¶ 17. Ottenberg acknowledged to Bianco that he and Kimmett had discovered 'gross mismanagement' at FES, though Ottenberg did not believe that it reached the level of fraud. Pl.'s MSJ Ex. 27 at 1."

Plaintiff also states that "in reference to Kimmett's concerns about providing an unqualified signature on the PennDOT audit, Ottenberg informed Bianco that Kimmett and he had discovered 'gross mismanagement' at FES. Pl.'s MSJ SOF ¶ 65; Pl.'s MSJ Ex. 27 at 1. With regard to fraud, Ottenberg informed Bianco that fraud 'absolutely' could exist, but that he (Ottenberg) was not aware of any. Pl.'s MSJ Ex. 27 at 1. Ottenberg and Bianco informed Kimmett he should sign the representation relating to the PennDOT audit because 'at this point we probably do not have clear evidence of fraud.' Pl.'s MSJ Ex. 45 at 1. Roman believed that it was appropriate to sign the PennDOT audit representation letter so long as he did not have 'personal knowledge' of any wrongdoing. Pl.'s Opp'n Ex. 78 (Roman Dep.) 213:11-214:22, 262:5-265:13. Roman directed Kimmett to sign the PennDOT audit representation, and

Kimmett understood that he would lose his job if he failed to do so. Pl.'s MSJ Ex. 11 (Kimmett

Decl.) ¶ 17. Kimmett was 'very concerned that [he] may lose [his] job because of the gross

mismanagement or possible wrongdoing that has occurred in the past and [his] efforts to rectify.'

Pl.'s MSJ Ex. 45 at 1." (Doc. 161).

121.      Plaintiff's concerns included past overpayments of commissions to PCAs,

discrepancies in inventories among the FES, the PCAs and the referring agencies, failure to

enforce contractual provisions, deficiencies in reporting, missing records and the failure to

process compromises and referrals. Pl. Resp. Req. for Adm. 17, Ex. 14; Roman dep. 216-217;

Roman dep. Ex. 7, TDK 002465-TDK 002466. (Doc. 81).

        Plaintiff states that ¶ 121 is Denied because "the specific concerns Kimmett detailed

for Roman and Ottenberg are included in his June 15, 2007 Memorandum. Pl.'s Opp'n Ex. 96

at TDK 002465-67. Kimmett also was concerned that wrongdoing and fraud had occurred

previously in FES and explained this to Roman and then, in a separate conversation, to Bianco

and Ottenberg. Pl.'s MSJ Ex. 11 (Kimmett Decl.) ¶ 17; *see also supra* response to ¶ 120.

Kimmett informed Roman of the 'statements made by representatives in the Department of

Revenue regarding possible wrongdoing.' Pl.'s MSJ Ex. 45 at 1. In response to this, Roman

claimed to have 'personally sat down with Robert Coyne, Deputy Secretary – Department of

Revenue' to discuss this. *Id*. Mr. Coyne, however, has testified that he has no recollection of

any such conversation with Mr. Roman. Pl.'s Opp'n Ex. 97 (Coyne Dep.) 213:10-214:13. Mr.

Rovelli testified that he did not discuss Revenue's allegations with Mr. Coyne. Pl.'s Opp'n Ex.

65 (Rovelli Dep.) 426:1-21. Notwithstanding that Kimmett informed Roman that Revenue

personnel had leveled accusations of wrongdoing in FES, neither Roman nor Rovelli raised that

issue with Deputy Secretary Coyne.  Both Roman and Rovelli, however, signed the PennDOT

representation letter despite Mr. Kimmett communicating his specific concerns and the

allegations by Revenue personnel to them.  *See* Pl.'s Opp'n Ex. 96 at TDK 002469."  (Doc. 161).

122.      For the period from plaintiff's employment until June 30, 2007, plaintiff received a

positive performance evaluation. Pl. Resp. to Req. for Admissions, No. 14, Ex. 11; Rovelli dep.

386.  (Doc.  81).

       Plaintiff states that ¶ 122 is Denied because Roman, who prepared that review,

described his review of Plaintiff as "[f]avorable and neutral. It was based on, you know, what

little exposure I had to Tom at that point, only a few months." Pl.'s Opp'n Ex. 78 (Roman Dep.)

307:14-308:1. Plaintiff states that "Roman's evaluation of [him]  was made prior to many of [his]

reports of waste, gross mismanagement, and wrongdoing that he later would send to Roman.

*See, e.g.*, Pl.'s Opp'n Ex. 98; Pl.'s Opp'n Ex. 89; Pl.'s MSJ Exs. 36, 45, 46, 53. It was also made

prior to Plaintiff  reporting on malfeasance that he learned was occurring in DOR. *See, e.g.*, Pl.'s

MSJ Exs. 26,48."  (Doc.  161).

123.      The evaluation commented that: "Mr. Kimmett's duties in the past year have been

primarily administrative. He has made a great deal of improvement in the daily operations of

the administrative side of FES and has worked diligently to address and resolve a wide variety of

issues." Pl. Resp. to Req. for Admissions, No. 14, Ex. 11; Rovelli dep. 390.  (Doc.  81).

124.     In connection with the positive performance evaluation, plaintiff received a pay raise above the average raise received by OAG attorneys and managers for the time period. Rovelli dep. 393, 602-603.  (Doc.  81).

Plaintiff states that ¶ 124 is Admitted with the explanation that "Roman, who was responsible for reviewing him, did not know why he received a pay raise above the average, and Roman was not the one who decided the amount of raise he  would receive. Pl.'s Opp'n Ex. 78 (Roman Dep.) 310:11-312:5. Rovelli believed that the pay increase was pro-rated to reflect the fact that Kimmett's employment did not start right at the beginning of the fiscal year. Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 413:13-414:20."  (Doc.  161).

125.     Plaintiff continued to report problems to his supervisors, particularly defendant Roman. Pl. Ans. 1st Interrog. No. 3, p. 11-13.  (Doc.  81).

Plaintiff states that ¶ 125 is Admitted that he reported problems to superiors, but denied insofar as Defendants' statement is meant by way of limitation. Plaintiff states that his "reports of problems within FES's and DOR's operations were made to numerous persons, including but not limited to Roman."  (Doc.  161).

126.     Plaintiff advised defendant Roman that there were numerous problems and deficiencies with the compromise process, that files on compromises were in disarray, and that many had not been processed. Roman dep. 400-401, 496-497, 595-596; Roman dep. Exs. 16, 23, 30.  (Doc.  61).

Plaintiff states that ¶ 126 is Denied insofar as Defendants' statement limits the extent of the problem discovered and raised by him. Plaintiff states that he "described multiple issues

relating to compromises with Mr. Roman, including (in addition to those listed by Defendants) the failure of PCAs to obtain and submit required documentation to support proposed compromises and otherwise meet the policies and procedures necessary to obtain a compromise, *see, e.g.*, Pl.'s Opp'n Ex. 97 (Coyne Dep.) 32:6-13, 96:18-97:11 (explaining documentation required for compromise to be processed); pressure by Revenue and PCAs to approve compromises that had been rejected because the taxpayer could not show valid cause (financial hardship, failure to receive timely notice, etc.) to justify a compromise, *see, e.g.*, Pl.'s Opp'n Ex. 69 (Furlong Dep.) at 408:1-9 (explaining that debtors need to show cause in order to obtain a compromise), and Furlong requesting compromises inconsistent with Revenue policy, *see* Pl.'s Opp'n Ex. 104." (Doc.  161).

127.     In a memorandum to defendant Roman, plaintiff questioned Revenue's policies with regard to certain compromises and recommended that the OAG refuse to approve those compromises. Roman dep. 356-357; Roman dep. Ex. 15. (Doc.  81).

Plaintiff states that ¶ 127 is Denied insofar as he "not only reported the 'What-If' compromise issue to Mr. Roman, but also had multiple communications with Revenue personnel, including but not limited to Furlong regarding that issue.  Kimmett identified the 'What-If' issue as creating a dangerous precedent, confirmed in part by the fact that Revenue does not publicize that it is willing to compromise jeopardy assessments with debtors who have failed to appeal and who can show no hardship. Pl.'s MSJ Ex. 48; Pl.'s Opp'n Ex. 69 (Furlong Dep.) 415:14-19, 418:6-14." (Doc.  161).

128.        Plaintiff also questioned Revenue practices regarding reports on commission

payments and fees, which he threatened to disapprove.  Pl. Ans. 1st Interrog. 3, p. 13.  (Doc.

81).

Plaintiff states that ¶ 128 is Denied.  Plaintiff states that "contrary to Defendants'

statement, Kimmett did not 'threaten to disapprove' commission payments and fees.  Instead,

'Mr. Kimmett questioned actions by Revenue, including pay-direct reports, no fee reports,

improper commissions being authorized, the 'what-if' settlements, the failure to document

compromises, innumerous verbal reports to Roman, Furlong, and others.'  Pl.'s Opp'n Ex. 105

at 13."  (Doc. 161).

129.        Plaintiff notified defendant Roman of a possible violation of the Fair Debt Collections

Practices Act, 15, U.S.C.A. §1601, et seq., by one of the PCAs. Roman dep. 500-501; Roman

dep. Ex. 24.  (Doc.  81).

Plaintiff states that ¶ 129 is Admitted that he notified Roman, but denied insofar as

"Defendants ignore that he also notified others, including DOR's Furlong, *see* Pl.'s Opp'n Ex. 88

(forwarding report to Furlong), about this and other examples of PCAs taking actions that

violated the law and were contrary to the terms of their contracts with OAG. *See also* Pl.'s

Opp'n Ex. 73. Indeed, Kimmett  communicated with Furlong and Susan Cruz – both Revenue

employees –regarding acts by PCA employees that violated confidentiality restrictions and were

likely illegal, and that had been routinely tolerated by FES prior to Kimmett's arrival. *See* Pl.'s

Opp'n Ex. 107."  (Doc.  161).

130-131.  Plaintiff met with defendant Nutt in July 2007 to request reassignment to another position. Kimmett, dep. 466-469; Nutt dep. 127.  (Doc.  81).

In the course of asking to be reassigned, and in response to defendant Nutt's questions, plaintiff told defendant Nutt some of the things he had found in the FES that he considered mismanagement, improprieties and wrongdoing. Kimmett dep. 468-469, 475-476. (Doc.  81).

Plaintiff states that ¶'s 130-131 are Denied. Plaintiff states that he "met with Nutt to detail the waste, wrongdoing, and gross mismanagement that [he] had discovered at FES. Kimmett explained to Nutt that he was not receiving support for his actions to remedy the myriad problems he had discovered and his fear that he would be fired because of his persistent attempts to take steps to rectify those problems. Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 466:4-471:3, 474:6-476:3; *see also* Pl.'s Opp'n Ex. 76 (Burman Dep.) 235:14-237:4 (Burman also spoke to Nutt of Kimmett's concerns at Kimmett's request). Because of this lack of support and fear for his job security, Kimmett requested reassignment."  (Doc.  161).

132.     At defendant Nutt's suggestion, plaintiff met with defendants Ryan and Nutt in August 2007. Kimmett dep. 478-479; Ryan dep. 160-161.  (Doc.  81).

Plaintiff states that ¶ 132 is Admitted that the meeting with Ryan was arranged at Nutt's suggestion, with the explanation that "Ryan believed it was inappropriate for Kimmett to discuss his concerns with Ryan and Nutt rather than with Roman and Rovelli. Pl.'s Opp'n Ex. 81 (Ryan Dep.) 162:8-164:3. Before that meeting, Ryan had 'no idea' that Kimmett had previously and repeatedly reported the problems he had identified to Roman and Rovelli. *Id.* 164:19-

165:5. Contrary to Ryan's opinion, Corbett testified that insofar as Kimmett believed that wrongdoing had occurred in FES, it would be proper for Kimmett to meet with Ryan to discuss it. Pl.'s Opp'n Ex. 108 (Corbett Dep.) 261:20-263:6. (Corbett, however, claimed to have no knowledge that Kimmett had in fact met with Ryan. *See id*. 262:9-15.) Ryan, however, testified that it was '[n]ot a great career move' for Kimmett to request a meeting with him because it would likely lead to recriminations from Rovelli. Pl.'s Opp'n Ex. 81 (Ryan Dep.) 174:17-175:8. As Ryan explained, to 'go over your supervisor's head and to complain could cause your supervisor to have, let's say, a certain ill-will toward you. Now, I'd like to think Lou [Rovelli] wouldn't, but we're all human.' *Id.* 175:9-15." (Doc. 161).

133.        Plaintiff outlined for defendant Ryan the improprieties in the FES that he had previously outlined to defendant Nutt, including overpayments to PCAs and cases unaccounted-for. Kimmett dep. 478-479. (Doc. 81).

        Plaintiff states that ¶ 133 is Denied. Plaintiff states that "at that meeting, [he] advised Nutt and Ryan about *all* of the problems he had found in FES up to that point and about his conversations with Furlong regarding wrongdoing at FES, including the fact that Furlong had implicated Keiser, Brandwene, and Rovelli in wrongdoing and a cover up. Pl.'s MSJ Ex. 64 at 1253; Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 478:18-480:21. Ryan promised to follow up with Corbett and get back to Kimmett in two to three weeks, and told Kimmett not to worry because they would not let his 'legs get chopped out from under [him].' Pl.'s MSJ Ex. 64 at 1254; Pl.'s Opp'n Ex. 68 (Kimmett Dep.) at 480:13-17. Ryan never got back to Kimmett as promised. Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 480:25-481:13. Nutt recalled that, at the meeting with Ryan and

Kimmett, Kimmett expressed his concern that 'things were not running appropriately in FES.' Pl.'s Opp'n Ex. 112 (Nutt Dep.) 253:22-255:2."

Plaintiff also states that "in a September 26, 2008 email to Kimmett, Nutt stated that he and Ryan 'will be sitting down with Tom Corbett to discuss.' Pl.'s Opp'n Ex. 109.  Nutt testified that this was a lie  – he did not sit down with Corbett to discuss the issues and he never intended to do so, despite telling Kimmett otherwise.  Pl.'s Opp'n Ex. 112 (Nutt Dep.) 155:3-165:2."  (Doc. 161).

134.     In the spring of 2008, plaintiff again discussed his concerns with Mike Kane. Kimmett dep. 185-187.  (Doc, 81).

135.     Kane suggested that plaintiff speak with an Assistant United States Attorney and gave him the name of a person to contact. Kimmett dep. 186.  (Doc.  81).

136.     Plaintiff contacted the Assistant U.S. Attorney who expressed an interest in sending an FBI agent to speak with plaintiff. Kimmett dep. 186-187.  (Doc.  81).

137.     Plaintiff did not meet with an FBI agent until 2009, after his dismissal from OAG employment in November 2008. Kimmett dep. 194-197; 2nd Amend.  Cmplt. ¶2.  (Doc.  81).

Plaintiff states that ¶ 137 is Denied insofar as "Kimmett's attorney had conversations with the FBI prior to filing suit. Subsequent to his communications with the Assistant United States Attorney Bruce Brandler, Kimmett reached out to an attorney for personal representation. Pl.'s MSJ SOF ¶ 84. Kimmett's original attorney communicated with the FBI agent in the summer of 2008, and the FBI has met with Kimmett himself and Kimmett's current counsel on subsequent occasions, including most recently in May and July 2010. *Id.* ¶ 85."  (Doc.  161).

138.-139.  Plaintiff does not know whether his contacts with Kane or the Assistant U.S. Attorney were revealed to defendants.  Kimmett dep. 199-200.  (Doc. 81).

We agree with Plaintiff and his citation to the record, Doc. 161, ¶'s 138.-139., that there are disputed facts as to whether Defendants were aware of Plaintiff's communications about problems with FES with persons outside of the OAG, including Kane and AUSA Brandler.

140.      During the same period, plaintiff asked Rich Hudic to speak to defendant Nutt on his behalf.  Hudic decl. ¶¶18-23.  (Doc.  81).

141.      Although Hudic attempted to contact defendant Nutt with regard to plaintiff, he was not successful in contacting him.  Hudic decl. ¶¶ 18-23; Nutt dep. 191-194.  (Doc. 81).

142.      There is no evidence that Hudic spoke with any of the defendants regarding plaintiff. Hudic decl. ¶ 18-23; Nutt dep. 191-194; Ryan dep. 266; Rovelli dep. 547; Corbett dep. 205-207. (Doc. 81).

Plaintiff states that ¶'s 141-142 are Denied.  Plaintiff states that "Hudic told Kimmett he was 'reaching out' to Nutt and Corbett.  Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 200:4-201:4. Indeed, Hudic e-mailed Nutt on April 29, 2008, writing, 'When you have a minute, can you call me about Tom Kimmett?'  Pl.'s MSJ Ex. 62.  Nutt testified that he could not recall whether he had any communications with Hudic about Kimmett.  Pl.'s Opp'n Ex. 112 (Nutt Dep.) 193:15-194:7."

Plaintiff also states that "Nutt received the April 2008 email from Hudic asking Nutt to contact Hudic about Kimmett.  While Hudic now claims Nutt never made the requested contact, Nutt knew precisely what Kimmett had communicated to Hudic  – specifically the

49

problems Kimmett had identified at FES  – and Nutt decided to avoid the conversation (just as he allegedly avoided a similar conversation with Corbett, *see* Counter-SOF ¶ 133, *supra*)." (Doc. 161).

143.      In the spring of 2006, the OAG began the process of replacing the computer software system used to manage administrative collections. Ottenberg dep. 35-36; see also Rovelli dep. 513; Gunn dep. 117.  (Doc.  81).

144.      Within a few months of his employment, plaintiff also recognized the need to replace the collections management software system. Kimmett dep. 111; Kimmett dep. Ex. 3.  (Doc. 81).

         Plaintiff states that ¶ 144 is Admitted with the clarification that "the decision to replace the FES computer system was made in April 2006, months prior to Kimmett commencing his employment as Collections unit supervisor. Pl.'s Opp'n Ex. 67 (Ottenberg Dep.) 179:7-180:2."  (Doc. 161).

145.      Plaintiff worked with Doug Ottenberg and Janey Gunn to talk to vendors and select a software system to meet the administrative unit's needs. Gunn dep.68-69, 73-74, 93, 122, 124, 126, 130- 132, 165; Ottenberg dep. 170-171.  (Doc.  81).

146.-147. Plaintiff's role on the project was to provide information regarding the administrative collections operation and the improvements he wished to make in that operation. Gunn dep. 131-132.  (Doc.  81).

         Ottenberg provided information regarding the financial needs of the OAG and Gunn served as project manager. Gunn dep.125, 132-133.  (Doc.  81).

Plaintiff states that ¶'s 146-147 are Denied. Plaintiff states that his "role was to 'provide the business information to select a package.' Pl.'s Opp'n Ex. 114 (Gunn Dep.) 130:14-21. Ms. Gunn is certain that the items Kimmett wanted included in the collections software package were included in the RFI sent to vendors who would bid on the system. *Id.* 131:6-10. Kimmett and Ottenberg had a shared role in the Artiva project – to help Janey Gunn, the IT expert, understand how the business unit functioned and what they were trying to accomplish. *Id.* 131:18-132:12." (Doc. 161).

148.    In the fall of 2007, the OAG selected Artiva as the new collections management software system for the FES. Gunn dep. 128, 165, 183; see also Ottenberg dep. 170-171. (Doc 81).

149.    After Artiva was selected, Gunn, Ottenberg and plaintiff began to work with the system's vendor to configure the system to meet the OAG's needs. Gunn dep. 153-156, 167, 173, 195, 197-199; Ottenberg dep. 171-172. (Doc. 81).

150.    For the purposes of the configuration, Gunn relied upon plaintiff to provide information about the administrative collections operation and to make business decisions regarding how plaintiff wanted the system to operate. Gunn dep. 139-141, 152, 153, 156. (Doc. 81).

Plaintiff states that ¶ 150 is Denied. Plaintiff states that he "was expected to make *business* decisions relating to the Artiva project, an example of which was selecting a vendor to use for processing credit card transactions. Pl.'s Opp'n Ex. 67 (Ottenberg Dep.) 190:19- 192:2. Technical information, such as the codes involved in inputting and processing claims, were

provided by others. The Financial Enforcement Technicians, like Bellaman and Gill, and not

Kimmett, possessed the specific knowledge of the myriad technical codes and coding issues.

Pl.'s Opp'n Ex. 70 (Gill Dep.) 286:6-288:7; Pl.'s Opp'n Ex. 74 (Keiser Dep.) 99:7-100:12 (more

than 50 different codes); Pl.'s Opp'n Ex. 65 (Rovelli Dep.). 287:17-289:9 ("It's codes.

Everything is – it's the land of codes. Codes for this, codes for that."). Kimmett was not expected

to furnish such information personally; he relied on the collections staff for such information.

*See* Pl.'s Opp'n Ex. 70 (Gill Dep.) 284:11- 295:21; Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 371:13-

17, 380:25-381:21, 567:1-8.  At Kimmett's request, Gill and/or Bellaman communicated with

Gunn on multiple occasions to provide the code information for the project. Pl.'s Opp'n Ex. 70

(Gill Dep.) 288:8-289:4; Pl.'s Opp'n Ex. 13 (Bellaman Dep.) 567:1-8. Gill felt it was completely

appropriate for Kimmett to ask her to meet with Gunn about codes, since she had superior

knowledge about them. Pl.'s Opp'n Ex. 70 (Gill Dep.) 288:8-20."  (Doc.  161).

151.-152. As work on the Artiva project progressed through early 2008, plaintiff sometimes

failed to provide information requested by the vendor or failed to provide it in a timely fashion.

Gunn dep. 148-150, 176-177, 190-195.  (Doc.  81).

      Gunn filled in the gaps as best she could. Gunn dep. 192-193.  (Doc.  81).

      Plaintiff states that ¶'s 151-152 are Denied. Plaintiff states that "Gunn specifically

identified 'action codes' as information Kimmett did not provide in timely fashion. Pl.'s Opp'n

Ex. 114 (Gunn Dep.) 176:7-178:14, which were not within Kimmett's knowledge or expertise.

*See* response to ¶ 150, *supra*. Gunn received the requested action code information from

Bellaman, who knew the codes through her years of work as an FES technician. Pl.'s Opp'n Ex. 114 (Gunn Dep.) 179:3-180:8." (Doc. 161).

Plaintiff states that "Gunn complained that she, and not Kimmett, completed 'conversion translations' for the Artiva system, Pl.'s Opp'n Ex. 114 (Gunn Dep.) 192:12- 193:7, and that Kimmett did not participate directly in working through the 200+ row spreadsheet of functionality gaps for the system. *Id.* 194:4-198:19. Gunn and Ottenberg had specific IT expertise; Kimmett did not. *See* Pl.'s Opp'n Ex. 67 (Ottenberg Dep.) 180:3-16 (Ottenberg describes himself as a "near-expert in IT"); *id.* 181:3-182:3 (Gunn an IT expert); *id.* 182:4-25 (Kimmett not an IT expert; not hired to bring IT expertise to the table). Not being an IT expert, Kimmett did not have the level of technical understanding about Artiva as Gunn and Ottenberg. *Id.* 189:21-190:11." (Doc. 161).

153.-154. In February 2008, plaintiff failed to attend an important meeting at the vendor's location that was intended to assist OAG personnel in understanding the system's terminology, functionality and structure. Gunn dep. 208-209, 219-222. (Doc. 81).

Plaintiff's failure to attend the meeting meant that other project team members had to devote their time and efforts to bring him up to speed. Gunn dep. 225-229. (Doc. 81).

Plaintiff states that ¶'s 153-154 are Denied. Plaintiff states that the "February/March 2008 meeting with Artiva representatives in Muncie, Indiana was scheduled on short notice, and Kimmett informed Gunn that he had a prior, longstanding commitment that would prevent him from traveling on the dates Gunn had selected. Pl.'s Opp'n Ex. 114 (Gunn Dep.) 208:19-210:5. (Indeed, Kimmett was not unique in his need to schedule Artiva events with family issues

– Ottenberg would later inform Gunn of his unavailability during two weeks in the summer because of his son's hockey tournament, and he received a similarly chilly and uncompromising response from Gunn. *See* Pl.'s Opp'n Ex. 115.) Because he could not attend that meeting, Kimmett asked one of his staff to fill in for him. Pl.'s Opp'n Ex. 114 (Gunn Dep.) 218:8-20. Gunn and others were reluctant to change the date of this meeting to accommodate Kimmett because they preferred that the travel not conflict with the Presidents' Day holiday. *Id.* 212:12-217:7. Notwithstanding Kimmett's absence, the meeting was successful and its goals were achieved; to the extent a few gaps remained after the meeting, Kimmett helped to complete them. *Id.* 211:16-212:11." (Doc. 161).

155.-158.  We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶'s 155.-158., that there are disputed facts as to these paragraphs.

159.-161. On April 8, 2008, White sent an e-mail to defendant Roman expressing his concern over plaintiff's performance on the Artiva project. Roman dep. 512-513, 529; Roman dep. Ex. 27. (Doc. 81).

> White wrote: "I am growing increasingly concerned about Tom's commitment to the success of this project. He is not providing timely input to Janey on matters that require his attention. He has not provided direction for a number of decision points and has not sought out the information necessary to build up his comfort level in those areas. He failed to attend a prior trip … [to the vendor] due to a personal matter …. Now, he initially tries to back out of the upcoming trip." Roman dep. 529; Roman dep. Ex. 27.  (Doc. 81).

White went on to state his concern that plaintiff's lack of commitment to the project might impact its success. Roman dep. 529; Roman dep. Ex. 27.  (Doc.  81).

Plaintiff states that it is Admitted that White sent an email to Roman. Plaintiff states that these paragraphs are Denied as to the accuracy of what was expressed in that email. Plaintiff states that "Gunn testified that she did not have concerns with Kimmett's performance on the project prior to April 2008, and that the only specific communications she recalled with White relating to Kimmett's performance on the project were the email exchanges that led to White's letter to Roman about Kimmett's attendance at the April 2008 Muncie conference." (Doc.  161).

Plaintiff states that "although opinions differ as to whether the Artiva project (implemented long after Kimmett's termination from OAG) has been a success, *compare* Pl.'s Opp'n Ex. 70 (Gill Dep.) 315:15-323:4, *with* Pl.'s Opp'n Ex. 76 (Burman Dep.) 301:9- 302:11, any apparent failures of the system as implemented are not the fault of Kimmett. *See* Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 561:3-13; Pl.'s Opp'n Ex. 70 (Gill Dep.) 322:4-323:4. Roman removed Kimmett from the project in June 2008.  Pl.'s Opp'n Ex. 114 (Gunn Dep.) 275:6-276:5. Long after Kimmett's employment termination, the Artiva project vendor experienced multiple rounds of layoffs that directly impacted the project. *Id.* 284:22-287:4. Subsequent to Kimmett's departure, there were project delays relating to writing technical interfaces with the Commonwealth's SAP system (*id.* 287:18-288:11) – tasks never alleged by anyone to be within Kimmett's purview. *See* response to ¶ 151-52, *supra*."  (Doc.  161).

162.      Plaintiff attended the meeting at the vendor's location, in April 2008, after he was directed to do so. Roman dep. 532-533; Gunn dep. 264.  (Doc.  81).

163.      When plaintiff returned from the meeting, his failures to provide timely information necessary to the project continued. Gunn dep. 268-271.  (Doc.  81).

Plaintiff states that ¶ 163 is Denied for lack of specificity. Plaintiff states that "Gunn specifically believed Kimmett was not providing information about dunning letters, 'particularly the variables that would be filled in by the system on letters. There were inconsistencies between the dialogue that was in the IVR scripts, and the dialogues that … was in the letters.' Pl.'s Opp'n Ex. 114 (Gunn Dep.) 269:17-270:12. This is precisely the type of information that the IT experts and the FES Technicians who interacted with Gunn were best suited to handle. *See* response to ¶¶ 150, 151-52. Kimmett tasked Bellaman, a FES technician with specific knowledge of the requested information, to work with Gunn. Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 567:1-8; Pl.'s Opp'n Ex. 114 (Gunn Dep.) 271:6-271:18. Other technicians assisted Bellaman in providing the technical information. Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 381:15-384:5." (Doc.  161).

164.      Gunn spoke to defendant Roman on numerous occasions and reported that she was not getting responses to requests for information or, when she received responses, they were not consistent with other information provided. Gunn dep. 268-269; 302-303; see Roman dep. 512-516, 534-536.  (Doc.  81).

Plaintiff states that ¶ 164 is Denied. Plaintiff states that "Gunn testified that *after* Kimmett was taken off the project, she went to talk to Rovelli 'because I did not see a long-term

solution coming from *Mike* [Roman].' Pl.'s Opp'n Ex. 114 (Gunn Dep.) 302:5-303:6 (emphasis

added).  By then, Kimmett was no longer on the project; Gunn's concern was with *Roman's*

failure to provide a long-term solution, not Kimmett's. *Id.* 301:9-302:10. Once Kimmett was

taken off the project, Keiser would not let Bellaman work on the project, despite Bellaman's

expertise. Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 561:3-13." (Doc.  161).

165.      Plaintiff was also not responding to meeting invitations. Gunn dep. 269.  (Doc.

81).

        Plaintiff states that ¶ 165 is Denied. Plaintiff states that "because the information

requested was that known to FES technicians, not Kimmett, Kimmett made Bellman available to

meet with Gunn and respond to those technical requests. *See* response to ¶ 163, *supra*." (Doc.

161).

166.      Eventually Gunn called defendant Rovelli to explain her frustrations with plaintiff and

to seek advice on how to proceed. Gunn dep. 301-306; *see also* Rovelli dep. 525-527, 586-

587. (Doc.  81).

        Plaintiff states to *See* his response to ¶ 164, *supra*.  (Doc.  161).

167.      Plaintiff was removed from the Artiva project in June 2008. Rovelli dep. 512-514,

531-532, 592-593; Rovelli dep. Ex. 26; Gunn dep. 272-275.  (Doc.  81).

        Plaintiff states that ¶ 167 is Admitted, with the clarification that after he "was

removed from the project, Keiser took over and Keiser, Roman, and Gunn isolated Kimmett and

Bellaman from working on the project further. Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 561:3-13."

(Doc.  161).

168.     Defendant Roman received various complaints about plaintiff's communications with Revenue personnel and with his own staff. Roman dep. 472-473, 480, 485-488, 490-491,521, 534, 544-545, 547-550; Roman dep. Exs. 21, 22, 26; Furlong dep. 286-290, 303-306, 310-311; Furlong dep. Ex. 19; Nale decl. ¶¶18-19; Goho decl. ¶¶7-10; Gill dep. 233-235; Ward decl. ¶¶6-8, 11.  (Doc.  81).

169.-171. We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶'s 169.-171., that there are disputed facts as to these paragraphs.

172.     Defendant Roman also received complaints from administrative collections unit staff regarding treatment they received from plaintiff that they perceived as rude or inappropriate. Roman dep. 548; Nale decl. ¶¶18-19; Gill dep.  233-235.  (Doc.  81).

Plaintiff states that ¶ 172 is Denied as to the characterization of the actual complaints received.  Plaintiff states that "Roman claims to have received complaints from Collections unit staff that Kimmett's treatment of them was 'rude,' specifically '[r]ough language. Perhaps overenthusiastic conversation. I guess the catchall term might be impoliteness or rudeness.' Pl.'s Opp'n Ex. 78 (Roman Dep.) 549:16-550:15. But those complaints were never of enough significance that Roman ever felt the need to discuss them with Kimmett, his subordinate. *See id.* 547:10-549:15; *see also* Pl.'s Opp'n Ex. 111 (Sarteschi Dep.) 153:16-154:18, 163:10-164:6, 182:18-183:2 (only two employees ever complained about Kimmett, and neither complaint was significant to warrant any follow-up investigation); HR Supervisor Sarteschi never heard any examples of Kimmett being abusive or acting outrageously or offensively. Pl.'s Opp'n Ex. 111 (Sarteschi Dep.) 162:15-163:9."  (Doc.  161).

173.-174.  We find, based on Plaintiff's responses  and his citation to the record, Doc. 161,

¶'s 173.-174., that there are disputed facts as to these paragraphs.

175.        In an exit interview, former FES employee Lisa Ward attributed her decision to leave

the section to plaintiff's treatment of her. Roman dep. 555-557; Roman dep. Ex. 28; Ward decl.

¶¶6-7, Ex. A.  (Doc.  81).

176.        We find, based on Plaintiff's responses  and his citation to the record, Doc. 161,

¶ 176., that there are disputed facts as to this paragraph.

177.        Ward complained that the tone of plaintiff's e-mails to her was inappropriate. Ward

decl. ¶11, Ex. A..  (Doc.  81).

        Plaintiff states that ¶ 177 is Denied. Plaintiff states that "Ward's statement, that

Kimmett's emails were inappropriate, did not concern Sarteschi, who has 39 years of HR

experience; he did not think it worthy of any further investigation. Pl.'s Opp'n Ex. 111 (Sarteschi

Dep.) 158:4-160:10. Roman also did not feel Ward's comments about Kimmett's emails were

significant enough to warrant any kind of follow-up. Pl.'s Opp'n Ex. 78 (Roman Dep.) 560:9-

562:12." (Doc.  161).

178.        Holly Goho, a former FES employee, told defendant Roman that she would be happy

to return to work in the FES if plaintiff were not the supervisor of the administrative unit. Goho

decl. ¶¶7-10.  (Doc.  81).

        Plaintiff states that ¶ 178 is Denied insofar as "Holly Goho did not like the fact that

Kimmett had criticized her for using a personal day to take a Friday off from work while the

office was very busy. Pl.'s Opp'n Ex. 78 (Roman Dep.) 568:13-570:7. Roman felt it was

appropriate for Kimmett, as Goho's superior, to make such a criticism to her. *Id.* 569:18-570:7. Roman does not recall ever discussing Goho's complaint about Kimmett with Kimmett. *Id.* 570:19-21. Gill reported that Goho did not like Kimmett because Kimmett was critical of the quality of her work. Pl.'s Opp'n Ex. 70 (Gill Dep.) 154:13-22. Goho was one of only two employees who ever complained about Kimmett to Sarteschi, the HR Supervisor, Pl.'s Opp'n Ex. 111 (Sarteschi Dep.) 207:17-208:5, and Sarteschi did not believe that Goho's complaint was significant enough to warrant any follow up or investigation. *Id.* 163:10-164:6. Sarteschi did not believe that Goho's complaint about Kimmett rose to the level of inappropriate behavior or that it created a bad environment in FES. *Id.* 164:7-11." (Doc. 161).

179.     Lee Gill returned to work in the FES in the summer of 2007. Gill dep. 23. (Doc. 81).

180.     In February 2008, plaintiff asked Gill to attend a weeklong meeting out of-state on the Artiva project. Gill dep. 221-223. (Doc. 81).

181.     After considering the request, Gill informed plaintiff that she could not attend because of personal responsibilities and commitments at home. Gill dep. 221-222. (Doc. 81).

182.     The next day, plaintiff told Gill that the "power that he (sic)" might hold her failure to attend the meeting against her because of the struggle involved in reemploying her. Gill dep. 223-224.(Doc. 81).

        Plaintiff states that ¶ 182 is Admitted that this is Gill's recollection insofar as Kimmett told Gill that the "powers may be" might hold her failure to attend the meeting against her "because Roman had been reluctant to re-hire Gill after her abrupt departure in early 2006.

Pl.'s Opp'n Ex. 70 (Gill Dep.) 226:13-229:10. Kimmett had to struggle to get Gill rehired in 2007. *Id*. 223:17-224:8." (Doc. 161).

183.     About a week later, plaintiff asked Gill if she knew what purgatory was.  He went on to state that purgatory was where she and the FES would be because she did not attend the meeting. Gill dep. 232-233.  (Doc. 81).

Plaintiff states that ¶ 183 is Denied. Plaintiff states that "as Gill explained, Kimmett's comments about purgatory (to extent at all material, which Plaintiff disputes) were in reference to the entire office, not Gill alone. Pl.'s Opp'n Ex. 70 (Gill Dep.) 232:5-233:6." (Doc. 161).

184.     Gill spoke with defendant Roman about plaintiff's comments because they did not sit well with her. Gill dep. 233-235.  (Doc. 81).

Plaintiff states that ¶ 184 is Denied insofar as "Gill never asked Roman to take any action toward Kimmett because of Kimmett's comments to her. Pl.'s Opp'n Ex. 70 (Gill Dep.) 234:10-235:11. Gill informed Roman of her conversation with Kimmett only because she wanted Roman to be aware of Kimmett's comments in case Kimmett took any negative employment action against her. *Id*. 235:9-16. Although Kimmett was upset with Gill, he did not take any adverse employment action against her – he later removed Gill from the Compromise team, but by that point Gill had no longer wanted to be part of that team. *Id*. 235:17-237:8." (Doc. 161).

185.-186. We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶'s 185.-186., that there are disputed facts as to these paragraphs.

187.     The PCA was a second placement agency; if the PCA was unsuccessful in collecting or compromising an account, the account would be closed and returned to Revenue. Furlong dep. 207, 211; Furlong dep. Ex. 16.  (Doc.  81).

Plaintiff states that ¶ 187 is Denied. Plaintiff states that "if [he] and his team determined that a compromise submitted by the second placement PCA, Linebarger, could not be accepted for various valid reasons, such compromises were not simply 'closed and returned to Revenue.' In many instances, a compromise was rejected because of Linebarger's failure to collect the necessary information from the taxpayer or the taxpayer's failure to take necessary steps such as filing any unfiled returns; but if and when such information was subsequently provided, the compromise would be approved.  *See, e.g.,* Pl.'s Opp'n Ex. 131 (first two pages of spreadsheet contain examples where compromise was approved after missing information was obtained from taxpayer). In addition, often when a compromise was not accepted, Kimmett and his team would provide a counteroffer which, if accepted, would result in a compromise of the debt with a higher dollar amount collected for the Commonwealth. *See, e.g., id.* (first two pages of spreadsheets reflecting examples of compromises accepted after debtor agreed to Kimmett's counteroffer); Pl.'s Opp'n Ex. 69 (Furlong Dep.) 365:3-18 (Kimmett would make counteroffers that would be accepted, thereby resolving the matter). In one notable example, Roman recommended that Kimmett accept a compromise, but allowed Kimmett to make a counteroffer when Kimmett so requested. The debtor accepted Kimmett's counteroffer, resulting in $100,000 above and beyond the original offer being collected for the Commonwealth. Pl.'s Opp'n Ex. 137."  (Doc.  161).

188.      Upon return to Revenue, such accounts were placed in "bad debt", which meant there was no hope of collecting them. Furlong dep. 211. (Doc.  81).

Plaintiff states that ¶ 188 is denied. Plaintiff states that "if an account was ever placed in 'bad debt' because it was not collected or compromised as a result of Linebarger's efforts, there were other collection options available. The case could be sent to OAG's Tax Litigation Section or sent back to the referring agency for prosecution. Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 25:10-28:15; Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 362:22-365:11. In addition, OAG has a contract with a third placement agency that collects debts from those debtors who did not pay or reach a compromise in response to Linebarger's efforts. Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 36:16-37:13." (Doc.  161).

189.      We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶ 189., that there are disputed facts as to this paragraph.

190.      We find, based on Plaintiff's responses  and his citation to the record, Doc. 161, ¶ 190., that there are disputed facts as to this paragraph.

191.      Defendants Roman and Rovelli met with defendant Ryan to discuss further measures. Rovelli dep. 536-538.  (Doc.  81).

192.      At the meeting, defendants Ryan, Rovelli and Roman discussed but decided against dismissing plaintiff.  Rovelli dep. 537-539.  (Doc. 81).

Plaintiff states that ¶ 192 is Admitted with the clarification that, "according to Rovelli, at the meeting, Ryan said that based on the report Rovelli and Roman had provided, Ryan 'would support a recommendation to terminate Tom's employment.'  Pl.'s Opp'n Ex. 65

(Rovelli Dep.) 537:8-20.  Rovelli, however, did not make such a recommendation, notwithstanding his alleged dissatisfaction with Kimmett's work on Artiva, interactions with Revenue employees, and interaction with his own staff.  *Id.*  Rovelli made the decision to terminate Kimmett's employment only after Kimmett filed his lawsuit, which Rovelli described as damaging Defendants' working relationships with Kimmett.  *See* Pl.'s MSJ SOF ¶ 87, 90. Rovelli took particular issue with the fact that Kimmett filed a 'Civil Rights Action in Federal Court' alleging wrongdoing.  Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 555:6 - 555:16."  (Doc. 161).

193.      Defendant Rovelli recommended to defendant Ryan that plaintiff be eased out of supervising the administrative collections unit and into the conventional role in which FES attorneys function, handling bankruptcy cases and select collections matters, but that plaintiff continue to function in an accounting capacity in relation to administrative collections; defendant Ryan approved. Rovelli dep. 537-539; Ryan dep. 272, 290; see also Roman dep. 592. (Doc. 81).

Plaintiff states that ¶ 193 is Denied insofar as "Rovelli's recommendation was consistent with the plan that he had for Kimmett upon hiring Kimmett; namely, that Kimmett would eventually transition into the Law unit and take on the functions and responsibilities of a Law unit attorney. Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 73:15-74:8."  (Doc.  161).

194.      In furtherance of that plan, plaintiff was sent to a bankruptcy litigation training seminar. Rovelli dep. 539; Roman dep. 592-593.  (Doc.  81).

195.      On August 8, 2008, defendant Roman e-mailed plaintiff's performance evaluation to defendant Rovelli. Roman decl. ¶38; Roman decl. Ex. 1; see also Rovelli dep. 557.  (Doc.  81).

64

196.     The evaluation covered the period from July 1, 2007 to June 30, 2008.  Roman decl. Ex. 1; Kimmett dep. 371; Kimmett dep. Ex. 45.  (Doc.  81).

197.     The evaluation criticized plaintiff's performance in three main areas: his failures on the Artiva project, his unwarranted disapproval of compromises; and his harsh treatment of subordinates.  Roman decl. Ex. 1; Kimmett dep. 371; Kimmett dep. Ex. 45.  (Doc. 81).

Plaintiff states that ¶ 197 is Denied.  Plaintiff states that "the employment review characterized Kimmett's interactions with his staff as 'unsatisfactory,' not harsh.  Pl.'s Opp'n Ex. 139 at 1251.  Much of the paragraph criticizing Kimmett's interaction with his staff dealt with Kimmett's alleged 'inability to integrate Jill Keiser into the administrative work of the section.' *Id*.  Keiser had refused to work with Kimmett, refused to cede her prior authority to Kimmett, and resisted Kimmett's attempts to make improvements in FES.  Pl.'s MSJ Ex. 11 (Kimmett Decl.) ¶¶ 12-13.  Kimmett explained Keiser's refusal to cooperate with him to both Brandwene and Roman.  Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 272:7-273:7.  Yet, in this review, Roman placed the blame for Keiser's intransigence on Kimmett."

Plaintiff states that "the criticisms contained in that evaluation, which was drafted by Roman in July of 2008 and transmitted to Rovelli by Roman on August 8, 2008 (three days before Kimmett filed suit), did not lead to a recommendation to terminate Kimmett's employment.  Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 557:3-12; Pl.'s Opp'n Ex. 81 (Ryan Dep.) 295:19-298:9.  Defendants delayed communicating their review of Kimmett until November, 2008, *see* Defts.' MSJ SOF ¶ 217-18, so Kimmett did not know of the content of his review prior to filing his lawsuit."  (Doc. 161).

198.      Plaintiff commenced this action on August 11, 2008. Docket, Doc. 1; Pl. Resp. to

Req. for Adm. No. 2.  (Doc.  81).

199.      The complaint named plaintiff's entire chain of command in the OAG and two

Revenue officials, James Furlong and Robert Coyne, as defendants. Docket, Doc. 1; Kimmett

dep. 102; Rovelli dep. 99-100, 553; Roman dep. 21; Ryan dep. 162-164.  (Doc.  81).

          Plaintiff states that ¶ 199 is Admitted with the clarification that "Furlong and Coyne

were dropped from the Second Amended Complaint ("the SAC"), the operative complaint in

this case. The SAC added the Office of the Attorney General and Does 1-10 as Defendants."

(Doc.  161).

200.      We agree with Plaintiff that his original Complaint (Doc. 1) speaks for itself.

201.      Following the filing of the complaint, the plan to transition plaintiff to handling

bankruptcy litigation was abandoned. Rovelli dep. 546.  (Doc.  81).

          Plaintiff states that it is Admitted that "Rovelli 'aborted' the planned transition of him

to the Law unit of FES after he  filed his complaint. Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 546:16-

546:20."  (Doc.  161).

202.      Deputy Attorneys General function in the name of the Attorney General representing

state agency and state official clients, including Revenue and its officials, in litigation; Revenue is

by far the Attorney General's principal client in bankruptcy litigation. Rovelli dep. 553-555.

(Doc.  81).

203.      We find, based on Plaintiff's responses  and his citation to the record, Doc. 161,

¶ 203., that there are disputed facts as to this paragraph.

66

204.      Defendant Rovelli concluded that plaintiff's allegations that Revenue officials Coyne

and Furlong had participated in wrongdoing and cover-up made it impossible for plaintiff to

represent Revenue in bankruptcy litigation.  Rovelli dep. 553-555.  (Doc. 81).

Plaintiff states that ¶ 204 is Denied.  Plaintiff states that "Rovelli understood that as

Collection unit supervisor, Kimmett would deal with DOR, and specifically Furlong, on a regular

basis; yet despite this, Rovelli did not feel it necessary to remove Kimmett from his position as

Collections unit supervisor immediately.  Furlong and Kimmett continued to interact

professionally with each other even after Kimmett's complaint was filed.  Pl.'s Opp'n Ex. 69

(Furlong Dep.) 469:21-470:11."  (Doc. 161).

205.      As a result, plaintiff continued in his position as the manager of the administrative

collections unit. Rovelli dep. 556-561.  (Doc. 81).

206.      After plaintiff filed his lawsuit, the work atmosphere in the FES became more difficult.

Roman Decl. ¶ 40.  (Doc. 81).

Plaintiff states that ¶ 206 is  Denied.  Plaintiff states that "fearing for his job, and after

months of experiencing resistance and  hostility because of his reports of waste, gross

mismanagement, and wrongdoing, Kimmett filed suit on August 11, 2008.  His complaint

detailed his reports on the waste, wrongdoing, and gross mismanagement in OAG and DOR

and his attempts to have them addressed through communications both within and outside his

chain of command.  Defendants took the position that the complaint destroyed their working

relationship with Kimmett because Kimmett should have kept any complaints he had within his

own chain of command.  *See* Pl.'s MSJ SOF ¶¶ 87-88; Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 600:7-

602:2.  Roman did not like Kimmett because Kimmett filed the complaint naming him as a

defendant.  Pl.'s Opp'n Ex. 78 (Roman Dep.) 615:6-12.  Defendants, including Rovelli, avoided

interactions with Kimmett after he filed suit.  Pl.'s MSJ Ex. 11 (Kimmett Decl.) ¶ 33.  Shortly after

the complaint was filed, Keiser confronted Bellaman with a copy of Kimmett's complaint and

threatened her because of her close working relationship with Kimmett and made defamatory

remarks about Kimmett.  *Id.* ¶ 34; Pl.'s Opp'n Ex. 141; Pl.'s MSJ SOF ¶ 51."  (Doc. 161).

207.     Defendant Roman limited his communications with plaintiff to what was necessary

for the functioning of the FES. Roman decl. ¶48.  (Doc.  81).

        Plaintiff states that ¶ 207 is denied insofar as "Roman's typical practice at FES was to

avoid face-to-face conversations with Kimmett, and Roman would communicate with Kimmett

almost exclusively by email or memorandum. Pl.'s MSJ Ex. 11 (Kimmett Decl.) ¶ 16; Pl.'s Opp'n

Ex. 66 (Bellaman Dep.) 515:4-515:23 (Roman, Ottenberg, and Keiser "pretty much avoided,

avoided Tom any time they could")."  (Doc.  161).

208.     Before the lawsuit was filed, defendant Roman sent plaintiff an e-mail concerning a

complaint by a member of plaintiff's staff that work had been taken off her desk. Roman decl.

¶41.  (Doc.  81).

        Plaintiff states that ¶ 208 is Admitted with the explanation that "Roman and Keiser

always encouraged Kimmett's subordinates to bring any complaints about Kimmett to their

attention, and certain employees found this to be a successful way to challenge routine work

assignments that Kimmett made to them. Pl.'s MSJ Ex. 11 (Kimmett Decl.) ¶ 18."  (Doc.  161).

209.     Defendant Roman advised plaintiff that it was not appropriate to reassign work without advising the employee involved. Roman decl. ¶41, 47; Roman decl. Ex. 2. (Doc. 81).

Plaintiff admits that Roman communicated that statement to him, but denies that "Roman had any real understanding of actual assignment at issue. Nale would instigate problems with Keiser's encouragement, refuse to answer the phones (despite being a phone collector), and would seek refuge in Roman's office. Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 549:15-551:7." (Doc. 161).

210.     Plaintiff responded, after his lawsuit was filed, characterizing defendant Roman's e-mail as inappropriate and accusing defendant Roman of creating a "toxic atmosphere" in the office by allowing staff to circumvent the chain of command and bring "every gripe they have against Kimmett" to defendant Roman. Roman decl. ¶¶45, 47; Roman decl. Ex. 2. (Doc. 81).

211.     After defendant Roman brought another concern from the same staff member to plaintiff's attention, plaintiff again accused defendant Roman of sending an inappropriate e-mail and fostering a toxic work environment. Roman decl. ¶ 50-53; Roman decl. Exs. 3, 4. (Doc. 81).

212.     Plaintiff told defendant Roman that Roman should not continue to "take shots at him" using FES employees. Roman decl. ¶ 53; Roman decl. Ex. 4. (Doc. 81).

Plaintiff states that ¶'s 211-212 are Denied. Plaintiff states that "Nale was encouraged by Roman and Keiser to express complaints about Kimmett to them, *see* Pl.'s MSJ Ex. 11 (Kimmett Decl.) ¶ 18; response to ¶ 209, *supra*, and once again Nale's challenge to a routine work assignment by Kimmett, *see* Defs.' MSJ Ex. 26 (roman Dep. Ex. 4), led Roman to

chastise Kimmett by email (because Roman continued to avoid face-to-face communications

with Kimmett, as had been his practice since shortly after he took the Chief position, *see* Pl.'s

MSJ Ex. 11 (Kimmett Decl.) ¶ 16).   Nale never approached Kimmett to discuss any concern she

had with her work assignments, *see* Defs.' MSJ Ex. 26 (Roman Dep. Ex. 4) ("If Cyndi has

difficulty with this request or any questions, she could have simply gone back to Dianne or

myself to let us know or to ask for more information."), because she had been encouraged by

Roman to bring any complaints about Kimmett directly to him.   Pl.'s MSJ Ex. 11 (Kimmett Decl.)

¶ 18."   (Doc. 161).

213.-214. After the lawsuit was filed, Furlong advised defendant Roman that Revenue no longer

would communicate with the OAG through plaintiff. Roman decl. ¶66.  (Doc. 81).

Revenue began to direct all of its routine correspondence with the FES to defendant

Roman. Roman decl. ¶67.  (Doc. 81).

Plaintiff states that ¶'s 213-214 are Denied.  Plaintiff states that "Furlong continued to

interact professionally with Kimmett even after Kimmett's complaint was filed, and Furlong

continued to provide Kimmett and others who worked for him at FES any information necessary

for them to work with DOR. Pl.'s Opp'n Ex. 69 (Furlong Dep.) 469:21-470:11."  (Doc. 161).

215.       In October 2008, plaintiff advised defendant Roman that he had delayed drafting

performance evaluations for two members of his staff because he had negative comments for

both of them.  Roman decl. ¶¶ 63, 64; Roman decl. Ex. 7.  (Doc. 81).

216.     Plaintiff explained he did not want to have his comments misconstrued because of the circumstances surrounding the FES and himself and the "charged atmosphere" in the section.  Roman decl. ¶ 64; Roman decl. Ex. 7.  (Doc. 81).

Plaintiff states that ¶'s 215-216 are Admitted, with the explanation that his "email was a respectfully worded attempt to diffuse the charged situation that Roman had created by challenging Kimmett's work assignment to certain Collections unit employees.  Prior to Kimmett sending his email to Roman and Sarteschi, Roman had sent a memorandum to Kimmett criticizing work assignments that Kimmett had given to one of his employees, Cyndi Nale.  *See* Defs.' MSJ Ex. 26 (roman Dep. Ex. 3) (Oct. 3, 2008 memo from Roman to Kimmett).  Roman had created the 'charged atmosphere' relating to Kimmett's assigning work to his employees by challenging those assignments in emails and memos to Kimmett, and Kimmett wanted to make clear that his evaluation of this employee was based on his concerns with her performance and not relating to the charged atmosphere that Roman had created by his repeated and inappropriate criticisms of Kimmett's assignment of work to his employees.  Defs.' MSJ Ex. 26 (Roman Dep. Ex. 7).  Because Kimmett 'would not want [his] comments to be misconstrued,' Kimmett sought Roman and Sarteschi's guidance and asked them if they preferred him to 'hold-off my evaluations for the immediate future or to draft them as planned.'  *Id.* " (Doc. 161).

217.     In October 2008, the parties to this litigation agreed to a temporary delay in providing plaintiff with his performance evaluation. Pl. Resp. to Req. for Adm. No. 2.  (Doc. 81).

218.      Plaintiff was given his performance evaluation on November 13, 2008. Ryan dep. 334. (Doc. 81).

219.      A remedial plan to correct the performance deficiencies accompanied the evaluation. Kimmett dep. 371-372; Kimmett dep. Ex. 45; Rovelli dep. 557-558. (Doc. 81).

          Plaintiff states that ¶ 219 is Denied. Plaintiff states that "Rovelli drafted the remedial plan in response to Kimmett's lawsuit. Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 548:6-549:7." (Doc. 161).

220.      The plan required plaintiff to meet with defendant Roman on a monthly basis to review compromises that plaintiff disapproved and discuss with respect to each whether the disapproval was consistent with the goal of collecting as much of the debt as practical in light of the debtor's financial condition. Kimmett dep. 371-372; Kimmett dep. Ex. 45, p. 1252. (Doc. 81).

          Plaintiff states that it is Admitted that "the plan required him to meet with Roman on the 1st of each month to review and discuss compromises that had been disapproved.  Pl.'s Opp'n Ex. 139 at 1252." Plaintiff states that it is Denied that "Kimmett, though he planned to comply with this requirement of the remedial plan, ever had the opportunity to do so because he received the review on November 13, 2008 and was notified of his employment termination on November 21, 2008. Pl.'s MSJ SOF ¶¶ 89, 91." (Doc. 161).

221.      The plan required plaintiff to attend and participate in Artiva training programs and perform on a timely basis all Artiva assignments given to him by his Section Chief. Kimmett dep. 371-372; Kimmett dep. Ex. 45, p. 1252. (Doc. 81).

Plaintiff states that it is Admitted that, "pursuant to the Remedial Plan, he continued to provide his input as requested on matters relating to the Artiva implementation. Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 503:8-504:12; Pl.'s MSJ SOF ¶ 89." (Doc. 161).

222.-223. The plan also required plaintiff to learn to communicate constructively with his subordinates and agency personnel and to manage the work of his unit more efficiently. Kimmett dep. 371-372; Kimmett dep. Ex. 45, p. 1252. (Doc. 81).

Toward that end, the plan required plaintiff to attend training programs aimed at improving interpersonal, managerial and supervisory skills. Kimmett dep. 371-372; Kimmett dep. Ex. 45, p. 1252. (Doc. 81).

Plaintiff states that it is Admitted that, "pursuant to the Remedial Plan, he took steps to sign up for the training programs on interpersonal, managerial, and supervisory skills. Pl.'s Opp'n Ex. 68 (Kimmett Dep.) 504:23-506:4; Pl.'s MSJ SOF ¶ 89." (Doc. 161).

224.     Plaintiff's progress under the plan was to be reviewed by Defendant Roman in approximately six months. Kimmett dep. 371-372; Kimmett dep. Ex. 45, p. 1252.

Plaintiff states that ¶ 224 is Admitted, and that "because Defendants terminated Plaintiff from his employment eight days after receiving the Remedial Plan, Defendants rendered this part of the plan moot."

225.     As permitted by OAG evaluation procedures, plaintiff, on November 18, 2008, submitted a nine-page, single-spaced response, excluding attachments, to his evaluation. Kimmett dep. 372-373; Kimmett dep. Ex. 46; Ryan dep. 307, 318-320; Rovelli dep. 574-575. (Doc. 81).

Plaintiff states that it is Admitted that, "because [he] had not seen the evaluation prior to it being presented to him on November 13, 2008, he informed Roman that he would draft a written response to it, as provided by OAG's policy. Pl.'s MSJ Ex. 64 at 1253. Admitted that it is a standard part of the evaluation process to invite the evaluated employee to comment. Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 578:17-21.  Corbett described the process of responding to one's evaluation as akin to an 'appeal' that would get discussed at levels above the supervisor who drafted the review. Pl.'s Opp'n Ex. 108 (Corbett Dep.) 114:1-117:2. The purpose of this process is to provide someone who disagrees with their review to "voice" their opinion if they believed the review was in some way unfair. *Id*. 117:22-118:12.  Admitted that Kimmett availed himself of this opportunity to provide a detailed review of what was an unfair evaluation. Kimmett's review detailed many of the concerns of waste, wrongdoing, violation of laws, and gross mismanagement that he had discovered and the resistance he had received in attempting to report those through his chain of command. Pl.'s MSJ Ex. 64 at 1253 (discussing his reports of misfeasance and malfeasance in FES); *id.* at 1254 (discussing his uncovering numerous problems and improprieties in FES, OAG, and DOR); *id.* at 1256 (detailing repeated attempts to get Roman to address problems unearthed by Kimmett); *id.* (stating Kimmett would "welcome an examination of the past and current practices in the compromise area" (an area on which he was criticized in his review) and stating his opinion that such review should be conducted by a third party); *id.* at 1256-57 (discussing problems and malfeasance relating to the compromise process that he and his team tried to address). Kimmett also attached various memoranda and email in support of the concerns raised in his response. *Id.* at 1262-1270." (Doc. 161).

226.     Plaintiff began his response declaring, "I believe the entire evaluation is inappropriate because it is part of an orchestrated and deliberate effort on the part of the Office to discredit me …. It is surreal to believe that individuals, Michael Roman and Lou Rovelli, that I have sued directly as part of (sic) lawsuit filed in August 2008, would be fair and unbiased in their evaluation and remarks when it serves their interest to discredit me as much as possible." Kimmett dep. Ex. 46, p. 1253.  (Doc.  81).

227.     With regard to his immediate supervisor, plaintiff stated: "Since Michael Roman started in the position of Chief of FES, he has created a toxic environment of division and strife …. In my opinion … he was placed in this position to stifle and curtail any further investigations and follow-up on FES transgressions and to fabricate and trump up charges against me." Kimmett dep. Ex. 46, p. 1255.  (Doc.  81).

228.     Further regarding his immediate supervisor, plaintiff stated: "Mike Roman has from day one stonewalled and ignored any issue or circumstance that has been reported to him that should require an obligation to follow-up and investigate. He continuously withholds documents from me and does not respond to memorandums and emails in order to make me look bad …." Kimmett dep. Ex. 46, p. 1259.  (Doc.  81).

229.     Further regarding his immediate supervisor, plaintiff stated: "I would point out and continue to assert that the genesis of the vast majority of personnel issues in FES is the direct result of the toxic environment Roman created by encouraging and supporting all complaints against Kimmett." Kimmett dep. Ex. 46, p. 1261.  (Doc.  81).

230.      With regard to compromises, plaintiff stated: "I welcome an examination of the past and current practices in the compromise area, I have been begging for one since November 2006. At this point I do not believe it can be performed by Roman or anyone in the Civil Law Division in a fair and unbiased way and not become a backdoor attempt to fabricate charges against me. To preclude the appearance of impropriety, I believe the Attorney General's Office is obligated to have this review conducted by an independent third party." Kimmett dep. Ex. 46, p. 1256.  (Doc.  81).

231.      With regard to the Artiva project, plaintiff stated: "Ms. Gunn and I started to disagree on a number of issues. I felt she was making business decisions that should be made by the business unit in the Project and she disagreed. She even had her decisions sanctioned by her Chief George White because she was aware that Mike Roman would never support me if I objected." Kimmett dep. Ex. 46, p. 1260.  (Doc 81).

232.      Further regarding his disagreements with Gunn, plaintiff stated: "I believe I should have received Mr. Roman's support and that any disagreement should have been handled in the open and not behind closed doors." Kimmett dep. Ex. 46, p. 1261.  (Doc.  81).

233.      Plaintiff concluded his response repeating: "I object to having an evaluation drafted by individuals that I have a current lawsuit against and who are aware that I met with their supervisors regarding them and their actions. To think they can be fair and unbiased is surreal. It not only creates the appearance of impropriety, it is a clear conflict of interest. … I welcome an examination of the Compromise area past and present. However, in order for this to be a true

76

examination and review in my opinion, it must be performed by an independent third party."
Kimmett dep. Ex. 46, p. 1261.  (Doc.  81).

234.       Until he received plaintiff's response to his performance evaluation, defendant
Rovelli expected to implement the remedial plan.  Rovelli dep. 566-567; Corbett dep. 235,
239.  (Doc. 81).

            Plaintiff states that ¶ 234 is Denied.  Plaintiff states that "Rovelli and the other
Defendants were angry at Kimmett for filing the  lawsuit and were looking to create reasons to
justify further action against Kimmett without appearing to retaliate against him.  Those actions
included Roman's emails and memos criticizing Kimmett's assignments to staff and Rovelli's
remedial plan.  *See* Pl.'s MSJ SOF ¶¶ 87-90."  (Doc. 161).

235.-238. We find, based on Plaintiff's responses  and his citation to the record, Doc. 161,
¶'s 235.-238., that there are disputed facts as to these paragraphs.

239.       Defendant Rovelli also believed that plaintiff's comments about Janey Gunn reflected
relationship issues he had with her that made it unlikely that he would cooperate with her in
Artiva implementation. Rovelli dep. 585-587.  (Doc.  81).

            Plaintiff states that ¶ 239 is Denied. Plaintiff state that he "had been taken off the
Artiva project months earlier, Pl.'s Opp'n Ex. 66 (Bellaman Dep.) 561:3-13, yet he continued to
provide any input or information relating to that project when it was requested of him.  Pl.'s
Opp'n Ex. 68 (Kimmett Dep.) 503:8-504:12. There were no examples of Kimmett failing to
provide requested input relating to that project after his receipt of the remedial plan. Pl.'s
Opp'n Ex. 65 (Rovelli Dep.) 590:9-591:22."  (Doc. 161).

240.        Defendant Rovelli believed that plaintiff had manifested an attitude toward

defendant Roman, and his entire supervisory chain of command, that was as inconsistent with

cooperation as he could imagine.  Rovelli, dep. 569-670.  (Doc. 81).

241.         In defendant Rovelli's view, plaintiff's response to his evaluation took the belligerent

tone of his lawsuit to another level: he was given a remedial plan cast in measured and

temperate tone, yet his response was unmeasured and intemperate; he was approached with

an open hand, but he responded with a thumb in the eye.  Rovelli dep. 577-578, 598-602.

(Doc. 81).

         Plaintiff states that ¶'s 240-241 are Denied.  Plaintiff states that "Rovelli believed that

the Kimmett's lawsuit had a 'belligerent tone' and that Kimmett's response to his evaluation was

'unmeasured and intemperate.'  Pl.'s Opp'n Ex. 65 (Rovelli Dep.) 578:1-15.  Insofar as Rovelli

'believed' Kimmett's tone was 'as inconsistent with cooperation as he could imagine,' Rovelli

never attempted to discuss his belief with Kimmett; indeed, Rovelli never discussed with

Kimmett any of Rovelli's 'beliefs' or interpretations of Kimmett's response.  *Id.* 584:5-585:6.

Indeed, no one ever discussed Kimmett's response with him; Rovelli had decided that 'there

was nothing [Kimmett] could say sincerely after writing this response that would leave me to

conclude that he would accept supervision or cooperate in remediation.'  *Id.* 585:8-12.

Rovelli's mind was made up when Kimmett continued to defend his reports and press for an

independent investigation into the most serious problems he had discovered at FES and DOR.

*See, e.g.,* Pl.'s Opp'n Ex. 81 (Ryan Dep.) 327:8-12 (Ryan took issue with Kimmett's call for an

independent investigation in the Response); Pl.'s Opp'n Ex. 108 (Corbett Dep.) 237:14-238:8

(Corbett first heard of Kimmett's call for independent investigation when reviewing the response)." (Doc. 161).

242.      Following plaintiff's response to his evaluation, defendant Rovelli requested a meeting with defendants Corbett, Ryan and Nutt, at which defendant Rovelli recommended that plaintiff's employment be terminated. Rovelli dep. 567, 600; Ryan dep. 306-307, l. 1-5; Corbett dep. 232-233. (Doc. 81).

243.-244. Defendants Ryan and Corbett agreed with defendant Rovelli's assessment of plaintiff's response. Ryan dep. 308-311; Corbett dep. 236, 239, 267. (Doc. 81).

On November 20, 2008, defendant Corbett authorized plaintiff's dismissal. Corbett dep. 232-233; Ryan dep. 362-363. (Doc. 81).

Plaintiff states that ¶'s 243-244 are Admitted,  with the explanation that "Ryan did not know that Kimmett had already begun to take steps to comply with the remedial plan, *see* Pl.'s MSJ SOF ¶ 89, and had he known that, it might have affected Ryan's agreement to terminate Kimmett's employment. *See* Pl.'s Opp'n Ex. 81 (Ryan Dep.) 333:15-335:15. Corbett made clear that his decision to terminate Kimmett's employment was based on Rovelli's recommendation, not his own review of the issues. Pl.'s Opp'n Ex. 108 (Corbett Dep.) 232:15-233:19; 243:10-245:15." (Doc. 161).

245.      Defendant Roman was not involved in the decision to terminate plaintiff's employment. Roman dep. 592. (Doc. 81).

246.       On November 21, 2008, plaintiff was informed that his employment was terminated effective November 28, 2010. Doc. 35, 2nd Amend. Cmplt. ¶2. (Doc. 81).

*2. Plaintiff's SMF*

Next, we consider Plaintiff's SMF and Defendants' responses filed with respect to Plaintiff's Motion for Partial Summary Judgment. (Docs. 130 & 157). We use the same format as we did above with respect to Defendants' SMF.

1.      In late September 2006, Plaintiff Thomas Kimmett was hired as the new supervisor of the Administrative Collections unit of the Financial Enforcement Section ("FES") of the Pennsylvania Office of Attorney General ("OAG"). Ex. 1 (Kimmett Dep.) 106:14-18. For approximately ten years prior to that, Kimmett had been employed in the Chief Counsel's office at the Pennsylvania Department of Revenue ("DOR"). Ex. 1 (Kimmett Dep.) 36:12-20, 49:25-50:2. Kimmett is an attorney, an accountant, and a member of the New Jersey Society of Certified Public Accountants. Ex. 2 (Kimmett Dep. Ex. 1). (Doc. 130).

Defendants **ADMIT** plaintiff was hired in September 2006 and assigned to supervise the administrative collections unit of the Financial Enforcement Section of the Pennsylvania Office of Attorney General, that for the prior ten years he was employed as an attorney in the Chief Counsel's Office at the Department of Revenue and that he is an attorney, an accountant and a member of the New Jersey Society of Certified Public Accountants. Defendants **DENY** that paragraph 1 completely describes plaintiff's position and the nature of this job. Defendants state that "plaintiff was hired by OAG as a Senior Deputy Attorney General, 2nd Amend. Cmplt. ¶13, to manage administrate collections, identify and solve problems, and eventually handle a traditional FES caseload with continuing to oversee administrative collections. Rovelli dep. 70-74, 112-116, 131-132, 140-142. He described his job in FES as being charged with 'running

and cleaning up FES'. Kimmett dep.  372-373, Kimmett dep.  Ex.  46, p.  1254, 'examining and restructuring' the FES operation 'in all aspects', Kimmett dep.  493-494, Kimmett dep.  Ex.  32, p.  2, and 'identify [ing] any problems, issues and improprieties, etc.  that exit (sic) in the operation.'  Kimmett dep.  120, 121, Kimmett dep.  Ex.  4."  (Doc.  157).

2.       Defendant Thomas Corbett has served as Pennsylvania's Attorney from January 2005 through the present. Ex. 3 (Corbett Dep.) 59:9-60:21. Corbett previously served as Attorney General from October 1995 through mid-January 1997. Ex. 3 (Corbett Dep.) 52:16-53:1.  (Doc. 130).[3]

3.       As (former) Attorney General of Pennsylvania, Corbett is (was) the chief law enforcement and civil officer of Pennsylvania. Ex. 3 (Corbett Dep.) 75:8-14.  Corbett exercises his duties through his appointed deputies and agents known as his "chain of command." Ex. 3 (Corbett Dep.) 75:15-76:2; Ex. 4 (Corbett Dep. Ex. 1). Corbett relies on his chain of command to act as gatekeepers and to determine what information is provided to him. Ex. 3 (Corbett Dep.) 81:14-82:11. Corbett has ultimate responsibility for all of OAG's sections and units, and if there are problems in any particular section of OAG, it reflects both on the office and on Corbett. Ex. 3 (Corbett Dep. 76:9-77:7).  (Doc.  130).

4.       Corbett acknowledged that operational problems existed in FES. Ex.  3 (Corbett Dep.) 98:21-100:6, 101:1-11, 102:18-103:13.  Insofar as there were operational problems in FES, Corbett relied upon Louis Rovelli and William Ryan to address them. Ex. 3 (Corbett Dep.) 107:2-15.  (Doc.  130).

_____

3.    Defendant Thomas Corbett is currently the Governor of Pennsylvania.

5.        Defendant Brian Nutt has served as Corbett's campaign manager for Corbett's campaigns for Attorney General in 2004 and 2008. Ex. 3 (Corbett Dep.) 61:22-62:5, 66:5-21. Nutt currently is managing Corbett's gubernatorial campaign. Ex. 3 (Corbett Dep.) 65:12-66:4. Nutt served as Chief of Staff to Corbett from January 2005 until May or June of 2008 when he left OAG to run Corbett's re-election campaign. Ex. 5 (Nutt Dep.) 54:11-16. Nutt returned to OAG as Corbett's Chief of Staff in November 2008, and held that position until May 2009 when he again left OAG to manage Corbett's gubernatorial campaign.  Ex. 5 (Nutt Dep.) 54:22-56:5; 67:16-68:19. During the time he served as Chief of Staff, the OAG Comptroller's Office reported up through the chain of command to him. Ex. 5 (Nutt Dep.) 54:17-21.  (Doc.  130).

6.        From January 2004 through the present, Defendant William Ryan has served as First Deputy to the Attorney General. Ex. 6 (Ryan Dep.) 41:16-42:17.  As First Deputy, Ryan oversees all legal and administrative matters on the law side of OAG. Ex. 6 (Ryan Dep.) 46:13-47:15. Ryan relies on Louis Rovelli for matters involving the entire Civil Law division of OAG, including FES. Ex. 6 (Ryan Dep.) 50:17-53:1.  (Doc.  130).

7.        Defendant Louis Rovelli is the Civil Law Division Director at OAG.  In that position, Rovelli is responsible for six OAG sections, including FES. Ex. 7 (Rovelli Dep.) 7:2-12. Rovelli spends relatively little of his time on FES. Ex. 7 (Rovelli Dep.) 7:21-8:9, 14:15-21. The Chief of FES reports to Rovelli. *See* Ex. 7 (Rovelli Dep.) 99:21-100:2. Rovelli reports to the First Deputy, and the First Deputy reports to the Attorney General. Ex. 7 (Rovelli Dep.) 457:2-458:1.  (Doc. 130).

8.      Defendant Steven Brandwene was Chief of FES from approximately 1985 through March 2007. Ex. 8 (Brandwene Dep.) 16:16-17:2. Defendant Michael Roman became Chief of FES when Brandwene retired and continues to hold that position today. Ex. 9 (Roman Dep.) 26:18-28:13, 37:13-17.  (Doc.  130).

9.      Defendant Jill Keiser has been an FES employee since FES was first created in 1981. Ex. 10 (Keiser Dep.) 7:4-7. From approximately the mid-1990s through the date that Kimmett was hired in September 2006, Keiser was the Supervisor of the Administrative Collections unit of FES. *See* Ex. 10 (Keiser Dep.) 7:19-9:19, 73:20-75:1; Ex. 8 (Brandwene Dep.) 24:17-21. (Doc.  130).

10.     FES is the division of OAG responsible for collecting debts owed to the approximately 200 Pennsylvania state agencies, which include DOR, the Department of Transportation ("Penn DOT"), the State Worker's Insurance Fund ("SWIF"), state colleges and universities, among others. Ex. 7 (Rovelli Dep.) 14:22-16:18; Ex. 6 (Ryan Dep.) 67:7-68:4. The debts include virtually any money owed to any Pennsylvania agency. Ex. 6 (Ryan Dep.) 67:7-68:4. The Financial Enforcement Section serves an important function for the Commonwealth of Pennsylvania. Ex. 7 (Rovelli Dep.) 411:19-412:6.  (Doc.  130).

Defendants **ADMIT** the facts as stated but **DENY** that paragraph 10 fully describes the nature of the debt referred.  Defendants state that "State agencies refer debt to FES for collection only after they have made their own efforts to collect the debt.  Rovelli dep.  15-16." (Doc.  157).

11.     From its inception in 1981 through the time period of Kimmett's employment, FES included two sections – the Law unit and the Administrative Collections ("Collections") unit. *See* Ex. 7 (Rovelli Dep.) 33:8-37:22. During that time, the FES Chief was responsible for overseeing both sections. Ex. 7 (Rovelli Dep.) 34:13-35:3. The Law section consists of attorneys who handle discussions and negotiations with debtors on high dollar and complex cases and who make appearances for OAG in bankruptcy litigation, and their supporting staff. Ex. 7 (Rovelli Dep.) 34:5-21.  (Doc. 130).

12.     The Collections unit has its own supervisor who reports to the FES Chief. The Collections unit is responsible for processing the collection of debts referred to it by state agencies. This includes entering cases referred by state agencies into the computerized debt-collection system that issues dunning letters to debtors, communicating with debtors who respond to the dunning letters, overseeing the referral of cases to Private Collection Agencies ("PCAs") under contract with OAG to collect debts, and processing the receipt and payment of funds to and from FES. Ex. 7 (Rovelli Dep.) 34:22-37:22.  (Doc.  130).

        Defendants **ADMIT** the facts as stated but **DENY** that paragraph 12 fully describes the responsibilities of the Collections unit.  Defendants state that "the Collections unit creates and manages the contracts with the PCAs and processes and approves compromises of debt, up to a certain amount.   Rovelli dep.  35, 37-38; Kimmett dep. 128."  (Doc.  157).

13.     In the Fall of 2009, approximately one year after Kimmett's employment was terminated, OAG removed the Collections unit from FES and placed it under the Comptroller Section. Ex. 9 (Roman Dep.) 45:22-47:14; Ex. 4 (Corbett Dep. Ex. 1). Unless otherwise stated,

the operations of FES are described herein as they existed when the Collections unit was part of FES (as it was during Kimmett's employment).  (Doc.  130).

14.      The Collections unit handles a web of fund flows, which includes (a) payments made by debtors to FES in response to FES's collection efforts; (b) money collected by PCAs from debtors that the PCAs remit to FES; (c) commission payments made by FES to PCAs; (d) payment by FES of debts it collects to the state agencies where the debt originated; and (e) payments from the state agencies to FES to reimburse FES for commissions FES paid to the PCAs for the PCAs' collection of the agencies' debt. Millions of dollars pass through FES every year. Ex. 11 (Kimmett Decl.) ¶ 3.  (Doc.  157).

15.      The Collections unit is responsible for processing compromises with debtors who owe money to a state agency. Ex. 7 (Rovelli Dep.) 50:22-51:11.  Such compromises are approved by an attorney in the Law unit or (while she was supervisor) Keiser. *See* Ex. 7 (Rovelli Dep.) 50:12-51:11.  (Doc.  130).

Defendants **ADMIT** that the Collections unit is responsible for processing compromises but **DENY** that paragraph 15 fully describes the authority to approve compromises.  Defendants state that "while she was supervisor of the unit, defendant Keiser had the authority to approve compromises of less than $1,000.  Rovelli dep. 38, 327.  An attorney could approve compromises over $1,000; a Senior Deputy Attorney General could approve compromises of up to $25,000; and the Section Chief could approve compromises of up to $100,000.  Rovelli dep. 117."  (Doc.  157).

16.        FES contracts with PCAs that are assigned certain cases by the Collections unit. Ex. 7 (Rovelli Dep.) 35:18-37:13. FES has contracted with the following PCAs: Linebarger Goggan Blair & Sampson ("LGBS"); Penn Credit Corporation ("Penn Credit"); AllianceOne; NCO Group ("NCO"); Diversified Collection Services, Inc.; Kadent; Unifund; and Pioneer Credit Recovery, Inc. *See* Ex. 12 (Def. Tom Corbett's Resp. Pl's First Set Interrogs.) at 13-15.  (Doc.  130).

17.        Until mid-2007, PCA employees worked on-site in FES's offices. Ex.  9 (Roman Dep.) 258:13-19, 260:1-10. These employees were given access to FES's and numerous DOR electronic databases that contained confidential taxpayer information. Ex. 7 (Rovelli Dep.) 143:19-144:10.  (Doc.  130).

        Defendants **ADMIT** that a few but not all employees of the PCAs worked on site in FES's offices until mid-2007 and that they were given access to databases that contained confidential taxpayer information.  Defendants **DENY** that paragraph 17 fully describes the PCA employees' status with regard to such confidential information or that it explains the circumstances of their departure from FES.  Defendants state that "the PCA employees signed confidentiality agreements with regard to the databases they had access to, as did FES employees.  Rovelli dep.  222-223; *see also* Gill dep.  364-365; Roman dep.  140, 187-188, 258-259; Roman dep.  Ex. 5.  In addition, at plaintiff's recommendation, PCA employees were no longer allowed to work on site a FES.  Kimmett dep.  257; *see also* Rovelli dep.  360-361 (defendant Rovelli inquired whether there was continued need for PCA employees to work on site, and when plaintiff advised there was not, directed plaintiff to discontinue the practice)." (Doc.  157).

18.        On March 1, 2006, Collections unit employee Lee Gill, who was responsible for

monitoring and accounting for the fund flow activity, abruptly quit FES. Ex. 7 (Rovelli Dep.)

62:5-16; Ex. 13 (Gill Dep.) 66:18-22, 69:3-19. Shortly after Gill quit, the Comptroller's Section

of OAG detected problems in the FES fund flow and, in response, sent Assistant Comptroller

Douglas Ottenberg to audit the Collections unit. Ex. 7 (Rovelli Dep.) 62:16-65:4. Such action

was unprecedented – never before had the Comptroller's office sent a representative to

audit FES. Ex. 7 (Rovelli Dep.) 84:15-85:20.  (Doc.  130).

        Defendants **ADMIT** that on March 1, 2006, Lee Gill abruptly resigned and that soon

afterward the Comptroller's Section sent Assistant Comptroller Doug Ottenberg to review

Collections Unit operations.  Defendants further **ADMIT** that the Comptroller's Section had not

taken such an action before.  Defendants **DENY** that Gill was responsible for monitoring all fund

flows.  Defendants state that "[Gill] was responsible for ensuring that PCAs received

commissions for 'pay directs' and that OAG billed the creditor state agencies for such

commissions.  Keiser dep.  26; Gill dep. 16-17; 20-22.  Defendants **DENY** that Doug Ottenberg

got involved because no one knew how to perform Gill's function and as a result bills needed to

be paid and agencies needed to be invoiced.  Ottenberg dep.  14.  Ottenberg was assigned to

figure out Gill's function and the status of her work, and to make sure the process began moving

again the way it should.  Ottenberg dep.  20.  Ottenberg reported: 'And basically what I did was

I compiled all of the preliminary - I don't want to say findings because it wasn't an audit.  It was

more of a management analysis where we were just on the surface looking at what I thought

were problems in the financial enforcement system.'  Ottenberg dep.  51-52; *see also*

Ottenberg dep. 20-21 (he was directed by Phillips through Bianco to review FES); Rovelli dep.

62-63 (that same); Bianco decl ¶10, decl.  Ex.  A." (Doc.  157).

19.        On his arrival at FES, Ottenberg was unable to locate any of the documents or

electronic files that Gill had used to record the fund flows she managed, despite examining Gill's

computer and personally searching Gill's entire office. Ex. 14 (Ottenberg Dep.) 63:24-64:11,

301:15-302:17; Ex. 15 (Keiser Dep. Ex. 2); Ex. 16 (Gill Dep. Ex. 3); Ex. 17 (Gill Dep. Ex. 5).

(Doc.  130).

        Defendants **ADMIT** that Ottenberg looked for documentation of Lee Gill's work in

her work cubicle and on her computer.  Defendants DENY Ottenberg was unable to find any of

Gill's documents or that the information contained in such documents was irretrievable.

Defendants state that "Ottenberg located some documents in Gill's file cabinet drawers, but

nothing was organized, and he chose to rebuild the information from scratch.  Ottenberg decl.

¶13-14.  Ottenberg was able to straighten out the reconcile and commission payments to the

PCA's and the billings to the creditor state agencies that were of concern by retrieving

information from the FES computer system, Oracle, from documents retained by the

Comptroller's Office and from documents he obtained from the Department of Revenue.

Ottenberg dep.  17, 21-22, 371-237; *see also* Pl.  Ex.  15(Keiser Ex. 2, pp.  1-2, 5/02/06

Ottenberg e-mail to Sheri Phillips)."  (Doc.  157).

20.        Prior to Ottenberg's arrival, Keiser dumped all of Gill's accounting files into the trash

and switched Gill's computer with that of another FES employee. Ex. 18 (Bellaman Dep.) 63:12-

65:17, 214:17-217:17, 422:24-424:25; Ex. 1 (Kimmett Dep.) 215:24-216:14; Ex. 1 (Kimmett

Dep. vol. 2) 59:25-62:5.  Later, Keiser would blame Gill for the missing documents. Ex. 18

(Bellaman Dep.) 423:13-424:13; Ex. 13 (Gill Dep.) 107:17-21; Ex. 19 (Gill Dep. Ex. 4).  (Doc.

130).

Defendants **DENY** that Keiser dumped all of Gill's accounting files in the trash and

switched Gill's computer with that of another FES employee.  Defendants state that "[a]fter Gill

resigned, Keiser and Santanna cleared out Gill's work cubicle and threw out some old

documents from past fiscal years that were stored in Gill's cubicle.  Keiser dep.  55-56;

Bellaman dep.  63-67, 74-75.  Keiser did not switch Gill's computer with the computer of

another employee nor does she have any knowledge that Santanna made such a switch.  Keiser

decl ¶37.  The billings that Ottenberg needed to recreate were only for the then-current fiscal

year of 2005-06.  Ottenberg decl ¶16.  Ottenberg located some documents in Gill's file cabinet

drawers, but nothing was organized, and he chose to rebuild the information from scratch.

Ottenberg decl.  ¶13-14.  Ottenberg was able to straighten out and reconcile the commission

payments to the PCA's and the billings to the creditor state agencies that were of concern by

retrieving information from the FES computer system, Oracle, from documents retained by the

Comptroller's Office and from documents he obtained from the Department of Revenue.

Ottenberg dep.  17, 21-22, 371-372; Ottenberg decl.  ¶¶15-18 *see also* Pl.  Ex.  15 (Keiser Ex.

2, pp.  1-2, 5/02/06 Ottenberg e-mail to Sheri Phillips); Bianco decl.  ¶11."  (Doc.  157).

21.      Assisting Keiser in trashing the documents was Mark Santanna, who was then a PCA

employee working on-site at FES. Ex. 18 (Bellaman Dep.) 64:16-65:17. Shortly thereafter, Keiser

recommended that OAG hire Santanna to replace Gill. Ex. 20 (Gill Dep. Ex. 2).  (Doc.  130).

Defendants **ADMIT** that Santanna and Keiser threw away old documents stored in

Gill's cubicle.  Defendants **DENY** that Santanna and Keiser threw away all of Gill's records or

that they knowingly threw away documents needed to straighten out the billings.  Keiser dep.

55-56; Bellaman dep.  63-67, 74-75; Keiser decl. ¶37.  Defendants state that they "further

**DENY** that Keiser alone recommended that the OAG hire Santanna.  Santanna was hired based

on Ottenberg's recommendation that an accountant was needed in FES.  Ottenberg decl.  ¶¶20-

23.  Ottenberg was very impressed with Santanna's work performance and recommended that

OPAG hire him to take over Gill's responsibilities.  Ottenberg dep.  21-22, 27; Ottenberg decl.

¶¶20-23."  (Doc.  157).

22.      Santanna was hired by OAG, and would remain an FES employee until mid-2007, at

which point his employment ended when a joint investigation by OAG's Internal Affairs unit

and the Dauphin County District Attorney's office determined Santanna had used his OAG

credentials to access confidential DOR taxpayer information illegally. Ex. 7 (Rovelli Dep.)

361:21-365:13, 520:14-523:13; Ex. 21 (Sarteschi Dep.) 174:2-178:1; Ex. 6 (Ryan Dep.)

224:19-225:20.  Although Santanna's actions were illegal, OAG gave him the option of

resigning (which he accepted) and he was not escorted off the premises by an agent (as Kimmett

was). Ex. 21 (Sarteschi Dep.) 174:2-178:21.  (Doc.  130).

Defendants **ADMIT** that Santanna was hired by OAG and that he remained an OAG

employee until investigations by the OAG Internal Affairs unit and the Dauphin County District

Attorney's Office revealed he had improperly accessed taxpayer information.  Defendants state

that they "also **ADMIT** that Santanna was allowed to resign and that he was not escorted from

OAG premises by an agent.  Defendants **DENY** that the investigations of Santanna were conducted jointly.  Rather, they were conducted in parallel.  Rovelli dep.  362-365.  Santanna was given the option of resigning in lieu of termination because there was no evidence he misused the confidential tax information he had improperly accessed and because he was regretful, contrite and has not exhibited hostility toward his supervisors or his co-workers. Rovelli decl.  ¶8." (Doc.  157).

23.      Based on discussions with Phillips, Rovelli decided to replace Keiser as Collections unit supervisor. Ex. 7 (Rovelli Dep.) 96:7-98:20; *id.* 254:6-8 ("I understood Jill to be a major issue and a major problem.  And that's why I acted on it."). Over the previous few years, Rovelli had become increasingly concerned with Keiser's ability to run the collections unit effectively. Ex. 7 (Rovelli Dep.) 65:20-67:3.  Rovelli wanted to find a professional who was good with numbers and "systems" to fill Keiser's position. Ex. 7 (Rovelli Dep.) 140:2-143:2.  (Doc.  130).

Defendants **ADMIT** that "based on discussions with Phillips and his increasing concern over the previous few years with Keiser's ability to run the Collections unit effectively, defendant Rovelli decided to replace Keiser as Collections unit supervisor.  Defendants **DENY** that Rovelli wanted merely, as paragraph 23 represents, 'to find a professional who was good with numbers and 'systems' to fill Keiser's position.'  To the contrary, Rovelli wanted to hire an attorney with finance experience into a newly-created attorney position in the FES to bridge the law and administrative sides of FES, manage administrative collections, identify and solve problems, and eventually handle a traditional FES attorney caseload while continuing to oversee administrative collections.  Rovelli dep.  70-74, 112-116, 131-132, 140-143." (Doc.  157).

24.     Rovelli understood the Comptroller's audit to have revealed deficiencies in various FES systems, and he also felt that a weakness of then-FES Chief Brandwene was that Brandwene was "[n]ot a numbers guy. Not a systems guy." Ex. 7 (Rovelli Dep.) 101:2-102:3. When asked about Brandwene's abilities, Corbett explained that by 2005, Brandwene was "RIP, retired in place." Ex. 3 (Corbett Dep.) 126:1-127:2.  (Doc.  130).

Defendants **ADMIT** that "defendant Rovelli understood that Doug Ottenberg's review of FES operations in the wake of Lee Gill's departure revealed deficiencies, Rovelli dep. 62-65, 68, that Rovelli felt a weakness of then-FES Chief Brandwene was that he was not a numbers or a systems guy, Rovelli dep.  101-102, and that Corbett described Brandwene as 'retired in place.'  Defendants **DENY** that the Comptroller's office 'audited' FES.  Ottenberg dep. 51-52.  Defendants **DENY** that this paragraph completely recounts Rovelli's or Corbett's descriptions of defendant Brandwene.  Rovelli described Brandwene's strengths as strong interpersonal, problem solving, legal and mentoring skills and good professional judgment. Rovelli dep.  104-108.  Corbett explained that by 'retired in place' he meant that Brandwene was not working as hard as he might be if he had only worked there five years.  Corbett dep. 126."  (Doc.  157).

25.     Rovelli interviewed Kimmett at the request of Brian Nutt, Corbett's then Chief of Staff. *See* Ex. 7 (Rovelli Dep.) 69:18-70:10. Nutt had received Kimmett's resume from Rich Hudic, a friend of Corbett's and Nutt's who was a member of the Governor's Action Team and the Executive Director of the Team Pennsylvania Foundation, a private, quasi-governmental

agency that works closely with Pennsylvania's Department of Community and Economic

Development and which acts as an economic development engine for Pennsylvania. Ex. 5 (Nutt

Dep.) 74:8-76:13; Ex. 3 (Corbett Dep.) 87:20-88:5; Ex. 1 (Kimmett Dep.) 89:4-23.  (Doc.

130).

      Defendants **ADMIT** paragraph 25, except to the extent it describes Rich Hudic as a

friend of defendant Nutt or defendant Corbett.  Defendants state that "Nutt described Hudic as

someone he had interactions with over the years.  Pl.  Ex.  5 (Nutt dep.  74-75).  Corbett

described Hudic as between an acquaintance and a friend, but someone he did not socialize

with and someone he only saw several times a year.  Pl.  Ex.  3 (Corbett dep.  89-90)."  (Doc.

157).

26.      Corbett and Hudic have known each other since the administration of Governor Tom

Ridge, and Corbett described his relationship with Hudic as "between acquaintance level and

friend." Ex. 3 (Corbett Dep.) 89:1-90:13.  Kimmett and Hudic had worked closely together

while Kimmett was employed by DOR. Ex. 1 (Kimmett Dep.) 86:13-89:23, 490:22-491:8.

(Doc.  130).

27.      Rovelli hired Kimmett to replace Keiser as the Collections unit supervisor with the

intention that Kimmett would build a "down river bridge" between the Law and Collections

units, "manage administrative collections," address "the breakdown in the fund flow," and

"modernize the operation." Ex. 7 (Rovelli Dep.) 114:6-117:10, 140:12-143:2, 125:2-126:20;

*see also* Ex. 6 (Ryan Dep.) 109:17-111:9 (testifying that Kimmett was hired to replace Keiser

"because of what bubbled up after Gill left" and because of his "money background" and

expertise); Ex. 8 (Brandwene Dep.) 62:11-63:16 (Kimmett was hired "as the new Jill Keiser").

Kimmett's job was to look at "practice and procedure in the administrative side of Financial

Enforcement, the side we hired [him] to manage" Ex. 7 (Rovelli Dep.) 140:19-22. "I wanted him

to spend his time on system redesign." Ex. 7 (Rovelli Dep.) 315:6-7.  (Doc.  130).

   Defendants **ADMIT** that paragraph 27 describes some of the functions plaintiff was

hired to perform as FES attorney and manager of the Collections unit.  Defendants **DENY** that

paragraph 27 is a complete description.  Defendants state that "Defendant Rovelli explained

that he wanted the attorney hired to manage administrative collections and 'particularly attend

to whatever the problems were at the time...to take a look at the system, look at those

problems, identify any additional problems, and propose and implement solutions.'  Rovelli

dep.  114-115.  Rovelli further explained that the attorney hired would eventually become a

'full fledged financial enforcement attorney' with the ongoing side duty to make sure the

administrative collections systems were running, 'perhaps periodically do what might be loosely

called an audit...make sure the books are balanced,' and review compromises and the contracts

with the collections agencies.  Rovelli dep.  116; *see also* Rovelli dep.  131-132, 140-142

(Rovelli communicated plaintiff's job duties, short-term and long-term, to plaintiff in the job

interview and again at the outset of plaintiff's employment)."  (Doc.  157).

28.  Though an accountant, Kimmett was not hired to audit FES. *See* Ex.  7 (Rovelli Dep.)

139:17-140:1. The Comptroller's office provides internal auditing functions to OAG, Ex. 3

(Corbett Dep.) 25:10-11, and the Comptroller's audit continued after Kimmett was hired. Ex. 7

(Rovelli Dep.) 139:17-140:1.  Rovelli's expectation was that Kimmett would work with Ottenberg by using Ottenberg's audit findings to implement improvements in FES's fund flow systems. Ex. 7 (Rovelli Dep.) 140:12-142:2.  (Doc.  130).

Defendants **ADMIT** that performing internal audits are among the functions performed by the Comptroller's office.  Defendants also **ADMIT** that defendant Rovelli expected plaintiff to work with Ottenberg to evaluate FES systems.  Defendants state that they **"DENY** that Rovelli expected that plaintiff would work with Ottenberg 'by using Ottenberg's audit findings' or that Rovelli did not expect plaintiff to perform audit-like functions.  Rovelli dep. 116, 140-142.  Defendants also **DENY** that Ottenberg performed an 'Audit' of FES or that his management analysis was limited to fund flow systems.  Ottenberg dep.  51-53; Ottenberg Def.  Ex.  9.  Rather, Ottenberg's review included account inventory discrepancies, aging and unassigned accounts, unenforced provisions of contracts with the PCAs, and the manner in which cases were referred to the PCAs.  Ottenberg dep.  53-70; Ottenberg Def.  Ex.  9." (Doc. 157).

29.	Although Kimmett was a lawyer, Rovelli did not hire him to work in the Law unit; Kimmett had no role supervising or assigning cases to the attorneys in the Law unit. Ex. 7 (Rovelli Dep.) 312:18-313:1; Ex. 9 (Roman Dep.) 44:21-45:21. When hiring Kimmett, Rovelli's intention was for Kimmett eventually to transition to the Law unit after Kimmett had improved the Collection unit's systems and take on the same kind of functions as the Law unit attorneys. Ex. 7 (Rovelli Dep.) 73:15-74:8.  (Doc.  130).

Defendants **ADMIT** that plaintiff had no role supervising or assigning cases to FES attorneys, but **DENY** that plaintiff was not hired as an FES attorney or on the legal side. Defendants state that "defendant Rovelli hired plaintiff into a newly-created attorney position in the FES to bridge the law and administrative sides of FES, manage administrative collections, identify and solve problems, and eventually become a 'full fledge financial enforcement attorney' with the ongoing side duty to make sure the administrative collections systems were running, 'perhaps periodically do what might be loosely called an audit...make sure the books are balanced,' and review compromises and the contracts with the collections agencies.  Rovelli dep. 112-116; *see also* Rovelli dep.  131-132, 140-142 (Rovelli communicated plaintiff's job duties, short-term and long-term, to plaintiff in the job interview and again at the outset of plaintiff's employment)."  (Doc.  157).

30.      Rovelli did not hire Kimmett to examine fraud, wrongdoing, or gross mismanagement that may have occurred at FES. Ex. 7 (Rovelli Dep.) 138:14-139:16. OAG has a separate Internal Affairs unit responsible for internal investigations into allegations of wrongdoing and other personnel issues. Ex. 3 (Corbett Dep.) 71:11-72:18, 73:21-74:2, 77:8-14; Ex. 6 (Ryan Dep.) 226:2-10.  That unit reports to Corbett through his First Deputy, William Ryan. Ex. 3 (Corbett Dep.) 75:17-21.  As Corbett explained, "[W]hen there's allegations of wrongdoing, they'll get involved." Ex. 3 (Corbett Dep.) 72:2-3; *see also* Ex. 6 (Ryan Dep.) 227:11-13 ("Internal Affairs investigates any violation of office policy.").  As Ryan explained, for allegations of wrongdoing or violation of office policy at FES, he and Rovelli would be responsible for commencing an internal investigation with Internal Affairs. Ex. 6 (Ryan Dep.) 229:3-18.  (Doc.  130).

Defendants **ADMIT** that when defendant Rovelli hired plaintiff, he did not tell him to examine fraud, wrongdoing or gross mismanagement that may have occurred at FES. Defendants **DENY** that it was outside plaintiff's duties to report such matters if he discovered them.  Defendants state that "Plaintiff was asked to 'look at the operation.'  Kimmett dep.  113. He viewed identifying problems and issues as part of his job.  Kimmett dep.  113-114.  Plaintiff described his job as being charged with 'running and cleaning up FES', Kimmett dep.  372-373, Kimmett dep.  Ex.  46, p. 1254, 'examining and restructuring' the FES operation 'in all aspects', Kimmett dep.  493-494, Kimmett dep.  Ex. 32, p. 2, and 'identify [ing] any problems, issues and improprieties, etc. that exit (sic) in the operation.'  Kimmett dep. 120, 121, Kimmett dep, Ex. 4. Defendants **ADMIT** that the Internal Affairs unit reports to defendant Ryan and investigates allegation of wrongdoing and violations of policy.  Defendants **ADMIT** that defendant Ryan is responsible fo authorizing Internal Affairs investigations.  Defendants **DENY** that defendant Rovelli is responsible for commencing such investigations.  Rather he may request that defendant Ryan authorize an investigation.  Pl.  Ex. 6 (Ryan dep.  229-230)."  (Doc.  157).

31.      When hired, Kimmett understood that he would be responsible for addressing certain managerial and efficiency issues, as well as some employee issues.  Ex. 1 (Kimmett Dep.) 109:16-111:3; 135:24-136:3.  Kimmett was not instructed to examine the entire FES operation, but he began doing so after commencing his employment and learning of wrongdoing from DOR and FES employees and examining certain records and documents. Ex. 1 (Kimmett Dep.) 113:5-115:13, 122:4-125:14. Kimmett attempted to address issue of wrongdoing and fraud despite being told by FES Chief Michael Roman to "get over this" and to stop spending time on

the problems and issues Kimmett had identified. Ex. 1 (Kimmett Dep.) 114:19-116:16. Despite

such instruction, Kimmett went beyond his given job duties to look into "gross mismanagement,

improprieties, …misfeasance or malfeasance" because he began to suspect substantial fraud

and a cover-up. Ex. 1 (Kimmett Dep.) 129:18-25; 177:20-23.  (Doc.  130).

Defendants **DENY** that plaintiff's understanding of his job was as limited as paragraph

31 suggests or that looking into "gross mismanagement, improprieties...misfeasance or

malfeasance" were beyond his job duties.  Defendants state that "[t]o the contrary, it is

undisputed that plaintiff was asked to 'look at the operation,' Kimmett dep. 113; that he viewed

identifying problems and issues as part of his job, Kimmett dep. 113-114; and that he viewed

his job as being charged with 'running and cleaning up FES', Kimmett dep.  372-373.  Kimmett

dep.  Ex.  46, p. 1254, 'Examining and restructuring' the FES operation 'in all aspects', Kimmett

dep.  493-494, Kimmett dep.  Ex.  32, p. 2, and 'identify [ing] any problems, issues and

improprieties, etc.  that exit (sic) in the operation.'  Kimmett dep.  120, 121, Kimmett dep.  Ex.

4.  Defendants **DENY** that defendant Roman instructed plaintiff not to address the problems and

issues plaintiff identified.  Rather defendants Roman and Rovelli asked plaintiff whether he had

personal knowledge of fraud when he expressed concerns about it in connection with the

PennDOT audit and encouraged him to tell them about it if he did.  Roman dep.  269-274; *see*

*also* Rovelli dep. 283-287 (when plaintiff stated to Rovelli that he believed Keiser had engaged

in wrongdoing but declined to identify what the wrongdoing was or who informed him of it,

Rovelli told him if he found evidence he must provide it).  One another occasion when plaintiff

made 'generic' assertions that defendant Keiser was involved in illegal or bad behavior, Roman

told him making a generic assertion was not enough to start an investigation.  Roman dep.  275.

Roman also told him that unless he was willing to identify a person who could provide facts that

could be investigated, or provide such facts himself, he should get past the fraud issue.  Roman

dep.  274-276.  Defendants **DENY** plaintiff discovered anything other than operational and

managerial problems of precisely the kind he had been hired to identify and remedy.  *See* ¶47,

*infra.*"  (Doc.  157).

32.        Shortly after starting at FES, Kimmett met with each of his employees in order to learn

more about the Collections unit and its operations.  Ex. 1 (Kimmett Dep.) 214:17-215:16.  (Doc.

130).

33.        In the course of those meetings, he learned from a number of his employees that

Keiser and Santanna had trashed Gill's documents on the eve of the Comptroller's audit.  Ex. 1

(Kimmett Dep.) 215:17-216:14; Ex. 18 (Bellaman Dep.) 216:12-21.  (Doc.  130).

        Defendants **ADMIT** plaintiff was told Keiser and Santanna threw away documents in

Lee Gill's work area.  Defendants **DENY** defendants Keiser threw away all of Gill's documents or

knowingly threw away any documents that would have been helpful to Ottenberg's review.

Defendants state that "[a]fter Gill resigned, Keiser and Santanna cleared out Gill's work cubicle

and threw out some old documents from past fiscal years that were stored in Gill's cubicle.

Keiser dep.  55-56; Bellaman dep.  63-67, 74-75.  The billings that Ottenberg needed to

recreate were only for the then-current fiscal year of 2005-06.  Ottenberg Decl. ¶16.  Ottenberg

was able to straighten out the reconcile of commission payments to the PCA's and the billings to

the creditor state agencies that were of concern by retrieving information from the FES

computer system, ORACLE, from documents retained by the Comptroller's Office and from documents he obtained from the Department of Revenue.  Ottenberg dep. 17, 21-22, 371-371; Ottenberg decl.  ¶¶15-18; *see also* Pl.  Ex.  15 (Keiser Ex. 2, pp. 1-2, 5/02/06 Ottenberg e-mail to Sheri Phillips).  Defendants also **DENY** that the Comptroller's Office conducted and 'audit" of FES.  Ottenberg dep. 51-52."  (Doc.  157).

34.      When Kimmett then informed Brandwene that he wanted to meet with Ottenberg, Brandwene told Kimmett that was unnecessary and that "it's all straightened out." Ex. 1 (Kimmett Dep.) 216:15-217:1.  (Doc.  130).

Defendants states that ¶ 34 is **DENIED.**  Brandwene decl.  ¶8.  (Doc.  157). Defendants state that "[i]n ¶ 8. of Brandwene's Declaration, he avers, 'I did not at any time discourage Plaintiff from speaking about FES with Assistant Comptroller Doug Ottenberg.'  (Doc. 158, Ex. 17)."

35.      Kimmett nevertheless met with Ottenberg and Comptroller Ed Bianco. Ex. 1 (Kimmett Dep.) 217:6-21. When Kimmett informed Ottenberg and Bianco, "I'm told that you came in and reviewed everything and that you're comfortable that there's no … wrongdoing or mismanagement," they responded "We have concerns too…. Doug said we went in and he said 'I put a Band-Aid on the Lee Gill situation…. We wanted to expand and look at more stuff and we weren't allowed to…. [I]t concerns us that we weren't allowed to do those things because we feel they needed to be done.'" Ex. 1 (Kimmett Dep.) 218:2-13. As Ottenberg testified, "[W]e all were concerned about fraud, and we all continued to express concerns about the entire FES operation." Ex. 14 (Ottenberg Dep.) 217:13-19. Ottenberg explained that Keiser was

uncooperative during his audit and that Brandwene and Rovelli did not want the audit to continue. Ex. 1 (Kimmett Dep.) 218:17-219:5.  (Doc.  130).

Defendants **ADMIT** that Ottenberg and Bianco had concerns about FES.  Defendants **DENY** that the Comptroller's office and Ottenberg were not allowed to continue or expand their review of FES operations.  Ottenberg decl.  ¶¶40-41.  Defendants **DENY** that defendant Keiser was uncooperative and that defendants Brandwene and Rovelli did not want the review to continue.  Defendants state that "Ottenberg testified that FES staff, including Brandwene and Keiser, was always responsive to his request for information.  Ottenberg dep.  39-42.  He also testified he never found that anyone was trying to prevent him from carrying out his work. Ottenberg dep. 42, 91; Ottenberg decl. ¶40-41.  Defendants **DENY** that Ottenberg performed an 'audit' of FES.  Ottenberg dep. 51-52, Bianco decl. ¶10."  (Doc.  157).

36.      Bianco and Ottenberg's concerns about FES's operations were significant enough that on December 7, 2006, they informed Kimmett by email  that they could not provide an "unqualified" signature to the statement that there were no material internal control weaknesses or problems with accounts receivable. Ex. 14 (Ottenberg Dep. 210:18-212:25); Ex. 22 (Ottenberg Dep. Ex.  2).  (Doc.  130).

Defendants state that ¶ 36 is  **DENIED**.  Defendants state that "Ottenberg asked plaintiff for his thoughts on whether an unqualified signature could be provided.  Pl.  Ex.  22 (Ottenberg Pl.  Ex.  2).  Ottenberg testified that plaintiff did not have facts to justify writing a qualified response.  Ottenberg dep.  215-216.  Ottenberg also testified that if there was support

or proof that fraud existed 'we would absolutely write a qualified opinion.'  Ottenberg dep.

220-221; Fiancé decl.  ¶¶14-15."  (Doc.  157).

37.         As the agency that collects all taxes, DOR is responsible for receiving the lion's share

of Pennsylvania's revenue.  As such, the Collections unit has significant interactions with DOR

and the unit historically had handled the placement of uncollected DOR debts with PCAs.  *See*

Ex. 7 (Rovelli Dep.) 33:21-37:22; Ex. 6 (Ryan Dep.) 76:5-77:1. OAG – not DOR – enters into

contracts with PCAs for the collection of Pennsylvania's debt, including DOR's debt. *See* Ex. 23

(Coyne Dep.) 39:17-41:5; Ex. 6 (Ryan Dep.) 57:3-7.  (Doc.  130).

38.         From September 2004 through the present, James Furlong, an employee of DOR's

Compliance Division, has served as the designated liaison between FES and DOR and as the

Assistant to Deputy Secretary Robert Coyne.  Ex. 24 (Furlong Dep.) 14:9-16.  In that role,

Furlong was the lead person for DOR's interactions with FES and the PCAs. Ex. 24 (Furlong

Dep.) 15:15-17:13.  (Doc.  130).

39.         In November 2006, Kimmett met with four DOR employees, including Furlong. Ex. 1

(Kimmett Dep.) 169:6-170:17. They informed Kimmett on a confidential basis of significant

concerns DOR had with FES, including information concerning wrongdoing and fraud by Keiser.

Ex. 25 (Kimmett Dep. Ex. 15); Ex. 1 (Kimmett Dep.) 122:4-123:10, 171:4-14.  (Doc.  130).

         Defendants **ADMIT** that in November 2006 plaintiff had a meeting with four

employees of the Department of Revenue including collections liaison Jim Furlong.  Defendants

state that "the meeting was held at plaintiff's request to provide him with an overview of the

collections process as it involved both FES and Revenue.  Furlong dep.  116-117, 122, 135-138.

Defendants **DENY** that the Revenue employees spoke to plaintiff confidentially about significant concerns the department had with FES or that they provided information concerning wrongdoing and fraud by defendant Keiser.  Kimmett dep  206-208 (denying Furlong told plaintiff to keep the information confidential); Furlong dep. 123, 139, 140 (denying Furlong told plaintiff to keep the information confidential)l; Furlong dep. 135-139, 143-145 (denying Furlong or anyone at the meeting shared troubling or negative information about anyone in either agency); Furlong dep. 260-262 (denying Furlong provided information about cases being moved to PCAs right before a payment from the debtor was expected and denying Keiser demanded commission payments for 'pay directs' without documentation); Furlong dep.  274-281 (denying Furlong or, to Furlong's knowledge, anyone else in Revenue gave plaintiff information about improprieties in FES that plaintiff claimed in Furlong Ex. 18 Revenue gave him)."  (Doc. 157).

40.-41.  We find, based on Defendants' responses and their citation to the record, Doc. 157, ¶'s 40.-41., that there are disputed facts as to these paragraphs.

42.       Furlong told Kimmett that Kimmett was in a "tough spot" and that, if Kimmett pursued this, Rovelli and Brandwene would find a way to fire Kimmett. Ex. 1 (Kimmett Dep.) 173:20-174:23, 180:24-181:12.  Kimmett was frightened by this because he knew Rovelli was and is very powerful within OAG.  Ex. 1 (Kimmett Dep.) 181:21-182:6.  Kimmett testified: "[I]t scared me.  You know, if this is going on, I'm now in the middle of something that I didn't expect to get in the middle of."  (Kimmett Dep.) 175:10-12.  Bianco and Ottenberg also would warn Kimmett on more than one occasion that if he pursued investigating the wrongdoing and

fraud, Rovelli and Brandwene would find a way to fire him.  Ex. 1 (Kimmett Dep.) 227:7-228:17.  (Doc. 130).

Defendants stat that ¶ 42 is **DENIED.**  Defendants point to the following evidence: Furlong dep. 262-263 (denying Furlong ever told plaintiff that plaintiff was in a "tough spot); Furlong dep. 325-326 (denying Furlong ever told plaintiff that plaintiff was in danger of being fired); Ottenberg decl. ¶ 43 (denying Ottenberg ever told plaintiff that he would be fired or that Brandwene and Rovelli would have him fired); Bianco decl. ¶ 16, 21 (denying Bianco ever told plaintiff that he would be fired or suggested that he was in danger of being fired by anyone in the OAG or that Brandwene and Rovelli would have him fired). (Doc. 157).

43.      Subsequent to that meeting, Kimmett met with Brandwene to discuss what he had learned from DOR.  Ex. 1 (Kimmett Dep.) 175:22-176-23; Ex. 8 (Brandwene Dep.) 78:14-81; 13; Ex. 25 (Kimmett Dep. Ex. 15).  Brandwene then spoke with Rovelli about the matter, and subsequently informed Kimmett that Rovelli wanted Brandwene to follow up.  Ex. 1 (Kimmett Dep.) 176:24-177:7.  Kimmett thought it "surreal" that Rovelli would have Brandwene, who was implicated in the wrongdoing, follow up on the matter.  Ex. 1 (Kimmett Dep.) 177:2-7. When Kimmett informed Furlong of this, Furlong stated that Revenue would not provide any information to Brandwene.  Ex. 1 (Kimmett Dep.) 177:8-11, 310:5-14.  Brandwene followed up by calling Furlong and asking Furlong why he was providing information to Kimmett and why he was dragging Keiser into this.  Ex. 1 (Kimmett Dep.) 177:12-19.  When told this by Furlong, Kimmett became concerned about a potential cover up.  Kimmett Dep. 177:20-23.  (Doc. 130).

Defendants state that ¶ 43 is **DENIED**.  Defendants point to the following evidence: Brandwene dep. 78-81 (plaintiff told Brandwene he had a "smoking gun" regarding Keiser but that he could not reveal what it was); Rovelli Resp. Pl. 1st Interrog, 2 (Rovelli asked Brandwene to inquire of Revenue Deputy Secretary Coyne whether Revenue had any evidence or reason to believe that Keiser had engaged in wrongdoing and Coyne responded that Revenue had none); Furlong dep. 135-139, 143-145 (denying Furlong or anyone at the November 2006 meeting shared troubling information about anyone in FES or Revenue); Furlong dep. 260-262 (denying Furlong provided information about cases being moved to PCAs right before a payment from the debtor was expected and denying Keiser demanded commission payments for "pay directs" without documentation); 274-281 (denying Furlong or, to Furlong's knowledge, anyone else in Revenue gave plaintiff information about improprieties in FES that plaintiff claimed in Furlong Ex. 18 Revenue gave him); Furlong dep. 270-271 (denying Brandwene called Furlong and asked him why he was providing information about FES to plaintiff); Brandwene decl. ¶ 9 (denying Brandwene discouraged Furlong from giving plaintiff information about FES or FES personnel) Furlong dep. 177-180 (denying Furlong had any knowledge of information Revenue had that was not to be shared with OAG); Furlong dep. 170-171, Furlong Ex. 13 (noting that a document sent confidentially to plaintiff had been "vetted" previously with Brandwene); Furlong dep. 174-175 (denying Furlong told plaintiff that Revenue would not provide information to him).  (Doc. 157).

44.          For a few weeks after the meeting, Furlong continued to provide Kimmett information on a "confidential basis" relating to problems at OAG. *See* Ex. 29 (Coyne Dep. Ex. 14); Ex. 30 (Furlong Dep. Ex. 13). That information included emails in which Furlong and others at DOR harshly criticized OAG for, among other things, "maintain[ing] no meaningful controls, reports, checks and balances, nor reconciliations for cases referred directly to their offices. There are no time frames in place for OAG to 'work the case', then return to Revenue." Ex. 30 (Furlong Dep. Ex. 13) at 1.  Furlong also said there were close to 30,000 unaccounted-for cases. Ex. 1 (Kimmett Dep.) 235:1-20.  (Doc.  130).

Defendants **ADMIT** Furlong provided plaintiff with information and documents after the November 2006 meeting.  Defendants further **ADMIT** that Furlong provided Pl.  Ex.  29 (Coyne Ex.  14) and Pl. Ex. 30 (Furlong Ex. 13) to plaintiff.  Furlong dep. 160-163; Furlong dep. Ex. 12.  Defendants **DENY** that the purpose of sharing the documents was to point out problems at FES or to "harshly" criticize OAG.  Defendants state that "the documents were provided because Furlong and plaintiff were engaged on a day-to-day basis trying to create a more efficient workflow for both agencies and Furlong believed it would be helpful for plaintiff to know what Furlong had previously proposed to his boss, Mr. Coyne, and to plaintiff's boss, Mr. Brandwene,  Furlong dep.  161-164, 166-173, 191-193.  Defendants do not dispute that Furlong told plaintiff there were 30,000 cases unaccounted for.  Defendants **DENY** Furlong suggested the cases were 'lost.'  Rather Furlong made the comments in the context of the efforts OAG and Revenue were making to reconcile their respective inventories of cases to make sure both agencies had an accurate record of who was handling what.  Furlong dep. 179-181, 191-

193.  The efforts at reconciliation were an on-going project that plaintiff was assigned to help with.  Furlong dep. 234-235." (Doc. 157).

45.   We find, based on Defendants' response and their citation to the record, Doc. 157, ¶ 45., that there are disputed facts as to this paragraph.

46.        Kimmett spoke with Ottenberg about what he had learned from DOR and emailed Ottenberg some of the information he had received from Furlong. Ex. 32 (Ottenberg Dep. Ex. 9); Ex. 1 (Kimmett Dep.) 207:23-208:24. Ottenberg understood that the information received from Furlong dealt with fraud, and that if Brandwene and Keiser intended to push and steer accounts to PCAs as described, that intent would constitute fraud. Ex. 14 (Ottenberg Dep.) 358:24-359:16.  (Doc.  130).

        Defendants **ADMIT** plaintiff told Ottenberg what plaintiff claimed he learned from Revenue.  Defendants **DENY** Furlong and others at Revenue said what plaintiff represents they said.  Furlong dep.  135-137, 143-145, 170-171, 174, 260-262, 270-271, 274-281. Defendants **ADMIT** Ottenberg understood that if what plaintiff said was true, fraud could be involved.  Defendants **DENY** plaintiff provided Ottenberg with anything more than hearsay regarding fraud.  Ottenberg dep. 203-206.  Defendants also **DENY** Ottenberg uncovered information that suggested fraud had occurred.  Ottenberg dep. 118-119; *see also* Ottenberg dep.  92-118 (describing Ottenberg's effort to determine whether cases had been improperly steered to collection agencies).  (Doc.  157).

47.        Kimmett experienced stiff resistance from his superiors once he began speaking and reporting about the waste, mismanagement, and wrongdoing he was discovering.  Ex. 11 (Kimmett Decl.) ¶¶10-21.  Early on, Ottenberg and Kimmett discussed the fact that Keiser and Brandwene were resisting Kimmett's attempt to identify and rectify issues Kimmett discovered at FES.  Ex. 33 (Ottenberg Dep. Ex. 14); Ex. 14 (Ottenberg Dep.) 319:14-320:23.  As Kimmett continued discovering and reporting on problems, he was subjected to continuous retaliation.  Ex. 1 (Kimmett Dep.) 328:7-16 ("I think everything that I reported at some point I was  – there was just continuous retaliation, you know, from the office, you know, from my superiors."); *id.* 375:3-13 ("Once I started identifying problems and issues and irregularities, improprieties, whatever you want to call them, I received stiff resistence throughout."); *id.* 506:13-18 (Kimmett was "treated like garbage"' "ignored"; "ostracized"); Ex. 9 (Roman Dep.) 613:8-12 ("[Mr. Kimmett] complained about resistance a lot.").  Rovelli denied Kimmett a promotion to Chief of FES because Kimmett's reports of gross mismanagement and wrongdoing were inconsistent with OAG's "culture."  Ex. 11 (Kimmett Decl.) ¶ 14-15.  (Doc. 130).

         Defendants state that ¶ 47 is **DENIED**.  Defendants state that "Plaintiff discovered nothing other than operational and managerial problems of precisely the kind he had been hired to identify and remedy.  Kimmett dep. 372-374, Kimmett dep. Ex. 46 (he was charged with "running and cleaning up FES"); Kimmett dep.  493-494, Kimmett dep. Ex. 32, p. 2 (he examined and restructured FES operations in all aspects); Kimmett dep. 120-121, Kimmett dep. Ex. 4 (describing his marching orders as "identifying] any problems issues and improprieties, etc. that exit (sic) in the operation.); *see also* Rovelli dep.  62-68, 83-87, 97-98, 251-254, 303-306

(describing operational and managerial problems such as record keeping deficiencies, inadequate technology, and excessive dependence on manual processes that led to the hiring of plaintiff); Ottenberg dep. 20-21, 24-26, 29-33, 37-38, 43-48 (the same); Kimmett dep. 217-220, 225, 228-229, 242, Kimmett dep. Ex. 12 (after meeting with his supervisors plaintiff prepared a plan of action to address problems he and Ottenberg found); Kimmett dep. 250-257, Kimmett dep. Ex. 14; Pl. Resp. Req. for Adm. No. 1; (after making some revisions plaintiff implemented all but one of the short term solutions he proposed in his plan of action); Rovelli decl. ¶ 7 (plaintiff reported suspected commission overpayments to Rovelli and Phillips and was asked to obtain more information before attempting to recoup the funds from the PCAs); *see also* ¶¶ 52, 53, 54, 55, 58, 59 and 62, *infra*, and the evidence cited therein refuting plaintiff's assertion that he discovered 'wrongdoing.'  Plaintiff was not subjected to retaliation of any kind. For the period from the beginning of his employment in September 2006 until the end of the fiscal year on June 30, 2007, plaintiff received a positive performance evaluation and an above average raise, even though he raised concerns regarding the operation of FES with defendants Brandwene, Roman and Rovelli. Kimmett dep. 175-176, 209, 221, 226-229, 242 (concerns raised); Kimmett dep. Ex. 12, 14, 15 (concerns raised); Ottenberg dep. 51-55 (concerns raised); Roman dep. 216-217, 266-268, 271-272 (concerns raised); Rovelli dep. 386, 390, 393 (positive performance evaluation and above average raise); Pl. Resp. Req. for Adm. No. 14, Ex. 11 (positive evaluation); Sarteschi decl. ¶ 9-10 (above average raise).  Plaintiff was allowed to promote and give raises to his staff.  Kimmett dep. 266-267 (Dianne Burman), 400-401 (Sherry Bellaman), 515-516 (Cindy Nale and Holly Goho).  Plaintiff was not promoted to Section Chief

because he had no litigation experience and had not demonstrated the interpersonal skill,

judgment or temperament needed to be an effective Section Chief.  Rovelli Resp. to Pl. 1st

Interrog. 9.  Rovelli did not discuss with plaintiff why he was not promoted and did not, as

paragraph 47 implies, tell plaintiff that his "reports of gross mismanagement and wrongdoing

were inconsistent with OAG's 'culture'."  Rovelli decl. ¶ 3-6 (Rovelli took the occasion of

informing plaintiff of Roman's appointment to encourage plaintiff to continue doing what he

was doing well, his work on accounts and contracts, and to work on what he wasn't doing well,

his handling of personnel issues; Rovelli told plaintiff that OAG management culture is to pursue

a structured, team approach to personnel problems, carefully documenting misconduct, efforts

to cure, and disciplinary actions, and that the information he had provided about Keiser was

insufficient to warrant any personnel inquiry or action)."  (Doc. 157).

48.  We find, based on Defendants' response and their citation to the record, Doc. 157, ¶ 48.,

that there are disputed facts as to this paragraph.

49.        On August 13, 2008, OAG Communications Director, Kevin Harley, issued

statements that labeled Kimmett's lawsuit as a "frivolous lawsuit by a disgruntled employee." Ex.

34 (Sarteschi Dep. Ex. 5). Harley made that statement without examining any of the facts

underlying Kimmett's complaint. Ex. 35 (Harley Dep.) 76:11-77:16, 79:18-95:19. Harley did

not have prior conversations with anyone who had worked with Kimmett at OAG when

choosing to label Kimmett "disgruntled." Ex. 35 (Harley Dep.) 73:8-74:14, 78:21-79:4. Indeed,

Rovelli and OAG Human Resource Director Bruce Sarteschi have specifically disavowed that

term as describing Kimmett. Ex. 7 (Rovelli Dep.) 562:7-565:12; Ex. 21 (Sarteschi Dep.) 184:7-

10. (Doc. 130).

Defendants **ADMIT** Harley described plaintiff's lawsuit as stated and that he did not

investigate the allegations in the complaint beforehand. *See* Harley dep. 76-77, 79-95.

Defendants further **ADMIT** that neither defendant Rovelli nor defendant Ryan suggested that

Harley use the words he used. Harley dep. 73-74. Defendants further **ADMIT** that defendant

Rovelli said he would describe plaintiff as "unhappy" rather than as "disgruntled." Defendants

**DENY** that Harley did not have any prior conversations with anyone who worked with plaintiff

at the OAG. *See* Harley dep. 73-73, 78-79 (cites do not support the assertion); Rovelli dep.

562-565 (testifying he told Harley there were performance problems with plaintiff). Defendants

**DENY** that Bruce Sarteschi suggested the term disgruntled did not aptly describe plaintiff.

Defendants state that Sarteschi denied that he had used it to describe plaintiff. Sarteschi dep.

184. (Doc. 157).

50.      On August 13, 2008, Kimmett e-mailed Roman about the "toxic environment"

Roman fostered in FES by allowing Kimmett's subordinates to circumvent the chain of

command and bring their complaints directly to Roman without speaking to Kimmett first. *See*

Ex. 36 (Sarteschi Dep. Ex. 6); *see also* Ex. 11 (Kimmett Decl.) ¶ 18. (Doc. 130).

Defendants **ADMIT** that after plaintiff filed his lawsuit, he sent defendant Roman an

e-mail accusing him of creating a "toxic environment" by allowing plaintiff's subordinates to

circumvent the chain of command. Defendants **DENY** that Roman encouraged plaintiff's staff

to circumvent plaintiff.  Rather, Defendants state that "Roman encouraged staff to raise their

concerns directly with plaintiff.  Roman decl.  ¶¶20-21, 41-47; Roman decl.  Ex. 2."  (Doc.

157).

51.        Bellaman testified that on the day Kimmett filed his lawsuit, Keiser presented

Bellaman with a copy of the lawsuit and then threatened Bellaman. *See* Ex. 18 (Bellaman Dep.)

166:10-169:13 ("[Keiser] said, you need to watch yourself, and you need to be careful now. I

looked at her, I said, what do you mean by that.  Just be careful. And she walked away.").  Keiser

also made disparaging remarks about Kimmett. Ex. 18 (Bellaman Dep.) 168:2-9.  (Doc. 130).

Defendants **ADMIT** that defendant Keiser spoke to Sherry Bellaman after plaintiff

filed his lawsuit, gave her a copy of the complaint and may have commented that she should be

careful, because Keiser and others had been cautioned not to talk about lawsuits.  Defendants

**DENY** that Keiser made disparaging comments about plaintiff.  Keiser dep. 252-257.  (Doc.

157).

52.        In mid-December 2006, Ottenberg informed Phillips of myriad issues Kimmett and

he had discovered at FES, including "2000+ dockets that were never assigned to a collector,

hundreds of inactive accounts sitting with [PCAs] well beyond their 6 month time limit, and the

millions of dollars with no collector notations nor any type of activity for well over two years…."

Ex. 37 (Ottenberg Dep. Ex. 3) at 2 (emphasis added).  (Doc.  130).

Defendants **ADMIT** that Doug Ottenberg sent Sheri Phillips an e-mail with the

language quoted.  Defendants **DENY** that Ottenberg's comments gave an accurate picture of the

status of accounts in FES.  Defendants state that "as Ottenberg explained in his deposition, his

comments in the e-mail were based on a 'master record' without further exploration of 'all of the detailed records and seeing ...even though it wasn't assigned maybe it was written off. Maybe it was closed.' Ottenberg dep. 233. Ottenberg also described his comments as 'preliminary' and based on his incomplete understanding of the system. Ottenberg dep. 233. He explained he should not have limited his review to the master record but should have explored matters down to the transactional level because 'when something was written off, it didn't always carry up to the master record.' Ottenberg dep. 233-234." (Doc. 157).

53.       On January 14, 2007, Ottenberg had concluded that both Keiser and Brandwene had exhibited sheer and utter incompetence in their prior management of FES. Ex. 33 (Ottenberg Dep. Ex. 14); Ex. 14 (Ottenberg Dep.) 331:18-334:4. Ottenberg testified, "So yes, I would say that it's safe to say that my thinking at that time was that both Jill and Steve apparently had sheer and utter incompetence." Ex. 14 (Ottenberg Dep.) 333:16-19. (Doc. 130).

Defendants **ADMIT** that in January 2007 Ottenberg believed that Keiser and Brandwene had exhibited sheer and utter incompetence. Defendants **DENY** that the e-mail on which the statement is based is dated January 14. Defendant state that "the e-mail is dated January 17. Pl. Ex. 33 (Ottenberg Pl. Ex. 14). Defendants also **DENY** that Ottenberg retained that view after further examination of the FES operation. He explained he should not have limited his review to the master record but should have explored matters down to the transactional level because 'when something was written off, it didn't always carry up to the master record.' Ottenberg dep. 233-234." (Doc. 157).

54.      By May 29, 2007, Ottenberg would confirm to Bianco that Kimmett and he "found gross mismanagement" at FES and that "the mismanagement of dockets is grossly obvious." Ex. 27 (Corbett Dep. Ex. 5) at 1. Ottenberg defined the gross mismanagement at FES as follows:

> actions or situations arising out of management ineptitude or oversight, leading to major violations of FES processes, regulations, or contract/grant provisions which could severely hamper the accomplishment of program goals. These include situations which lead to the waste of Government resources and could jeopardize the project or reputation of the agency. This category includes, but is not limited to, unauditable records, unsupported costs, highly inaccurate fiscal and/or program reports, and the lack of good internal control procedures.

Ex. 27 (Corbett Dep. Ex. 5) at 2.  (Doc.  130).

Defendants **ADMIT** that Ottenberg described what he found in FES as stated. Defendants **DENY** that Ottenberg equated that state of affairs to fraud.  Defendants point out that Ottenberg stated, "we are clearly not aware of any fraud."  Pl. Ex. 27 (Corbett dep. Ex. 5). Defendants state that in Ottenberg's deposition, "he explained that he thought he and plaintiff had adequately investigated the only issue of possible fraud that had come to their attention. Ottenberg dep. 155-156."  (Doc.  157).

55.      In early January 2007, Kimmett and Ottenberg met with Phillips, Rovelli, and Brandwene to discuss issues and problems at FES. Ex. 14 (Ottenberg Dep.) 51:24-52:4; Ex. 7 (Rovelli Dep.) 239:4-240:11. Kimmett and Ottenberg decided that Ottenberg would take the lead in talking at the meeting so as to avoid putting Kimmett in an awkward situation of discussing systemic management failures and wrongdoing with his bosses, Rovelli and Brandwene. Ex. 1 (Kimmett Dep.) 227:7-228:4. Ottenberg subsequently sent a short email to Kimmett recapping the meeting which stated, "I hope you were OK with how that was

presented. We have a problem; we're allowing FES to save face; Tom's your man; He can't fix it

with the current employee structure; give him the reins to get it done." Ex. 38 (Ottenberg Dep.

Ex. 1 ). (Doc. 130).

Defendants **ADMIT** the meeting to discuss issues and problems at FES was held as

stated and that Ottenberg took the lead in presenting what had been found.  Defendants also

**ADMIT** that Ottenberg sent the e-mail identified.  Defendants **DENY** that "wrongdoing" was

discussed at the meeting.  Defendants state that "the discussion concerned operational and

managerial problems of precisely the kind plaintiff had been hired to identify and remedy.

Kimmett dep. 372-374, Kimmett dep. Ex. 46 (he was charged with "running and cleaning up

FES"); Kimmett dep. 493-494, Kimmett dep. Ex. 32, p. 2 (he examined and restructured FES

operations in all aspects) Kimmett dep. 120-121, Kimmett dep. Ex. 4 (describing his marching

orders as "identify [ing] any problems issues and improprieties, etc. that exit (sic) in the

operation.); *see also* Rovelli dep. 62-68, 83-87, 97-98, 251-254, 303-306 (describing

operational and managerial problems such as record keeping deficiencies, inadequate

technology, and excessive dependence on manual processes that led to the hiring of plaintiff);

Ottenberg dep. 20-21, 24-26, 29-33, 37-38, 43-48 (the same); Kimmett dep. 221, 226-227;

Kimmett dep. Ex. 10 (the issues discussed at the meeting included discrepancies in account

inventories between referring agencies and FES and between FES and PCAs, contractual

provisions that were not being enforced, inactive and unassigned accounts, control of referrals

to FCAs and missing documentation for past commission billings and receipts); Ottenberg dep.

54-55 and Ottenberg dep. Def. Ex. 9 (the same).  Defendants also **DENY** that Ottenberg took

the lead in the meeting to avoid putting plaintiff in an awkward position with his supervisors or

that Ottenberg and plaintiff discussed such a reason for Ottenberg taking the lead.  Ottenberg

Decl ¶¶28-29 (denying he took the lead a the meeting for the reasons asserted by plaintiff.)"

(Doc.  157).

56.        After the meeting, Kimmett learned from Ottenberg that Sherri Phillips wanted

Kimmett to draft a "plan of action" addressing problems that had been discovered at FES. Ex. 1

(Kimmett Dep.) 232:13-233:20. In response, Kimmett drafted a 10-page action plan presenting

twelve "issues" and proposed solutions along with intermediate-term objectives and long-term

goals. Ex. 39 (Brandwene Dep. Ex. 12). Among the issued raised by Kimmett were manual

overrides of the automatic referral process, thousands of extensions granted to PCAs, problems

with "personnel in FES," contractual violations by the PCAs, unsupervised work by PCA

employees on site at FES who had access to confidential information, and lack of oversight over

pay direct commissions paid to PCAs. Ex. 39 (Brandwene Dep. Ex. 12).  (Doc.  130).

Defendants **ADMIT** plaintiff was asked to draft an action plan and did so.

Defendants **DENY** he was asked to do so after the meeting.  Defendants state that "at the

meeting, either defendant Rovelli or Sheri Phillips asked plaintiff to draft the plan. Ottenberg

dep. 75-76; 80-81; Pl. Ex. 39 (Brandwene dep. Ex. 12)."  (Doc. 157).

57.        After receiving Kimmett's initial action plan, Rovelli called Kimmett into his office. Ex.

1 (Kimmett Dep.) 258:10-22. Rovelli was upset with Kimmett and started the meeting by saying

"I read this draft and you're telling me that somebody here is a crook. Well, I'm not a crook,

Steve's not a crook so you must be talking about Jill Keiser." Ex. 1 (Kimmett Dep.) 258:17-22. Rovelli then ordered Kimmett to revise the action plan to take out a number of the statements relating to FES personnel. Ex. 1 (Kimmett Dep.) 259:3-260:18; Ex. 7 (Rovelli Dep.) 244:22-246:14. At Rovelli's request, Kimmett circulated a revised plan of action that eliminated any reference to FES personnel. Ex. 7 (Rovelli Dep.) 216:13-218:3. (Doc. 130).

Defendants **ADMIT** that defendant Rovelli met with plaintiff after he received plaintiff's initial plan of action, that he asked him to remove comments concerned with personnel rather than practice and procedure and submit a revised plan, and that plaintiff did so. Defendants **DENY** that Rovelli was upset with plaintiff, that Rovelli made the statements plaintiff attributed to him, or that the infirmity of the comments Rovelli asked plaintiff to remove from the plan was merely that they concerned personnel. Rovelli decl. ¶¶1-2. Defendants state that "Rovelli told plaintiff to remove comments the evident purpose of which was to criticize personnel, but that also were inaccurate and uninformed or misleading. Rovelli dep. 177-185, 189-191 (plaintiff commented inaccurately that Revenue took over the PCA referral process because Revenue was unhappy with FES); Rovelli 199-204, 212-213 (plaintiff misleadingly implied that NCO, a PCA formerly under contract with OAG, had been treated unfairly because it had received only three referrals since 2001, but ignored or did not make the effort to learn that OAG had suspended NCO from referrals pending an investigation of NCO practices by the OAG Bureau of Consumer Protection, which culminated in the termination of NCO's contract). Defendants also **DENY** any suggestion that revisions Rovelli told plaintiff to

117

make in any way altered any of the issues plaintiff reported or solutions he proposed.  *Compare* Rovelli dep. Ex. 9 and Rovelli dep. Ex. 7; *see* Rovelli dep. 176-177, 236."  (Doc. 157).

58.        Kimmett determined that PCAs were receiving commission payments to which they were not entitled.  Kimmett directed Ottenberg to run a program to determine whether PCAs were receiving commissions to which they were not entitled.  Ex. 1 (Kimmett Dep.) 452:1-453:5.  On February 20, 2007, Ottenberg reported back that Kimmett's "hunch" was correct; the program identified $292,981.26 in commissions wrongly paid to PCAs.  Ex. 40 (Corbett Dep. Ex. 19) at 1; Ex. 1 (Kimmett Dep.) 453:6-24.  Those overpayments included "commission payments that were paid <u>prior to the PCA receiving the account</u> or after their holding period expired."  Ex. 40 (Corbett Dep. Ex. 19) at 1 (emphasis added); *see also* Ex. 27 (Corbett Dep. Ex. 5) at 2 (Ottenberg tells Bianco that representation letter "might have to be qualified" because of commission payments made to PCAs outside of the holding period). (Doc. 130).

Defendants **DENY** ¶58 that plaintiff established PCAs were receiving commissions to which they were not entitled.  Defendants state that "the Ottenberg program, and the report it generated, was based on information contained in the FES computer system, Oracle, and was concerned with whether collections were 'timely' in relation to the time period the PCA contracts prescribed for the PCAs to work on accounts referred to them (hereinafter the "holding period").  Ottenberg decl. ¶¶31-36; Ottenberg decl. Ex. F (Also Pl. Ex. 40 and Corbett dep. Ex. 19); *see also* Keiser decl. ¶7 and Keiser decl. Ex. 1, 2, 3 (the contracts provided time periods for PCAs to work on accounts).  The program did not call into question whether the PCAs actually collected the debts, nor did it consider whether the collections were made

outside the holding period based on informal extensions of the holding period.  *Id.*; Ottenberg

decl. ¶38-39; Keiser decl. ¶¶ 6, 8 (FES based commissions on the actual collection of a debt);

Keiser decl. ¶¶9-13 (describing circumstances in which informal extensions were permitted and

relating that practice to Ottenberg's report); *see also* Keiser decl. ¶7; Keiser decl. Exs. 1, 2 and 3

(the contract provisions prescribing holding periods did not prohibit payment of commissions on

debts collected outside the holding periods).  Even assuming that a commission payment was

'proper' only if the collection was made within the holding period, the report was inadequate to

establish whether a payment was 'timely.'  The computer program was difficult to write and

prone to errors.  Ottenberg decl. ¶31; *see also* Keiser decl. ¶¶31-33 (providing an example of

how the program's failure to note the reassignment of a debt to a PCA made a timely payment

appear untimely).  The report it generated flagged payments as untimely based on the date the

debtor's payment was entered into the FES computer system rather than on the date of the

debtor's check.  Ottenberg decl. ¶¶34, 37; Keiser decl. ¶23-29 (explaining that debtors'

payments were entered into Oracle once a month and that using a debtor's check date is a

fairer and more accurate way to determine if a payment was made within the contractual

period).  Using the check date rather than the processing date to determine timeliness alone

reduces by one-third the number of 'untimely' commissions.  Keiser decl. ¶29.  The program

also failed to take into account situations in which debtors had multiple accounts and relevant

transactions were not noted in Oracle for all of the accounts.  Ottenberg decl. ¶39; Keiser decl.

¶¶ 14-18 (explaining how transactions on two accounts involving the same debtor made one

account on the report appear as though a PCA received a commission on a payment made

before the PCA received the account); *see also* Keiser decl. ¶¶ 20-21 (explaining how transactions on two accounts involving the same debtor made the payment on one account look untimely on the report).  Defendants **DENY** Ottenberg told Bianco that a representation letter might have to be qualified because of the commission payments.  Ottenberg told Bianco that the portion of the representation letter dealing with 'outstanding sanctions, litigation or disallowance of costs' might have to be qualified 'depending on how you're going after the commission payments made outside the holding period and the unpaid interest.'  Pl. Ex. 27 (Corbett dep. Ex. 5, p. 2)."  (Doc. 157).

59.      Kimmett assembled a team, which verified the findings in the report and confirmed that many of the commissions identified should not have been paid.  Ex. 1 (Kimmett Dep.) 454:4-16; Ex. 18 (Bellaman Dep.) 438:21-445:21.  But when Kimmett sought to recoup the nearly $300,000 in commissions that had been previously and erroneously paid to PCAs, he was instructed by Rovelli and Phillips not to do so.  Ex. 1 (Kimmett Dep.) 457:12-458:7.  (Doc. 130).

        Defendants **ADMIT** in ¶ 59 that plaintiff assigned several members of his staff each to review portions of the report and determine whether commissions should have been paid based on the date the account was placed and the date the debt payment was processed by FES. Bellaman dep. 293-294 (Bellaman and other staff members each reviewed several pages of the report); Bellaman dep. 294-296 (Bellaman used the transaction date, the date when the payment was put into the FES system, and not the date of the debtor's check to determine whether the payment was made within the holding period).  Defendants **DENY** that the team

accurately determined whether the commissions were earned by the PCAs.  *See* Defendants'
response to paragraph 58 above and the evidence cited therein.  Defendants **DENY** that plaintiff
was not authorized to recoup improperly paid commissions.  Rovelli decl. ¶7 (Phillips and
Rovelli declined to authorize wholesale "bill back" based on the report; they told plaintiff to
gather more information and they would authorize him to recoup commissions that, all
variables considered, should not have been paid); *see also* Kimmett dep. 457-466; Kimmett
dep. 463 ("I do have a recollection that we spoke about it and they seemed to  – at this point it
was you know, still preliminary, but they seemed to want, you know, more information on this.
You know in fairness to Sheri and Lou, I don't think they outright said no on this one").  (Doc.
157).

60.       Kimmett instructed his assistant Diane Burman to run a report each month to prevent
unearned commissions from being paid to PCAs. In May 2007, nearly $10,000 in potential
overpaid commissions were withheld thanks to this report. Ex. 28 (Burman Dep.) 165:3-173:8;
Ex. 1 (Kimmett Dep.) 272:24-273:7; Ex. 41 (Burman Dep. Ex. 4); Ex. 42 (Rovelli Dep. Ex. 14).
(Doc.  130).

        Defendants **ADMIT** that plaintiff instructed Dianne Burman to review pay direct
information to determine whether commissions were properly due to PCAs and that between
her manual review and a computer program a little over $9,000 in commissions were not paid.
Pl. Ex. 41 (Burman dep. Ex. 4); Pl. Ex. 42 (Rovelli dep. Ex.  14).  Defendants **DENY** that such
manual reviews began only after plaintiff began his employment with OAG.  *See* Gill dep. 50-
56; Keiser 14-18.  (Doc.  157).

61.        Kimmett identifies PCA contract violations. In an email thread shared "confidentially" with Kimmett, Furlong expressed DOR's concerns that PCAs had grown too comfortable with their no-bid contracts. Ex. 43 (Furlong Dep. Ex. 12) at 2 ("[A]gencies feel 'safe' with their no-bid contracts and too 'comfortable' in collecting what they can with minimal timeframes and effort."). Kimmett determined that the PCAs were violating their no-bid contracts with OAG and, in two significant respects, this was costing the Commonwealth millions of dollars. First, the PCAs had entirely failed to make any interest payments on hundreds of thousands of dollars of Commonwealth funds – debts they collected – held in their accounts each month. When Kimmett reported this and recommended that the PCAs be required to live up to the contract and pay unpaid interest going back five years, Rovelli, Phillips, and Roman rejected that proposal and instructed Kimmett only to seek interest on a going-forward basis, notwithstanding the long-standing nature of that contractual obligation. Ex. 9 (Roman Dep.) 340:5-342:7; Ex. 7 (Rovelli Dep. 379:16-380:14); Ex. 44 (Rovelli Dep. Ex. 15).  (Doc. 130).

Defendants **ADMIT** Jim Furlong provided plaintiff with an e-mail dating back to 2005 in which he discussed how to instill the urgency to collect in collection agencies who perhaps felt safe with no-bid contracts.  Furlong dep.  152-153, 156-159.  Defendants **DENY** Furlong intended his statement to convey that he opposed no-bid contracts.  Furlong dep.  156-159. Defendants **ADMIT** that plaintiff believed the PCAs were not complying with their contracts, but **DENY** that there is any evidence that any non-compliance with the contracts cost the Commonwealth millions of dollars.  *See* Pl. Ex. 9 (Roman dep.  340-342); Pl. Ex. 7 (Rovelli dep. 379-380); Pl. Ex. 44 (rovelli dep. Ex. 15).  Defendants **ADMIT** that the contracts with the PCAs

122

required the PCAs to pay interest on the debts they collected and that plaintiff recommended

that the PCAs be billed for unpaid interest going back five years.  Defendants **ADMIT** that

defendants Roman and Rovelli and Sheri Phillips disagreed  with his recommendation and

authorized plaintiff to collect the interest prospectively.  Defendants **DENY** that plaintiff was not

authorized to collect interest retrospectively.  Defendants state that "plaintiff was authorized to

collect interest retrospectively to the date the PCAs were informed that the OAG would enforce

the interest provision. *See* Pl. Ex. 44 (Rovelli dep. Ex. 15).  Roman explained as the basis of his

decision on retroactivity that a business practice had evolved whereby the Commonwealth did

not require payment of interest and that it would not be fair in such circumstances to suddenly

demand payment going back five years.  Pl. Ex. 9 (Roman dep. 342-344)."  Doc. 157).

62.       Second, Kimmett determined that FES was paying commissions to PCAs on debts that

were collected by FES long after the PCAs' holding period had expired, notwithstanding the fact

that such payments were inconsistent with the contract terms.  Although it had been

demonstrated that such overpayments were costing the Commonwealth thousands of dollars

per month, Roman's position was that, so long as the debt was collected, it was fine to pay the

PCA a commission – even when under the terms of the contract they were not entitled to such

payment.  Ex. 9 (Roman Dep.) 248:7-250:21.  (Doc.  130).

         Defendants **ADMIT** plaintiff believed that commissions had been paid contrary to the

terms of the PCA contracts.  Defendants **DENY** that the commissions were improperly paid.

Defendants state that "commissions were paid on debts actually collected by the PCAs,

sometimes after the holding period, but for good reasons related to the high volume of accounts

processed and practical business considerations.  *See* paragraphs 58 and 59, *infra*, and the

evidence cited therein.  Defendants note that while the PCA contracts require the PCAs to close

and return accounts upon expiration of the holding period, they did not specify forfeiture of

commissions on debts collected as a penalty for failure to close and return accounts upon

expiration of the holding period.  Keiser decl. ¶7; Keiser decl. Exs. 1,2 and 3 (relevant

contractual language).  Defendants also **DENY** that paragraph 62 fully represents defendant

Roman's position regarding payment of commissions on collections made after the account

holding period had expired.  Recognizing that business practices develop over time with the

assent of both parties to a contract that are not entirely consistent with the terms of the contract,

Roman explained that he was not concerned that, pursuant to business practices developed

over time between OAG and the PCAs, commissions were paid in some circumstances on

accounts held past the holding period, if indeed collections were made on such accounts.

Roman dep. 248-251; *see also* Keiser decl. ¶¶6, 8-35 (explaining FES practices and discussing

the flaws in Ottenberg decl. Ex. F, which is also Pl. Ex. 40 and Corbett dep. Ex. 19, the report on

Commissions paid outside the holding period); Ottenberg decl. ¶¶31-39 (discussing the

limitations of the report); Brandwene decl. ¶¶20-21 (discussing a case incompletely portrayed in

the report)."  (Doc. 157).

63.        Roman explained that, in his opinion, if a pattern or practice of business operations

had developed in dealing with the PCAs – even if inconsistent with the actual terms of the

contract and to the fiscal detriment of the Commonwealth – it would be inappropriate to hold

124

the PCAs to their actual obligations under the contract. Ex. 9 (Roman Dep.) 342:20-344:12. (Doc. 130).

Defendants **ADMIT** that paragraph 63, which cites to defendant Roman's deposition testimony regarding the failure of PCAs to pay interest on collections, partly represents Roman's view on the subject, but **DENY** that it fully represents his view. Defendants state that "Roman believed that the OAG should have been enforcing the interest provision all along, but that its failure to do so made it unfair to demand compliance by the PCAs after the fact. Pl. Ex. 9 (Roman dep. 343-344)." (Doc. 157).

64.      Ed Bianco of the Comptroller's Office requested that Kimmett sign off on findings submitted in response to a PennDOT audit of FES. Based on the gross mismanagement and possible wrongdoing that he had discovered, Kimmett had significant reservations in providing an unqualified signature. Ex. 45 (Ottenberg Dep. Ex. 21). On June 15, 2007, Kimmett sent two memoranda to Roman detailing his concerns, one of which Kimmett also addressed and sent to Comptroller Bianco. Ex. 45 (Ottenberg Dep. Ex. 21) at 2, 3-4. Kimmett also met with Roman to discuss his concerns. Ex. 45 (Ottenberg Dep. Ex. 21) at 1. At the meeting, Roman told Kimmett that Kimmett needed to "get past" the fraud issue. Ex. 45 (Ottenberg Dep. Ex. 21) at 1; Ex. 9 (Roman Dep.) 274:5-15; Ex. 1 (Kimmett Dep.) 115:2-21. Because of Roman's comments, Kimmett signed the unqualified response because he believed his job would be at risk if he did not do so. Ex. 11 (Kimmett Decl.) ¶ 17. (Doc. 130).

Defendants **ADMIT** Ed Bianco asked plaintiff to sign off on a management representation letter in connection with an accounts receivable audit conducted by PennDOT.

Ottenberg dep.  152-157, Ottenberg dep. Def. Ex. 27.  Defendants **ADMIT** plaintiff had

reservations about providing an unqualified signature.  Defendants **ADMIT** plaintiff sent a one

page memorandum, dated June 15, 2007, to defendant Roman only.  Roman dep. 659-662,

Roman dep. Ex. 7.  Defendants **DENY** Roman and Bianco received a two page memorandum

from plaintiff dated June 15, 2007 and identifying the subjects as "Confirmation of

Representation."  Roman dep. 659-662, Roman dep. Ex. 7; Bianco decl. ¶25; Bianco decl. Ex.

C.  Defendants **ADMIT** plaintiff met with Roman to talk about his concerns.  Defendants **DENY**

Roman told plaintiff in that conversation to get past the fraud issue in the context of the

discussion regarding the PennDOT audit.  Defendants state that "Roman asked plaintiff whether

he had personal knowledge of matters contrary to the representations required by PennDOT,

and plaintiff did not.  Roman dep. 266-276.  Defendants **ADMIT** that on another occasion

when plaintiff made 'generic' assertions that defendant Keiser was involved in illegal or bad

behavior, Roman told him that making a generic assertion was not enough to start an

investigation and that unless he was willing to identify a person who could provide facts that

could be investigated, or provide such facts himself, he should get past the fraud issue.  Roman

dep. 274-275.  Defendants **DENY** Roman suggestion in any way that plaintiff would lose his job

if he failed to sign the representation letter.  Roman decl. ¶17.  Defendants **DENY** plaintiff

discovered anything other than operation and managerial problems of precisely the kind he had

been hired to identify and remedy.  *See* ¶¶ 47, 52, 53, 54, 55, 58, 59, 62, *supra*, and the

evidence cited therein, which refutes plaintiff's assertion that he discovered 'wrongdoing.'"

(Doc.  157).

126

65.        Kimmett discussed his concerns regarding the PennDOT audit sign off with

Ottenberg. In email exchanges with Kimmett and with Comptroller Bianco on May 29, 2007,

Ottenberg confirms that Kimmett had discovered gross mismanagement at FES. Ex. 27 (Corbett

Dep. Ex. 5); Ex. 40 (Corbett Dep. Ex. 19). Ottenberg also states that there may have been fraud

in FES. Ex. 14 (Ottenberg Dep.) 354:25-355:5 ("Q: Now at this point, … you're not able to rule

out the possibility of fraud, are you? A: No, I'm not."). In the exchange with Bianco, Ottenberg

also recognized that Keiser's "close personal relationship with senior managers of the private

collection agencies is inappropriate and the mismanagement of dockets is grossly obvious … ."

Ex. 27 (Corbett Dep. Ex. 5).  (Doc.  130).

        Defendants **ADMIT** plaintiff expressed concerns to Ottenberg about signing the

management representation letter requested by PennDOT.  Defendants **ADMIT** Ottenberg

engaged in an e-mail exchange with Bianco on May 29, 2007.  Defendants **DENY** Ottenberg

credited the discovery of gross mismanagement to plaintiff alone.  Defendants state that

"Ottenberg said 'we' found gross mismanagement. Pl. Ex. 27 (Corbett dep. Ex. 5).  While

defendants **ADMIT** Ottenberg said he was not able to rule out the possibility of fraud, he also

stated he was clearly not aware of any fraud.  Pl. Ex. 27 (Corbett dep. Ex. 5, p. 1).  Defendants

**DENY** Ottenberg uncovered information that suggested fraud had occurred, despite his efforts

to do so.  Ottenberg dep. 351, 356-358, *see also* 92-118 (describing Ottenberg's effort to

determine whether cases had been fraudulently steered to collection agencies).  Defendants

**ADMIT** Ottenberg referred to Keiser's close relationship to managers of collection agencies in

his e-mail, but note that his knowledge of such relationships is based on the hearsay of another

FES employee who said that Keiser went to lunch with representatives of PCAs.  Ottenberg dep. 352-353."  (Doc. 157).

66.        Kimmett discovered approximately 250 compromises in Keiser's office, some of which dated back to the 1990s, which had never been sent to the referring agencies. Ex. 1 (Kimmett Dep.) 335:20-336:18. Kimmett put together a team to review those files, and determined that some had never been processed despite payment having been received from the debtor, thus resulting in the debtor to continue to be billed for the supposedly compromised debt. Ex. 1 (Kimmett Dep.) 336:19-337:8. There were many other files that stated based on the official record that payment had been received, although no record could be found regarding where that money went, and the PCAs denied having ever received those payments. Ex. 1 (Kimmett Dep.) 337:6-22.  (Doc.  130).

Defendants **ADMIT** that approximately 250 compromises were located in FES, some of which dated back to the 1990's, and that plaintiff put together a team to review those compromises.  Defendants **DENY** the remainder of paragraph 66.  Defendants state that "approximately 130 compromises were found in defendant Keiser's office.  Over 80 compromises were found in Mark Santanna's office.  Burman decl. ¶8.  The compromises found in Keiser's office contained pending settlement memoranda signed by various FES personnel who had the authority to compromise debt.  Burman decl. ¶10.  Approximately 92 of the 130 compromises were on Revenue accounts.  Burman decl. ¶14.  In the majority of such accounts, the compromise payment was received but no settlement memorandum was noted on the Revenue computer system.  Burman decl. ¶14.  In the 15 accounts in which no payment was

noted as received, it could not be determined whether the debtor ever made payment to the PCA or Revenue or whether the payment was received by Revenue and misapplied.  Burman decl. ¶17.  After reviewing the accounts on Revenue's computer system and meeting with the PCAs, the team was unable to determine whether the PCA failed to send the settlement memorandum with the payment or whether Revenue received the settlement memorandum but did not record that the payment was in settlement of the debt.  Burman decl. ¶18.  In any event, FES was not notified that the payment was received by Revenue.  Burman decl. ¶18.  The compromises found in Santanna's office were compromises that he was working on prior to his resignation.  They involved accounts placed with the PCAs, containing compromise offers in various stages of completion, which were reviewed and updated.  Burman decl. ¶19." (Doc. 157).

67.      Kimmett sent a memorandum to Roman on May 16, 2008 addressing this issue. Ex. 46 (Kimmett Dep. Ex. 41). Roman would later testify that he found the conclusions Kimmett's (sic)  presented in that memorandum "generic" and found the memorandum "not particularly relevant …." Ex. 9 (Roman Dep.) 496:21-499:19.  Roman took no action.  (Doc.  130).

Defendants **ADMIT** plaintiff sent the memorandum identified, in which plaintiff reports to his supervisor on the unprocessed compromise issue and the manner in which plaintiff proposed to resolve the problem.  Defendants **DENY** that the excerpts quoted from defendants Roman's testimony fairly reflect what he said about the memorandum. Defendants state that "Roman testified that the memorandum provided a rationale to correct the problem

identified, Roman dep. 498-499, and noted that the blame for the problem could have rested either with FES or with the agencies that referred debt to it.  Roman dep. 499."  (Doc. 157).

68.       Kimmett also discovered that the PCA employees working on-site at OAG had been routinely and unilaterally authorizing extensions to the time that their PCA employers could hold a case. Ex. 1 (Kimmett Dep.) 416:3-417:5; Ex. 7 (Rovelli Dep.) 325:12-21. This represented a conflict of interest and it allowed PCAs to receive commissions for payments made long after the time limits provided in their Contracts with OAG. Ex. 7 (Rovelli Dep.) 358:12-361:16.  Kimmett expressed his concerns about this in his plan of action and in subsequent communications. Ex. 39 (Brandwene Dep. Ex. 12).  (Doc. 130).

         Defendants **ADMIT** that PCA employees who worked on site at FES authorized extensions of time for the PCAs to work on accounts.  Defendants also **ADMIT** that the practice was something of a conflict of interest and should have been supervised by FES personnel. Defendants note that "when defendant Rovelli learned PCA employees were granting extensions, he wanted it stopped.  Rovelli dep. 322, 360.  Defendants further note that, in response to Rovelli's inquiry whether there was a continued need for PCA employees to work on site at FES, plaintiff advised that there was not, whereupon Rovelli directed plaintiff to discontinue the practice effective June 20, 2007.  Kimmett dep.  257; Rovelli dep. 360-361." (Doc. 157).

69.       After Santanna resigned from FES, Kimmett learned that Santanna had authorized the compromise of a nearly $1 million debt for installment payments totaling only $20,000, despite not having the authorization to do so. Ex. 47 (Rovelli Dep. Ex. 12); Ex. 9 (Roman Dep.) 431:12-

22. Kimmett reported this in a memorandum to Roman. Ex. 47 (Rovelli Dep. Ex. 12). Despite searching diligently, Kimmett and a number of his subordinates (including but not limited to Burman and Bellaman) could not locate backup documentation relating to that particular settlement. Ex. 28 (Burman Dep.) 281:20-285:17. Rovelli explained that he and Roman signed off on that "abhorrent compromise" without questioning its basis. Ex. 9 (Roman Dep.) 429:4-430:4; Ex. 7 (Rovelli Dep.) 334:13-336:9. (Doc. 130).

Defendants **ADMIT** that months after Mark Santanna had resigned, plaintiff discovered that, months before he had resigned, Santanna had sent a letter offering to compromise a debt of nominally $914,000 for four payments of $5,000 each and that the debtor had accepted the offer and made the payments; the offer and acceptance was discovered when an accountant inquired of FES why the lien had yet to be cleared. Pl. Ex. 47 (Rovelli dep. Ex. 12). Defendants **ADMIT** that plaintiff and his staff were unable locate a file on the matter and that there was no record that Santanna had obtained attorney approval to make the offer. Defendants **ADMIT** that plaintiff reported the matter to defendant Roman and recommended that the compromise be disavowed, but that Roman decided to honor it and defendant Rovelli concurred. Defendants **DENY** that Rovelli described the compromise as "abhorrent." Defendants state that Rovelli "described it as 'aberrant.' Rovelli dep. errata 0336. Defendants **DENY** that the compromise was approved without considering whether it was appropriate to do so. Rather Rovelli and Roman decided to honor the agreement that was made, rather than get into a dispute with the debtor over whether Santanna had to appeared to have authority to make the agreement. Rovelli dep. 333-336; Roman dep. 428-431.

131

Defendants also **DENY** that the compromise was substantively inappropriate.  Files on this

matter were eventually located, one by Roman's staff and another by Diane Burman.  2nd

Roman decl. ¶5; Burman dep. 282-283.   The files show that the debt compromised had

originally been assigned to an FES attorney in Philadelphia.  2nd Roman decl. ¶6; 2nd Roman

decl. Ex. 1.  In 2002, with the approval of then FES Chief Brandwene, the attorney placed the

case in 'bad debt,' because the taxpayer, a corporation, had gone out of business a year earlier

and had no assets, and because the taxpayer's corporate officer, against whom the

Commonwealth had lodged corporate officer assessments, did not have sufficient assets to

warrant further litigation of the matter.  2nd Roman decl. Ex. 1.  Four years later, an offer in

compromise of $12,000 was received on the account.  Brandwene decl. ¶11; Brandwene decl.

Ex. 2.  The information submitted with the offer shows that, even if the Commonwealth

attempted to enforce the corporate officer assessments, the taxpayer's corporate officer still did

not have assets sufficient to satisfy the liability.  Brandwene decl. ¶16, Brandwene decl. Ex. 2.

In such circumstances, the compromise offered by Santanna and accepted by the debtor was

reasonable and appropriate.  Brandwene decl. ¶12."  (Doc.  157).

70.        Improper "What-If" Compromises. Kimmett also identified and reported on problems

within DOR's operations. On February 21, 2008, Kimmett sent a memorandum to Roman

criticizing DOR's practice of entering into "What- If" settlements in which it would resettle a

taxpayer's jeopardy assessment years after the appeal period had expired. Ex. 48 (Roman Dep.

Ex. 15). Kimmett opined that "it creates a dangerous precedent to begin circumventing the

appeals process by accepting the information after the settlement has become final." Ex. 48

(Roman Dep. Ex. 15); Ex. 1 (Kimmett Dep.) 327:12-330:20. Kimmett also objected to DOR's statement that it would "keep this quiet" as inappropriate. Ex. 48 (Roman Dep. Ex. 15).  (Doc. 130).

Defendants **ADMIT** plaintiff sent the memorandum described in which he recommended that the OAG refuse to approve "what if" compromises.  Defendants **DENY** that plaintiff's memorandum accurately describes "what if" compromises.  Furlong dep. 96-97, 101-102; Furlong Ex 8 (plaintiff's memo is factually incorrect); 2nd Roman decl. ¶7 ("settlement" of taxes is a term of art that refers to Revenue's determination of the tax owed, not to the compromise of a tax liability); *see also* Furlong dep. 95, 101-102 (revenue did not "resettle" taxes as part of a compromise).  Defendants also **DENY** that "what if" compromises are improper or kept a secret.  Defendants state that "the procedure has been used by Revenue since at least 1988.  Furlong dep. 103-104.  'What if' compromises usually come about because a corporate taxpayer did not submit sufficient information to Revenue to allow tax officials to 'settle' the taxpayer's liability.  2nd Roman decl. ¶8.  To  get the taxpayer's attention, and to get the taxpayer to submit the information that would allow  Revenue to 'settle' the tax liability, Revenue issues a jeopardy assessment, which is made-up tax liability set in excess of any expected actual liability.  2nd Roman decl. ¶8.  Revenue had a statutorily-limited period within which it could 'resettle' a tax.  *See* 2nd Roman decl. ¶7.  If the taxpayer failed to submit the information Revenue needed before the statutory period expired, the only way to resolve the liability, without requiring the taxpayer to pay the unrealistically high jeopardy assessment, would be through a 'what if' compromise.  Furlong dep. 107-108; 2nd Roman decl. ¶8.  In

developing the compromise, Revenue determines what the tax liability would have been if the taxpayer had submitted the necessary information within statutory time frames.  Furlong dep. 95-96, 101-102; 2nd Roman decl. ¶9.  That calculation is then used to evaluate an offer in compromise of the tax liability premised on the jeopardy assessment.  Furlong dep. 102, 104-106; 2nd Roman decl. ¶9.  The Department has no desire to keep the process quiet.  Furlong dep. 106-107."  (Doc.  157).

71.      DOR Failed to Collect Fees as Required by Law. Effective April 1, 2006 the Pennsylvania legislature passed Act 40, which required Revenue to collect from debtors the amount of commission payment paid to PCAs for the collection of that debtor's debt. Ex. 23 (Coyne Dep.) 72:12-73:3; Ex. 49 (Coyne Dep. Ex. 6).  (Doc.  130).

Defendants **ADMIT** that effective July 7, 2005 the Pennsylvania legislature enacted Act 40, which imposed the cost of collecting certain tax liabilities on taxpayers, including commission or remuneration paid to PCAs.  Pa. Stat. Ann. tit. 72, § 10003.17(a).  Defendants **DENY** that Revenue failed to collect fees as required by law.  Defendants state that "Act 40 authorizes the fees to be collected 'in any way the underlying tax could be collected', Pa. Stat. Ann. Tit. 71 § 10003.14 (b), which OAG and Revenue interpret as allowing the fees to be compromised or waived as appropriate.  Roman decl. ¶14; Coyne dep. 92-95, 98-100."  (Doc. 157).

72.   We find, based on Defendants' response  and their citation to the record, Doc. 157, ¶ 72., that there are disputed facts as to this paragraph.

73.        Cruz discussed with Kimmett the fact that the Commonwealth was losing money

because DOR was waiving the Act 40 fee. Ex. 50 (Cruz Dep.) 66:9-67:1. When DOR waived

the Act 40 fee, the PCAs would still withhold their commission from the amount collected from

the debtor. Ex. 50 (Cruz Dep.) 42:22-44:6, 98:3-99:5.  (Doc.  130).

        Defendants state that ¶ 73 is **DENIED**.  Defendants state that "Cruz had discussions

with plaintiff regarding the Commonwealth losing money because in some cases Revenue was

not charging the PCA commission fees to the taxpayers when tax credits were applied to their

debts.  Efforts were made to recover the Act 40 fees from the taxpayer when the fee was not

included in the debtors' payment to Revenue. When that occurred, the account was then

charged the fee and sent back to the PCA for collection.  Act 40 fees were also taken into

consideration when debts were compromised and could be waived as part of a compromise.

Cruz dep., 61-66, 234; Coyne dep. 92-95, 98-100; Furlong dep. 59-61."  (Doc. 157).

74.        Cruz generated "No Fee Reports" in which she would list cases in which the Act 40

fee had not been collected. *See, e.g.*, Ex. 51 (Cruz Dep. Ex. 3); Ex. 52 (Cruz Dep. Ex. 12 ). Cruz

provided those reports to Kimmett for review.  Ex. 50 (Cruz Dep.) 73:14-21, 83:10-85:5.  (Doc.

130).

        Defendants **DENY** Cruz generated reports listing cases where Act 40 fees had not

been collected.  Defendants state that "Cruz's testimony regarding the exhibits cited reveals that

the exhibits were 'No Add-on Fee Imposed' Spreadsheets, which were generated to advise

Revenue's Bureau of Corporation Taxes to impose Act 40 fees on taxpayers' accounts.  Cruz

dep. 55-58, 121-122.  Defendants **ADMIT** that Cruz shared at least some of these spreadsheets with plaintiff.  Cruz dep.  73, 92-93."  (Doc.  157).

75.        On April 22, 2008, Kimmett emailed Furlong regarding his concern that DOR was improperly waiving the Act 40 fees, as reflected in the reports provided to Kimmett by Cruz. Ex. 53 (Coyne Dep. Ex. 30). Cruz agreed that DOR's failure to collect Act 40 fees was a problem. Ex. 50 (Cruz Dep.) 80:1-13.  Furlong forwarded Kimmett's email to Coyne, and Coyne commissioned a group to review the issue. Ex. 23 (Coyne Dep.) 312:22-313:8; Ex. 54 (Coyne Dep. Ex. 29). The report recognized that Cruz's "No Fee Reports" were generated to "assure appropriate posting and/or removal of fees, as may be appropriate" and acknowledged that "this is not a perfect system" with potential for errors. Ex. 54 (Coyne Dep. Ex. 29).  (Doc.  130).

Defendants **DENY** Cruz generated reports listing cases where Act 40 responsibility to "identify problems, issues, improprieties, etc." existing in the collections operation, raised a concern about whether Act 40 fees were being waived.  *See* Pl. Ex. 53 (Coyne dep. Ex. 30). Defendants also **ADMIT** that plaintiff raised his concern because he understood that the PCAs were being paid, despite the waiver of fees, through the direct pay report-payments which plaintiff and his subordinate, Sherry Bellaman, authorized.  *See* Pl. Ex. 53 (Coyne dep. Ex. 30). Defendants **DENY** that Revenue was improperly waiving Act 40 fees in the context plaintiff questioned.  Defendants state that "the problem instead was one of synchronizing the manual application of the Act 40 fees by the Corporation Tax Bureau with the payment of the tax when corporate taxpayers submitted their payments directly to Revenue rather than through the PCA working on the account.  Coyne dep. 311-313; Coyne dep. Ex. 29.  It caused confusion in the

Corporation Tax Bureau as to what was being paid and what should be manually posted on the ledger.  Coyne dep. 313-17.  Sometimes the fees were manually adjusted off the Corporation Tax ledger because the staff of the Bureau didn't fully understand what was going on due to the complexity of the system.  Coyne 320-322.  In such circumstances, the PCAs were paid for the collections they made, based on a percentage of the debt collected, and Revenue then made efforts,  through the PCAs, to recover the Act 40 fee from the taxpayer.  Coyne dep. 322-323; Cruz dep. 232-234.  Defendants **DENY** that plaintiff accurately stated Cruz's view.  Rather Cruz viewed the Corporation Tax Bureau's failure to impose Act 40 fees as a problem.  Cruz dep. 55-58, 79-80, 121-122."  (Doc.  157).

76.        Mr. Coyne understood that the Act 40 fees were being "adjusted off of our corp tax system somehow," Ex. 23 (Coyne Dep.) 320:9-321:2, and as a result, the commissions were being paid out of the debt collected from the taxpayer. Ex. 23 (Coyne Dep.) 322:8-17. Indeed this is consistent with Cruz's understanding that commissions would be deducted from the collected debt when the Act 40 fee was not also collected from the debtor. Ex. 50 (Cruz Dep.) 98:3-99:5.  (Doc.  130).

Defendants **ADMIT** that the Bureau of Corporation Taxes was failing to impose or removing Act 40 fees from corporation tax accounts and that PCA commissions were being paid out of debt collected from the taxpayer.  Defendants **DENY** that paragraph 76 is a complete description of the situation.  Defendants state that "efforts were made to recover the Act 40 fees from the taxpayer when the fee was not included in the debtor's payment to Revenue.  When that occurred, the account was then charged the fee and sent back to the PCA for collection.

137

Act 40 fees were also taken into consideration when debts were settled or compromised.  Cruz, 61-66, 233-234; Coyne dep. 93-94." (Doc.  157).

77.        PCAs and DOR Pushed Improperly Documented and Unjustified Compromises of DOR Debts. Kimmett discovered that many compromises of DOR debts that were being submitted by PCAs did not contain basic supporting documentation or information justifying the compromises. Ex. 18 (Bellaman Dep.) 471:25-473:11. Kimmett put together a team including Bellaman and Burman to review the compromises. Ex. 18 (Bellaman Dep.) 320:3-21; Ex. 28 (Burman Dep.) 100:1-101:10; Ex. 1 (Kimmett Dep.) 364:5-365:5. Kimmett also informed the PCAs of the documentation that they were required to compile for the approval of a compromise. Ex. 18 (Bellaman Dep.) 448:14-457:17. In an email to Furlong, the Linebarger PCA objected to Kimmett's review of the compromises and Kimmett's team's denial of the compromises. Ex. 55 (Furlong Dep. Ex. 16).  Furlong provided Linebarger's objection to Roman. Ex. 55 (Furlong Dep. Ex. 16).  Roman requested, and Kimmett and his team performed, a detailed and time consuming review of every compromise whose denial Linebarger had objected to.  Ex. 18 (Bellaman Dep.) 501:5-507:2, 516:19-517:4, 520:2-521:9. Kimmett and his team discovered that Furlong would "play with" compromise accounts by lowering the dollar amount previously established with the debtors, PCA, and OAG regarding a compromise offer. Ex. 11 (Kimmett Decl.) ¶ 26; Ex. 28 (Burman Dep.) 215:5-223:14. On February 27, 2008, Kimmett submitted a memorandum that catalogued the many examples of gross mismanagement and wrongdoing that DOR had previously reported, that detailed examples of mismanagement and wrongdoing subsequently discovered by Kimmett, and that detailed his

and his team's response to the compromise issue. Ex. 56 (Roman Dep. Ex. 16); Ex. 1 (Kimmett Dep.) 331:5-334:8; Ex. 9 (Roman Dep.) 400:18-401:20. Although that memo detailed very direct statements about gross mismanagement and wrongdoing, Roman characterized it as "perfectly routine garden variety stuff.  There's nothing here that alarmed me." Ex. 9 (Roman Dep.) 417:5-20.  (Doc.  130).

Defendants **ADMIT** that plaintiff put together a team to review compromises, which included Sherry Bellaman and Diane Burman.  Defendants **ADMIT** that plaintiff informed PCAs of the documents that should accompany compromises proposals.  Defendants also **ADMIT** that one of the PCAs, LGBS, complained to Jim Furlong that plaintiff was unreasonably denying compromises.  Furlong dep. 207; Furlong dep. Ex. 16.  Defendants **DENY** that the compromises plaintiff rejected were unjustified.  Defendants state that "to the contrary, Revenue was concerned that reasonable compromises were being rejected and that the PCAs had to return over $200,00 to debtors that had been paid in anticipation of compromises.  Roman dep. 385; Furlong dep. 198-199, 207; Furlong dep. Ex. 16.  Furlong was also concerned that many of these cases were 'hard core' tax cases involving taxpayers without assets or with limited assets and that, in the absence of a compromise, they would be returned to Revenue by the PCA and placed in bad debt.  Furlong dep. 211, 232; Furlong Ex. 16.  Placing a case in 'Bad debt' means no further efforts to collect would be made.  Furlong dep. 211.  Defendants **ADMIT** that Furlong shared his concerns with defendant Roman and that Roman overruled plaintiff's decision when he determined that the proposed compromise was substantively justified.  Roman decl. ¶15.  Defendants **DENY** any suggestion that Furlong dealt inappropriately with

compromises.  To the contrary, revenue and PCAs working on accounts referred to them by Revenue were authorized to offer and receive offers of compromise.  Furlong dep. 66-68; burman dep. 289; *see also* Furlong dep. 213-214, 220 (counteroffers).  In addition, Revenue was authorized to approve compromises up to $5,000,  and such approvals cannot properly be characterized as 'playing' with compromise accounts.  Furlong dep. 66-68; *see also* Cruz dep. 136-143 (discussing a case that Revenue compromised, within its authority, after OAG rejected the compromise).  Defendants **ADMIT** that on February 27, 2008, plaintiff sent a memorandum to Roman in response to Furlong's complaints about the rejection of compromises.  Defendants further **ADMIT** that the memorandum purports to recount wrongdoing reported by Revenue and subsequently discovered by plaintiff.  Defendants **DENY** that Revenue reported any wrongdoing.  Furlong dep. 271, 274-276, 278 (Furlong denied making such statements and did not hear anyone else from Revenue make such statements).  Defendants further **DENY** that plaintiff discovered and reported 'wrongdoing.'  *See* ¶¶ 47, 52, 53, 54, 55, 58, 59, 61, 62, 66, 69, 70, 71, 72, *infra*, and 78, 79, *supra*, and the evidence cited therein, which refutes plaintiff's assertion that he discovered and reported 'wrongdoing.'  Defendants **DENY** that Roman ultimately characterized the allegations in plaintiff's memorandum as 'garden variety' complaints.  Roman dep. 421 ("I probably spoke too quickly before when I said I heard all of these things before"), 423-424 (Roman never heard the allegations in plaintiff's memorandum from someone in a position to know such things, such as Jim Furlong)."  (Doc. 157).

78.        DOR Authorizes Unearned $300,000 Payment to Favored PCA.  In May 2008,

Kimmett discovered that DOR had authorized a commission payment of almost $300,000 to

LGBS for a debt that was collected when OAG's tax litigation department entered into a

stipulation of settlement with the debtor to resolve ongoing litigation over the matter. Ex. 57

(Coyne Dep. Ex. 25). The PCAs understand that they cannot work cases while on appeal and

are not entitled to commissions for payments received as a result of litigation or a settlement of

litigation. Ex. 18 (Bellaman Dep.) 536:5-15, 537:13-21. On May 23, 2008, Furlong emailed

Kimmett to say that he concurred with Kimmett's determination that the commission ought not

be paid. Ex. 57 (Coyne Dep. Ex. 25). Shortly thereafter, however, Roman informed Furlong that

LGBS, the PCA in line to receive the undeserved commission, was making a "threat" to go to

the Attorney General if the debt was not paid. Ex. 23 (Coyne Dep.) 276:12-279:14; Ex. 58

(Coyne Dep. Ex. 26) at 2. In response to this "threat," Furlong and Coyne contrived an

explanation to justify the $300,000 payment to LGBS, Ex. 58 (Coyne Dep. Ex. 26) at 1, which

Coyne then forwarded to Roman. Ex. 59 (Coyne Dep. Ex. 28). Roman then instructed Kimmett

to pay the commission. Ex. 60 (August 8, 2008 E-mail from Robert Coyne to Michael Roman).

The collections log, however, clearly indicated that the Linebarger PCA was notified that the

matter was in litigation and thus knew that it would not be entitled to a commission if the

matter was resolved in litigation. Ex. 18 (Bellaman Dep.) 533:8-540:2; Ex. 61 (Bellaman Dep.

Ex. 28).  (Doc.  130).

        Defendants state that ¶ 78 is  **DENIED**.  Defendants state that "on June 1, 2007,

Revenue referred the account to LGBS for collection.  Coyne dep. Ex. 28.  LGBS worked on the

account until they were notified on August 3, 2007 to place the account on hold because the matter had been appealed to the Commonwealth Court.  (Bellaman Ex. 28).  The account was not recalled from LGBS.  The appeal was settled by stipulation between the OAG Tax Litigation Section and the debtor in October 2007.  Coyne dep. 270-271, Ex. 25.  In May 2008, plaintiff questioned the commission payment to LGBS for that account.  Plaintiff told Furlong that, because of the settlement, the commission should not be paid, Coyne dep. Ex. 25, and Furlong initially agreed.  After review of the account, Coyne and Furlong learned that Revenue had not coded the account correctly and that the account had been mistakenly referred to LGBS. Coyne also reviewed the LGBS worksheets regarding the account, which showed that prior to notification that the matter was on appeal, LGBS made several contacts with the debtor.  Coyne dep. 278.  Revenue's policy was to approve pay-directs based on the PCA having been assigned the case.  Coyne dep. Ex. 28.  Under the contracts PCAs are entitled to commissions on cases that are placed with them.  Roman dep. 224.   Revenue decided that fairness dictated that the commission should be paid to LGBS and made that recommendation to Roman.  Coyne dep. Ex. 28.  Roman reviewed the matter with Revenue and agreed that the commission should be paid.  Coyne dep. 277-278.  To date, there is no record of a commission payment made to LGBS on the Snapple account.  Bianco decl. ¶33."  (Doc.  157).

79.        Kimmett reported examples of the gross mismanagement and wrongdoing to persons who worked at independent Commonwealth Agencies, including but not limited to DOR, the Pennsylvania Department of Motor Vehicles, the Pennsylvania Department of Transportation, state colleges and universities, and a number of other Commonwealth agencies. Ex. 11

(Kimmett Decl.) ¶¶ 6-7.  When asked who he discussed his findings of waste, gross mismanagement, and wrongdoing, Kimmett responded, "[I]t's almost like asking me … have you talked about football and can you tell me how many times you talked about football." Ex. 1 (Kimmett Dep.) 163:5-20.  (Doc.  130).

Defendants **ADMIT** plaintiff spoke with persons who worked together at Commonwealth agencies in the course of performing his job.  Kimmett dep. 156; Furlong dep. 193-194.  Defendants **ADMIT** that in those conversations plaintiff discussed problems with the collections process and explored ways in which the process could be improved.  Kimmett dep. 155-156, 158-160; Furlong dep. 194.  Defendants state that "to the extent that plaintiff's communications went beyond discussions of problems with and ways of improving the collections process, there is no evidence that defendants were aware of them.  Defendants **DENY** plaintiff discovered anything more than operation and managerial problems of precisely the kind he had been hired to identify and remedy.  *See* ¶¶ 47, 52, 53, 54, 55, 58, 59, 61, 62, 65, 66, 69, 77, 78, *supra*, and the evidence cited therein, which refutes plaintiff's assertion that he discovered and reported 'wrongdoing.'"  (Doc.  157).

80.      Kimmett spoke on multiple occasions with Richard Hudic about the examples of waste, mismanagement, and wrongdoing that Kimmett had found at OAG and DOR. Ex. 1 (Kimmett Dep.) 518:18-22; Ex. 11 (Kimmett Decl.) ¶¶ 8-9, 27-28.  After Kimmett had been given the job in FES, Hudic had asked Tom to "make sure you protect the General when you're there…. [H]e [Corbett] might not have a lot of allies there so make sure you look out for his best interest." Ex. 1 (Kimmett Dep.) 517:14-22. In an early communication with Hudic, Kimmett told

him, "Rich, there's something going on here that's beyond just mismanagement, you know, and here's what I'm – here's what I've been told. You know, it seems that the people involved, and some of them are right above me, might be involved in all of this and I don't know if the General knows about this." Ex. 1 (Kimmett Dep.) 178:15-22. Kimmett was concerned that if only "the Rovelli smokestack" – Brandwene, Keiser, and Rovelli – knew of the wrongdoing Kimmett was reporting, then nobody would report it to Corbett. Ex. 1 (Kimmett Dep.) 467:9-14. (Doc. 130).

Defendants **ADMIT** plaintiff spoke to Rich Hudic at various times with regard to his concerns about FES. Hudic decl. ¶11. Defendants **DENY** they were made aware of the conversations. Hudic decl. ¶¶23, 25; Kimmett dep. 182-183; 199-200; Ryan dep. 265-266; Rovelli dep. 547; Corbett dep. 205-207; Nutt dep. 194. Defendants **DENY** plaintiff discovered anything other than operational and managerial problems of precisely the kind he had been hired to identify and remedy. *See* ¶¶ 47, 52, 53, 54, 55, 58, 59, 61, 62, 65, 66, 69, 77, 78, *supra*, and the evidence cited therein, which refutes plaintiff's assertion that he discovered and reported "wrongdoing." (Doc. 157).

81.      At that time, Kimmett believed that Corbett and Nutt, if they learned of the waste, mismanagement, and wrongdoing Kimmett had found, and which implicated others in Kimmett's direct chain of command, would want to take steps to correct it. Ex. 11 (Kimmett Decl.) ¶ 28. Yet, to this day, Corbett has not requested and is not aware of any investigation by the Internal Affairs unit or an independent entity into Kimmett's findings. Ex. 3 (Corbett Dep.) 238:9-14; 282:8-283:2; Ex. 6 (Ryan Dep.) 230:6-231:1. (Doc. 130).

Defendants **ADMIT** that defendant Corbett has not requested an investigation by the OAG Internal Affairs unit and has no personal knowledge of any investigation by any independent entity regarding anything plaintiff claims he found.  Defendants **DENY** plaintiff discovered anything other than operational and managerial problems of precisely the kind he has been hired to identify and remedy.  *See* ¶¶47, 52, 53, 54, 55, 58, 59, 61, 62, 65, 66, 69, 77, 78, *supra*, and the evidence cited therein, which refutes Plaintiff's assertion that he discovered and reported "wrongdoing."  (Doc.  157).

82.      Mr. Kimmett also discussed the "misfeasance, malfeasance or just outright wrongdoing" he had found in FES and DOR with Mike Kane, Ex. 1 (Kimmett Dep.) 185:20-186:2, a former colleague of Kimmett's from DOR who was then working as the Executive Director of the Pennsylvania Commission on Crime and Delinquency and who previously had been an Assistant United States Attorney. Ex. 1 (Kimmett Dep.) 179:10-180:18.  (Doc.  130).

Defendants **ADMIT** plaintiff spoke with Mike Kane.  Defendants **DENY** they were aware of the conversation.  Kimmett dep. 182-183; 199-200; Ryan dep. 265-266; Rovelli dep. 547; Corbett dep. 205-207; Nutt dep. 194.  (Doc.  157).

83.      At Mr. Kane's suggestion, in May 2008, Kimmett spoke with Bruce Brandler, an Assistant U.S. Attorney at the United States Attorney's Office. Ex. 1 (Kimmett Dep.) 186:3-187:8. Mr. Kane explained that he trusted Mr. Brandler and that Mr. Brandler would not be afraid of the Pennsylvania Attorney General's Office. Ex. 1 (Kimmett Dep.) 186:3-16. After the phone conference with Kimmett, Brandler wanted to send an FBI agent to interview Kimmett. Ex. 1 (Kimmett Dep.) 187:19-187:23. It was at that point that Mr. Kimmett first reached

out to an attorney. Ex. 1 (Kimmett Dep.) 188:13-17.  (Doc.  130).

Defendants **ADMIT** plaintiff had the conversations described.  Defendants **DENY**

they were aware of the conversations.  Kimmett 199-200; Roman dep. 102, 636-637; Ryan

dep. 265-266; Rovelli dep. 547; Corbett dep. 205-207.  (Doc.  157).

84.       Kimmett's attorney communicated with an FBI agent in the summer of 2008, and

Kimmett subsequently met with an FBI agent. Ex. 1 (Kimmett Dep.) 193:15-197:9. At the FBI's

request, Kimmett's met again with the FBI agent on May 19, 2010 in Harrisburg, Pennsylvania,

and Kimmett's attorney met with the FBI agent on July 6, 2010 in Washington D.C. Ex. 11

(Kimmett Decl.) ¶ 32.  (Doc.  130).

Defendants **ADMIT** that Plaintiff's attorney communicated with an FBI agent in the

summer of 2008 and that plaintiff subsequently met with an agent.  Defendants **DENY** they

were aware of these contacts.  Roman dep. 102, 636-637; Ryan dep. 365-266; Rovelli dep.

547; Corbett dep. 205-207; *see also* Kimmett dep. 200.  (Doc.  157).

85.       At about the same time Kimmett spoke with Kane, Kimmett talked again with Hudic

about what he had found. Ex. 11 (Kimmett Decl.) ¶¶ 27-29.  Hudic informed Kimmett that he

would raise Kimmett's concerns with Nutt and/or Corbett. Ex. 1 (Kimmett Dep.) 200:11-18. On

April 29, 2008, Hudic emailed Nutt to ask Nutt to "call me about Tom Kimmett." Ex. 62 (Nutt

Dep. Ex. 17).  (Doc.  130).

Defendants **ADMIT** that plaintiff spoke with Hudic again in the spring of 2008  and

that at plaintiff's request Hudic attempted to reach defendant Nutt.  Hudic decl. ¶¶18-19.

Defendants **DENY** Hudic ever shared plaintiff's concerns with defendants Corbett or Nutt.

Hudic decl.  ¶¶23,25.  (Doc.  157).

86.        Kimmett informed Diane Burman, Mike Kane, some people in DOR, and others of

his conversations with Hudic. Ex. 1 (Kimmett Dep.) 182:23-183:24, 198:11-200:3.  (Doc.

130).

           Defendants **ADMIT** plaintiff told Dianne Burman, Mike Kane and some others about

his communications with Hudic.  Defendants **DENY** they were aware of the conversations.

Hudic decl.  ¶¶23-25; Kimmett dep. 182-183; 199-200; Ryan dep. 265-266; Rovelli dep. 547;

Corbett dep. 205-207, Nutt dep. 194.  (Doc.  157).

87.        Kimmett filed his initial complaint on August 11, 2008. Ex. 6 (Ryan Dep.) 337:6-13.

In response to Kimmett's lawsuit, Rovelli aborted Kimmett's planned transition to the Law unit

of FES. Ex. 7 (Rovelli Dep.) 536:19-539:3; *id*. 546:16-20 ("The remedy of moving Tom out of

the supervisory role in the administrative collections process and into the attorney role, was

aborted when Tom's lawsuit was filed."); 547:22-548:5. In Rovelli's opinion, the lawsuit had a

substantial negative effect on Defendants' working relationships with Kimmett.  Ex. 7 (Rovelli

Dep.) 600:10-601:3 ("There's no way you can propound allegations of the kind that are

propounded in the lawsuit and not have, as a defendant, reactions to that that will affect your

working relationship with the Plaintiff. And there's no way that the Plaintiff's working

relationship with the Defendants could be the same after those allegations are propounded.").

After Kimmett filed suit, Rovelli took it upon himself to draft a remedial plan for Roman to

present to Kimmett along with the annual evaluation. Ex. 7 (Rovelli Dep.) 548:13-549:3,

558:8-10; Ex. 63 (Ryan Dep. Ex. 15).  (Doc.  130).

Defendants **ADMIT** that plaintiff filed his lawsuit on August 11, 2008, that before the lawsuit was filed defendant Rovelli planned to transition plaintiff from managing administrative collections to the more conventional FES attorney role of handling selected collections matters and representing Commonwealth agencies in bankruptcy litigation, and that after the lawsuit was filed Rovelli aborted the plan.  Rovelli dep. 536-639, 546, 553-555 (plaintiff could not appear in court in the name of the Attorney General or represent Revenue, the OAG's principal bankruptcy client in bankruptcy litigation, after he'd accused the Attorney General, his supervisors and Revenue collections official of illegality and cover-up).  Defendants **ADMIT** that plaintiff's lawsuit, with its accusations of illegality and cover-up aimed at his supervisors and Revenue officials, damaged his relationships with both.  Rovelli dep. 600-602.  Defendants also **ADMIT** that Rovelli drafted the remedial plan that accompanied plaintiff's performance evaluation after plaintiff filed his lawsuit.  Defendants note that Rovelli received the evaluation from defendant Roman on August 8, 2008, before plaintiff filed his lawsuit.  Rovelli Resp. 1st Interrog. No. 13; Roman decl ¶38; Roman decl. Ex. 1.  (Doc. 157).

88.      OAG strongly emphasizes the importance of reporting up one's chain of command. *See* Ex. 6 (Ryan Dep.) 163:16-164:13, 174:17-175:13. Ryan testified that Kimmett's report outside of his chain of command was "[n]ot a great career move" because "to go over your supervisor's head and to complain could cause your supervisor to have, let's say, a certain ill-will toward you." Ex. 6 (Ryan Dep.) at 174:17-175:13. Roman testified that he does not like Kimmett because Kimmett sued him. *See* Ex. 9 (Roman Dep.) at 615:6-12.  (Doc.  130).

Defendants **ADMIT** that defendants Ryan and Roman testified as indicated. Defendants note that there is no evidence that defendants Rovelli and Roman were aware that plaintiff went over their heads to speak with defendant Ryan until plaintiff included those allegations in his original complaint in this case. *See* Ryan dep. 175-176; Rovelli dep. 577; 2nd Roman decl. ¶18. (Doc. 157).

89.     After Kimmett received his 2008 evaluation and remedial plan from Roman, Kimmett took steps to comply with that plan up until the date on which his employment was terminated. Ex. 1 (Kimmett Dep.) 501:8-506:18. Kimmett made sure to provide his input whenever it was requested on matters relating to FES's implementation of a new computer system. Ex. 1 (Kimmett Dep.) 503:8-504:12.  Kimmett also took steps to sign up for training programs on interpersonal, managerial, and supervisory skills. Ex. 1 (Kimmett Dep.) 504:23-506:4. Indeed, because Kimmett understood that his job was conditioned on meeting the requirements of the remedial plan, he planned to do so and he took steps to do so during the short time between his receipt of the plan and the termination of his employment. Ex. 1 (Kimmett Dep.) 506:13-18. (Doc. 130).

Defendants **ADMIT** plaintiff took the steps he says he took, but **DENY** they were aware of the steps plaintiff took.  2nd Roman decl. ¶19 (Roman did not know that plaintiff took steps to comply with the remedial plan).  Rovelli decl. ¶9 (in view of the venomous content and tone of plaintiff's response to his evaluation, the steps plaintiff claims he took would not have influenced Rovelli's recommendation that he be dismissed).  (Doc. 157).

90.        On November 18, 2008, Kimmett submitted to Roman a written response to his

evaluation ("Response"). Ex. 64 (Rovelli Dep. Ex. 29). The Response discussed his lawsuit,

reiterated the concerns raised in the lawsuit, and called for an independent investigation of FES.

Ex. 64 (Rovelli Dep. Ex. 29).  Roman then provided the Response to Rovelli. Ex. 7 (Rovelli Dep.)

556:10-13.  Upon reading the Response, Rovelli decided to recommend the immediate

termination of Kimmett's employment. Ex. 7 (Rovelli Dep.) 567:10-14. Rovelli explained that

his decision to recommend termination was driven by the Response, with its references to

Kimmett's lawsuit, coupled with the lawsuit itself. Rovelli explained that the Response

"heightened the belligerent tone of the lawsuit, between the lawsuit and … the response to the

Evaluation." Ex. 7 (Rovelli Dep.) 576:22-578:14; *see also id*. 600:7-602:2 ("The response to the

Performance Evaluation took that to a whole other level, compounded the destruction …

destruction of already damaged working relationships."). Ryan and Corbett accepted Rovelli's

recommendation and, on November 21, 2008, Kimmett was informed that his employment was

being terminated. Ex. 6 (Ryan Dep.) 361:6-363:4. No one ever discussed the Response with

Kimmett. *See* Ex. 7 (Rovelli Dep.) 584:11-585:6.  (Doc.  130).

        Defendants **ADMIT** that, as permitted by the OAG evaluation procedures, plaintiff

submitted a nine-page, single-spaced response to his evaluation on November 18, 2008.

Defendants **DENY** that paragraph 90 fully describes the content and tone of the response.

Defendants state that "Plaintiff characterized the evaluation as part of an 'orchestrated and

elaborate effort to discredit' him.  Kimmett dep. Ex. 46, p. 1253.  He declared that in light of his

lawsuit it was 'surreal' to believe his immediate supervisors, defendants Roman and Rovelli,

could be fair and unbiased when it 'serves their interest to discredit me as much as possible.' Kimmett dep. Ex. 46, p. 1253.  Roman, he said, had been placed in his position to 'to stifle and curtail any further investigations and follow-up of FES transgressions and to fabricate and trump up charges against me.'   Kimmett dep. Ex. 46, p. 1255.  He accused Roman of 'continuously withholding [ing] documents from me and...not respond [ing] to memorandums and emails in order to make me look bad.'   Kimmett dep. Ex. 46, p. 1256.  He attributed personnel issues in FES to the 'toxic environment Roman created by encouraging and supporting all complaints against Kimmett.'  Kimmett dep. Ex. 46, p. 1259.  He insisted that compromise practices could not be reviewed  by anyone in the Civil Law Division 'in a fair and unbiased way and not become a backdoor attempt to fabricate charges again me.'  Kimmett dep. 46, p. 1256.  He insisted that for an examination of compromise practices to be a 'true examination...it must be performed by an independent third party.'  Kimmett dep. Ex. 46, p. 1261.  Defendants **DENY** that defendant Rovelli recommended plaintiff's dismissal based on the lawsuit.  Rather Rovelli said that plaintiff's response to his evaluation 'heightened the belligerent tone of the lawsuit...meaning the response to the Evaluation is another level of belligerence.  And that's after he was given a remedial plan that was prepared after the lawsuit and cast  in a measured and temperate tone.'  Rovelli dep. 578.   Rovelli explained that his decision to recommend plaintiff's dismissal was based primarily on plaintiff's response to his evaluation, Rovelli dep. 567-569, 574-575, in part of plaintiff's performance deficiencies, Rovelli dep. 589, and on his sense of the deterioration in the operation of administrative collections happening in the wake of the lawsuit.  Rovelli dep. 589; see also Rovelli Resp. Pl. 1ˢᵗ Interrog. 15.  Defendants **ADMIT**

that defendants Ryan and Corbett accepted Rovelli's recommendation and that on November 21, 2008 plaintiff was informed that his employment was be terminated.  Defendants also **ADMIT** that they did not discuss plaintiff's response to the evaluation with him." (Doc.  157).

91.        Mr. Kimmett was subsequently informed by Mr. Rovelli on November 21, 2008, that his employment was terminated. Ex. 1 (Kimmett Dep.) 512:4-13. An agent from the criminal division escorted Mr. Kimmett through OAG's offices back to Kimmett's office and, after Kimmett collected his personal belongings, escorted Kimmett to the stairwell. Ex. 1 (Kimmett Dep.) 506:22-507:1, 508:8-509:4.  (Doc.  130).

        The above ends the material facts of this case which were submitted by Defendants and Plaintiff.  We now turn to our discussion.

**VI.  Discussion.**

        Defendants move for summary judgment with respect to Plaintiff's First Amendment claim and his claim under the PA Whistleblower Act.  Plaintiff moves for summary judgment only as to liability on his First Amendment claim.

        Based on the above SMF of both Defendants and Plaintiff, 337 in total, we will recommend that the Court  grant Defendants' Summary Judgment Motion regarding Plaintiff's First Amendment claim against them, *i.e.* Defendants Corbett, Ryan, Nutt, Rovelli and Roman. We will also recommend that the Court deny Plaintiff's Summary Judgment Motion.  Despite the voluminous exhibits submitted by both Defendants and Plaintiff, which are properly cited in their respective SMF, we do not find issues of material fact are disputed as to Defendants' Summary Judgment Motion and Plaintiff's First Amendment claim.

Defendants contend that Plaintiff has failed to establish his First Amendment retaliation claim.  Plaintiff brings his retaliation claim against Defendants under §1983 since Defendants are state actors and they allegedly violated Plaintiff's First Amendment rights.

In a § 1983 civil rights action, the Plaintiff must prove the following two essential elements:  (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct complained of deprived the Plaintiff of rights, privileges or immunities secured by the law or the Constitution of the United States.  *Parratt v. Taylor*, 451 U.S. 527 (1981); *Kost v. Kozakiewicz*, 1 F. 3d 176, 184 (3d Cir. 1993); *Beattie v. Dept. of Corrections SCI-Mahanoy*, 2009 WL 533051, *3 (M.D. Pa.). Further, Section 1983 is not a source of substantive rights.  Rather, it is a means to redress violations of federal law by state actors.  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).[4]  *See also Holocheck v. Luzerne County Head Start, Inc.*, 385 F. Supp. 2d 491, 498-499 (M. D. Pa. 2005).

It is well established that personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior*.  *See, e.g., Rizzo v. Goode*, 423 U.S. 362 (1976); *Hampton v. Holmesburg Prison Officials*, 1546 F.2d 1077, 1082 (3d Cir. 1976); *Parratt, supra*.  It is also well settled in the Third Circuit that personal involvement of defendants in alleged constitutional deprivations is a requirement in a § 1983 case and that a complaint must allege such personal involvement.  *Id.*  Each named defendant must be shown, through the complaint's allegations, to have been personally involved in the events or

---

4.   There is no dispute that the five Defendants, Corbett, Ryan, Nutt, Rovelli and Roman, were employees of the PA OAG during the relevant times of this case. Thus, Defendants are state actors.

occurrences upon which Plaintiff's claims are based.  *Id.*  As the Court stated in *Rode v.*

*Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998):

> A defendant in a civil rights action must have personal involvement
> in the alleged wrongs . . . . [P]ersonal involvement can be shown
> through allegations of personal direction or of actual knowledge and
> acquiescence.  Allegations of participation or actual knowledge
> and acquiescence, however, must be made with appropriate
> particularity. (Citations omitted).

*See also Beattie v. Dept. of Corrections SCI-Mahanoy*, 2009 WL 533051,*3("a prerequisite for a

viable civil rights claim is that a Defendant directed, or knew of and acquiesced in, the

deprivation of a Plaintiff's constitutional rights.") citing *Rode, supra.*

Plaintiff alleges that he was terminated from his job as a Senior Deputy Attorney

General in the FES of the OAG because he repeatedly spoke out against improper and illegal

activities in the FES and DOR, and that Defendants retaliated against him for his conduct.

Plaintiff avers that  during his employment with the OAG while working in the FES, he

discovered waste, fraud, gross mismanagement and wrongdoing, and that he reported this to

Defendants as well as others.  Plaintiff alleges that his conduct was protected under both the

Speech Clause as well as under the Petition Clause with respect to his lawsuit and reports to the

FBI and U. S. Attorney's Office.  As a result of disclosing the wrongdoing *via* his speech, lawsuit

and reports, Plaintiff alleges that Defendants retaliated against him and terminated his

employment with the OAG.

In *Mincy v. Chmielewski*, 2007 WL 707344, *5-*6 (M.D. Pa.), the Court stated:

Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment. *See Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir.2000). To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Rauser v. Horn*, 241 F.3d 330 (3d Cir.2001) (quoting *Allah*, 229 F.3d at 225).

"As a threshold matter, a [plaintiff] in a retaliation case must prove that the conduct which led to the alleged retaliation was constitutionally protected." *Rauser*, 241 F.3d at 333; *see also*, *Jerry v. Williamson*, 2006 WL 3741840, 1 (3d Cir.2006).

In *O'Connell v. Sobina*, 2008 WL 144199, *11 (W.D. Pa.), the Court stated "merely alleging the fact of retaliation is insufficient."

The *O'Connell* Court also stated:

> If the plaintiff proves these three elements, the burden shifts to the state actor to prove that it would have taken the same action without the unconstitutional factors. *Mt. Healthy*, 429 U.S. at 287.

*Id.; see also Fortune v. Basemore*, 2008 WL 4525373, *4-*5 (W. D. Pa.)("It is well settled that retaliation for the exercise of a constitutionally protected right is itself a violation of rights secured by the Constitution."); *Sims v. Piazza*, 2009 WL 3147800, *24 (M.D. Pa.) citing *Rauser v. Horn*, 241 F.3d 333-34 (3d Cir.2001).

Thus, Plaintiff must show that the alleged retaliatory conduct by the state actors was related to his engaging in constitutionally-protected conduct.

In *Alexander v. Forr*, 2006 WL 2796412 at *22 (M.D. Pa.), the Court stated:

> [I]n establishing the elements of a First Amendment claim of retaliation, a plaintiff must come forward with more than "general attacks" upon the defendant's motivations and must produce "affirmative evidence"

155

of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive. *Crawford-El v. Britton,* 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (internal citations omitted).

Moreover, as the *Mincy* Court stated, to succeed on a First Amendment retaliation claim, a Plaintiff must show that the action by state officials was sufficiently "adverse," that is "they would be 'sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'"   2007 WL 707344,*6.

It is not disputed that Plaintiff, as a Senior Deputy Attorney General with the OAG, was a public employee during all relevant times of this case.   In *Cindrich v. Fisher*, 341 Fed. Appx. 780, 786 (3d Cir. 2009), the Court stated:

> "A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Baldassare v. New Jersey,* 250 F.3d 188, 194 (3d Cir.2001). To prevail on a First Amendment retaliation claim, a public employee must first show that her activity was protected by the First Amendment. This is an issue of law. To warrant First Amendment protection, an employee must speak "as a citizen upon matters of public concern," not "as an employee upon matters only of personal interest." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *see Sanguigni v. Pittsburgh Bd. of Pub. Educ.,* 968 F.2d 393, 399-400 (3d Cir.1992). In *Garcetti,* the Court clarified that, even if an employee's speech touches on a matter of public concern, it is not protected speech "as a citizen" if it was made pursuant to the employee's official duties. 547 U.S. at 421, 126 S.Ct. 1951; *see Gorum v. Sessoms,* 561 F.3d 179, 185 (3d Cir.2009); *Foraker v. Chaffinch,* 501 F.3d 231, 239 (3d Cir.2007); *Hill v. Borough of Kutztown,* 455 F.3d 225, 242 (3d Cir.2006). It may, of course, be protected by whistleblower or employment discrimination statutes.

The Court in *Wise v. PA Dept. of Transp*., 2010 WL 3809858, *7-*8 (W.D. Pa. 9-23-10), further elaborated as follows:

156

In *Connick v. Meyers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court acknowledged the government's interest in regulating speech of its employees in order to promote "efficiency and integrity in the discharge of official duties, and [in maintaining] proper discipline in the public service." *Connick,* 461 U.S. at 150-51. Given the significant competing interests, courts must balance the public employee's constitutionally protected interest to speak about matters of public concern against the interests of the government employer. *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

To determine whether a public employee's protected speech outweighs the government's interest in regulating such speech, the Court of Appeals for the Third Circuit adheres to a three-part balancing test: (1) the employee must show his speech was constitutionally protected; (2) the plaintiff must show the protected activity was a substantial or motivating factor in the alleged retaliatory action; and (3) the defendant may defeat the plaintiff's claim by demonstrating by a preponderance of the evidence that the same retaliatory action would have been taken absent the protected conduct. *Watters v. City of Phila.,* 55 F.3d 886, 892 (3d Cir.1995).

Whether the speech was constitutionally protected turns on two requirements. The speech must relate to a matter of public concern. *Watters,* 55 F.3d t 892. Determining whether speech is a matter of public concern is a question of law which requires examination of the record in total-considering the content, form, and context of the speech. *See Connick,* 461 U.S. at 147-48 n. 7. Public concerns relate to any matter of political, social, or other concern to the community. *Brennan v. Norton,* 350 F.3d 399, 412 (3d Cir.2003). Speech involving matters of public concern must enrich or provide some value to the community. *Id.* at 413. Furthermore, speech of a purely personal nature will not qualify as a matter of public concern. *Connick,* 461 U.S. at 147; *Brennan,* 350 F.3d at 412. The Supreme Court has recognized speech motivated by a private concern may qualify as protected speech if it also addresses a matter of public concern. *Rankin,* 483 U.S. at 387 n. 11. If the speech related to a matter of public concern, the plaintiff must show the public interest advanced by the speech was not outweighed by any injury the speech could cause to the interest of the state employer in promoting the efficiency of public services. *Watters,* 55 F.3d at 892; *Waters v. Churchill,* 511 U.S. 661, 686, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).

The second prong is composed of two separate elements. *Wardle v. Cnty. of Montgomery,* No. 05-3808, 2006 WL 2171976, at *6 (E.D.Pa.

July 28, 2006). First, the threshold deterrence test requires the fact-finder to determine the alleged retaliatory action was punitive, such that it would deter a person of ordinary firmness from engaging in protected speech. *See McKee v. Hart,* 436 F.3d 165, 170 (3d Cir.2006); *Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir.2000); *Wardle,* 2006 WL 2171976, at *6. Second, the fact-finder must be persuaded a causal connection exists between the protected speech and the alleged punitive action. *Wardle,* 2006 WL 2171976, at *6; *see McKee,* 436 F.3d at 169-71. The alleged retaliation must be more than de minimis. *McKee,* 436 F.3d at 170. The Supreme Court noted that failing to hold a birthday party for a public employee as punishment for exercising protected speech could be considered a retaliatory act for purposes of satisfying the second prong. *Ratan,* 497 U.S. at 76 n. 8 (citing *Ratan v. Republican Party of Illinois,* 868 F.2d 943, 954 n. 4 (7th Cir.1989)). The Court of Appeals for the Third Circuit has acknowledged acts which are de minimis individually may be sufficiently actionable when viewed as a whole. *Suppan,* 203 F.3d at 235.

*See also Schlarp v. Dern*, 610 F. Supp. 2d 450, 464-65 (W.D. Pa. 2009).

Further, Plaintiff must "identify specific matters of public concern addressed by specific speech." *Cindrich*, 341 Fed. Appx. at 787. In *Cindrich*, the Court relying on *Connick*, stated that the Supreme Court separated "speech on matters of public concern from speech relating to the employee's private interests." *Id*. In *Schlarp v. Dern*, 610 F. Supp. 2d at 465, the Court stated that the "'as a citizen' inquiry presents a mixed question of law and fact. The 'public concern' and 'balancing tests' present questions of law for the court to decide." (Citations omitted).

In *Beckinger v. Twp. of Elizabeth*, 697 F. Supp. 2d 610, 627 (W.D. Pa. 2010), the Court stated:

In *Garcetti [Garcetti v. Cebalos*, 547 U.S. 410 (2006)], the Supreme Court clarified the standard that a court should use to determine whether speech of a public employee is protected under the First Amendment. First the court must determine whether the employee spoke both (1) as a citizen; and (2) on

a matter of public concern. *Garcetti,* 547 U.S. at 418, 126 S.Ct. 1951 (citing *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731, 88 S.Ct. 1731). If the answer to either question is no, the employee has no First Amendment claim. *Id.* If the answer to both questions is yes, then the possibility of a First Amendment claim arises. *Id.* The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. *Id.* "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Id.* The Court in *Garcetti* made clear that speech made "pursuant to official duties" does not warrant the constitutional protection of speech made pursuant to an individual's status "as a citizen." *Id.* at 421, 126 S.Ct. 1951.Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

> *Id.* at 421-22, 126 S.Ct. 19.

In *Wise*, the Court noted:

> In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held even when a public employee's speech relates to a matter of public concern, the speech may not be constitutionally protected if it was made in furtherance of the public employee's official duties. *Id.* at 1960 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

2010 WL 3809858, *9, n. 2.

Recently, in *Borough of Duryea, Pa. v. Guarnieri*, __S.Ct.__, 2011 WL 2437008, *5

(June 20, 2011), the Supreme Court stated:

> When a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If an employee does not speak as a citizen, or does not address a matter of public concern, "a federal court is not the appropriate

159

forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Ibid.* Even if an employee does speak as a citizen on a matter of public concern, the employee's speech is not automatically privileged. Courts balance the First Amendment interest of the employee against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

This framework "reconcile[s] the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission." *San Diego v. Roe,* 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) *(per curiam)*. There are some rights and freedoms so fundamental to liberty that they cannot be bargained away in a contract for public employment. "Our responsibility is to ensure that citizens are not deprived of [these] fundamental rights by virtue of working for the government." *Connick, supra,* at 147; *see also Keyishian v. Board of Regents of Univ. of State of N. Y.,* 385 U.S. 589, 605–606, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Nevertheless, a citizen who accepts public employment "must accept certain limitations on his or her freedom." *Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). The government has a substantial interest in ensuring that all of its operations are efficient and effective. That interest may require broad authority to supervise the conduct of public employees. "When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her." *Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion). Restraints are justified by the consensual nature of the employment relationship and by the unique nature of the government's interest.

In *Karchnak v. Swatara Twp*., 2009 WL 2139280, *15 (M.D. Pa. 7-10-09), the Court stated, "[i]t is clear from [*Reilly v. City of Atlantic City*, 532 F. 3d 216 (2008)] that where a claimant's speech relates to 'specialized knowledge' or 'experience' acquired through the claimant's job that speech falls within the claimant's official duties, and is thus not protected under *Garcetti*."  The *Karchnak* Court also stated:

160

To meet the first prong of the *prima facie* case for retaliation, a statement made by a government employee is protected when: (1) is made by the employee in her capacity as a citizen; (2) the statement involved a matter of public concern; and (3) the government did not have an adequate justification for treating the speaker differently than a member of the general public. *Hill,* 455 F.3d at 242. The landscape for public employees making First Amendment retaliation claims has been significantly altered since the United States Supreme Court's decision in *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). As the United States Court of Appeal for the Third Circuit recently observed, " *Garcetti* simply 'narrowed the Court's jurisprudence in the area of employee speech' by further restricting the speech activity that is protected." *Reilly v. City of Atlantic City,* 532 F.3d 216, 228 (3d Cir.2008) (*quoting Foraker v. Chaffinch,* 501 F.3d 231, 241 (3d Cir.2007)). After *Garcetti,* a court analyzing a public employee's First Amendment retaliation claims must first consider whether the employee's speech is made pursuant to the employee's official duties. "[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Garcetti,* 547 U.S. at 424.

*Id.,* * 6.

In *Moore v. Darlington Twp.*, 690 F. Supp. 2d 378, 388 (W.D. Pa. 2010), the Court stated:

As far as speech, in order to pass the first step of the inquiry, Plaintiff must show that he "spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos,*547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). To do so, he must navigate between the precedential Scylla and Charybdis of *Connick* and *Garcetti* by showing both that his speech was not on a matter of purely personal interest, *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and that it was not made pursuant to his official duties, (*Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)).

"The standard for guiding this inquiry is whether the speech in question was made pursuant to the practically understood or expected duties of a Plaintiff's employment." *Id.* at 389. "An employee's speech involves a matter of public concern if it is fairly related to political, social, or other community concerns." *Eddy v. Corbett*, 2009 WL 2982643, *4 (W.D. Pa. 9-14-

161

09)(citation omitted), affirmed 2010 WL 1999017, 381 Fed.Appx. 237 (3d Cir. 2010)(Non-Precedential).

We agree with Plaintiff (Doc. 87, p. 10) that he has met the threshold requirement of a retaliation claim since he has presented evidence, as stated in his responses to Defendants' SMF and in his SMF detailed above, that he spoke both as a citizen and on matters of public concern. *See Eddy v. Corbett*, 2009 WL 2982643, *4. Plaintiff's evidence shows that he repeatedly expressed his concerns about the FES and the OAG, and about the alleged mismanagement, fraud and wrongdoing to many people, both in the government and outside of the government. We find that the evidence cited by Plaintiff in his SMF, as well as in his responses to Defendants' SMF, amply demonstrates the protected nature of his speech and the specific speech on which he bases his retaliation claim. We find the record cited to by Plaintiff in his SMF and in his responses to Defendants' SMF, detailed above, specifically identifies his speech at issue, including the form, context and content. We find that based on the record as a whole, detailed above, that Plaintiff spoke to people who did not work in the OAG and who were not directly involved in his work at the OAG. We also agree with Plaintiff and find, based on the record cited to by Plaintiff in his SMF and in his responses to Defendants' SMF, that his speech was not only made pursuant to his official duties. Further, we find that Plaintiff's SMF and his cited evidence, detailed above, shows that his speech did not merely concern matters of private interest. We find that Plaintiff's cited evidence in his SMF and in his responses to Defendants' SMF sufficiently shows that, while some of his speech was related to issues involved with his work, other portions of his speech went beyond his official duties in the OAG. As

162

Plaintiff states (Doc. 87, p. 13), his "job was to supervise the [OAG] Collections unit and examine and improve the various systems in the Collections unit. [Doc. 130] ¶ 27.  Kimmett was never tasked to investigate wrongdoing or mismanagement at FES and DOR, nor was he responsible for auditing either department.  Indeed, OAG has an Internal Affairs unit responsible for investigating allegations of wrongdoing and personnel issues, and the Comptroller's Office is responsible for internal audits.  *Id.* [Doc. 130] ¶¶ 28, 30.  And no one ever expected or tasked Kimmett, the Supervisor of a sub-unit of a section of OAG, with investigating DOR's operations. *Id.*"

Also, as Plaintiff points out (Doc. 87, p. 12), his evidence also shows that he not only spoke to persons employed in the OAG and other state governmental agencies, but to people outside of the state government with no involvement in his work at the OAG, including Hudic, the FBI, a former Assistant U.S. Attorney (Kane), and a present Assistant U.S. Attorney (Brandler). Plaintiff also indicates (Doc. 87, p. 11, n. 1) that as recently as the summer of 2010, he was still speaking with federal officials about alleged wrongdoing in the OAG.   We concur with Plaintiff (Doc. 87, pp. 11-19), based on his above detailed SMF, that his evidence shows that his speech, in sufficient measure, related to matters which were of concern to the community.

Thus, as a question of law, we find that Plaintiff's speech has satisfied the "public concern" test.  After the employee demonstrates that his speech involves a mater of public concern, he must show that his "interest in the speech outweighs the government employer's countervailing interest in providing efficient and effective services to the public." *Curinga v. City*

*of Clairton*, 357 F. 3d 305, 310 (3d Cir. 2004)(citation omitted); *Eddy v. Corbett*, 2009 WL 2982643, *4 .

Since we disagree with Defendants and find that Plaintiff's evidence sufficiently shows that his speech, in part, was made as a citizen and that his speech, in part, addressed matters of public concern, we must utilize the *Pickering* balancing test which also presents a question of law for the court to decide.  *See Schlarp v. Dern*, 610 F. Supp. 2d at 464-65.  Thus, we must determine if Plaintiff's speech was made "under circumstances in which, on balance, his [ ] interest in speaking outweighs his [ ] employer's interest in promoting workplace efficiency." *Id.* at  465 citing *Garcetti*, 547 U.S. at 421.  A balance must be met between the interests of Plaintiff, as a citizen, in speaking about matters of public concern and the interest of the OAG, as an employer, "in promoting the efficiency of the public services it performs through its employees."  *Id.* quoting *Pickering*, 391 U.S. at 568.

In *Eddy v. Corbett*, 2009 WL 2982643, *4, the District Court stated that its "determination of a government-employer's countervailing interest at this initial step requires consideration of whether the employee is a policymaker under the *Elrod/Branti* line of cases. This is because the 'government's interest in appointing politically loyal employees to policymaking positions converges with its interest in running an efficient workplace.'" citing *Curinga v. City of Clairton*, 357 F. 3d 305, 312.  "The ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position ... ."  *Id.* citing *Branti v. Finkel*, 445 U.S. 507 (1980).  The District Court in *Eddy v. Corbett*, 2009 WL 2982643, *5, then stated:

> If, using the teachings of the Supreme Court in *Elrod* and *Branti,*
> this Court finds Eddy to be a policymaker, then the *Pickering*/*Connick*
> balancing test tips decidedly in the employer's favor. At one end of the
> spectrum is the Sixth Circuit's decision that held as a matter of law that the
> second step of the *Pickering*/*Connick* balancing test favors the governmental
> employer "where a confidential or policymaking public employee is
> discharged on the basis of speech related to his political or policy views...."
> *Rose v. Stephens,* 291 F.3d 917 (6th Cir.2002). Commenting on the Sixth
> Circuit's decision in *Rose,* the Court of Appeals for the Third Circuit was
> unable to go that far, but stated, "whether or not this can be decided as a
> matter of law, the government's interest in these kinds of cases is likely
> dispositive." *Curinga v. City of Clairton,* 357 F.3d at 312 n. 5.

We agree entirely with Plaintiff (Doc. 87, pp. 10-11) that his speech about alleged waste, mismanagement and wrongdoing in the OAG was protected under the First Amendment. *Id*. at 466 ("[Plaintiff's] filing formal grievances constituted activity protected under the First Amendment ... ."). We further agree with Plaintiff that this case also involves conduct protected under the Petition Clause, including both his lawsuit and his reports to the FBI and U.S. Attorney's Office. (*Id*.). However, as Defendants correctly point out (Doc. 168, pp. 8-11), the *Pickering* balancing test still applies to Petition Clause cases. *See Schlarp v. Dern*, 610 F. Supp. 2d at 464-65.

The Court in *Borough of Duryea, Pa. v. Guarnieri*, 2011 WL 2437008, *6, very recently stated that even though its case arose under the Petition Clause and not the Speech Clause of the First Amendment and was based "on the premise that Guarnieri's grievances and lawsuit are petitions protected by the Petition Clause," "Guarnieri just as easily could have alleged that his employer retaliated against him for the speech contained within his grievances and lawsuit." The Court stated that "[t]he question presented by this case is whether the history

and purpose of the Petition Clause justify the imposition of broader liability when an employee

invokes its protection instead of the protection afforded by the Speech Clause." *Id.*

The Court in *Borough of Duryea, Pa. v. Guarnieri,* considered whether to "apply the

public concern test developed in Speech Clause cases to Petition Clause claims by public

employees." *Id.* at *8.  The Court stated that "[t]he considerations that shape the application of

the Speech Clause to public employees apply with equal force to claims by those employees

under the Petition Clause." *Id.*

The Court in *Borough of Duryea, Pa. v. Guarnieri,* 2011 WL 2437008, *8 , then

stated:

> The substantial government interests that justify a cautious and
> restrained approach to the protection of speech by public employees are
> just as relevant when public employees proceed under the Petition Clause.
> Petitions, no less than speech, can interfere with the efficient and effective
> operation of government. A petition may seek to achieve results that
> "contravene governmental policies or impair the proper performance of
> governmental functions." *Garcetti,* 547 U.S., at 419. Government must
> have authority, in appropriate circumstances, to restrain employees who
> use petitions to frustrate progress towards the ends they have been
> hired to achieve. A petition, like other forms of speech, can bring the
> "mission of the employer and the professionalism of its officers into
> serious disrepute." *Roe,* 543 U.S., at 81. A public employee might, for
> instance, use the courts to pursue personal vendettas or to harass members of
> the general public. That behavior could cause a serious breakdown in public
> confidence in the government and its employees. And if speech or petition
> were directed at or concerned other public employees, it could have a
> serious and detrimental effect on morale.
> When a petition takes the form of a lawsuit against the government
> employer, it may be particularly disruptive. Unlike speech of other sorts,
> a lawsuit demands a response. Mounting a defense to even frivolous claims
> may consume the time and resources of the government employer. Outside
> the context of public employment, this Court has recognized that the Petition
> Clause does not protect "objectively baseless" litigation that seeks to "

'interfere *directly* with the business relationships of a competitor.' "
*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries,
Inc.,* 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (quoting
*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365
U.S. 127, 144, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)). In recognition of
the substantial costs imposed by litigation, Congress has also required civil
rights plaintiffs whose suits are "frivolous, unreasonable, or without
foundation" to pay attorney's fees incurred by defendants. *Christiansburg
Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648
(1978); see also Fed. Rule Civ. Proc. 11 (providing sanctions for claims that
are "presented for [an] improper purpose," frivolous, or lacking evidentiary
support). The government likewise has a significant interest in disciplining
public employees who abuse the judicial process.

Unrestrained application of the Petition Clause in the context of
government employment would subject a wide range of government
operations to invasive judicial superintendence. Employees may file
grievances on a variety of employment matters, including working
conditions, pay, discipline, promotions, leave, vacations, and terminations.
*See* Brief for National School Boards Association as *Amicus Curiae* 5. Every
government action in response could present a potential federal
constitutional issue. Judges and juries, asked to determine whether
the government's actions were in fact retaliatory, would be required
to give scrutiny to both the government's response to the grievance and
the government's justification for its actions. This would occasion review
of a host of collateral matters typically left to the discretion of public
officials. Budget priorities, personnel decisions, and substantive policies
might all be laid before the jury. This would raise serious federalism
and separation-of-powers concerns. It would also consume the time
and attention of public officials, burden the exercise of legitimate
authority, and blur the lines of accountability between officials and
the public.

The Court *Borough of Duryea, Pa. v. Guarnieri,* 2011 WL 2437008, *9,  further stated

that:

In light of the government's interests in the public employment context,
it would be surprising if Petition Clause claims by public employees were
not limited as necessary to protect the employer's functions and
responsibilities. Even beyond the Speech Clause, this Court has explained
that "government has significantly greater leeway in its dealings with citizen
employees than it does when it brings its sovereign power to bear on citizens

167

at large." *Engquist v. Oregon Dept. of Agriculture,* 553 U.S. 591, 599, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008); see also *NASA v. Nelson,* 562 U.S. ——, —— (2011) (slip op., at 12). The government's interest in managing its internal affairs requires proper restraints on the invocation of rights by employees when the workplace or the government employer's responsibilities may be affected. There is no reason to think the Petition Clause should be an exception.

"The public concern test was developed to protect these substantial government interests." *Id.* at *10.  "Adoption of a different rule for Petition Clause claims would provide a ready means for public employees to circumvent the test's protections." *Id.*

The Supreme Court did not agree with Guarnieri's claim that application of the public concern test to the Petition Clause was inappropriate.

The Court in *Borough of Duryea, Pa. v. Guarnieri,* 2011 WL 2437008, *13 , then stated:

> The framework used to govern Speech Clause claims by public employees, when applied to the Petition Clause, will protect both the interests of the government and the First Amendment right. If a public employee petitions as an employee on a matter of purely private concern, the employee's First Amendment interest must give way, as it does in speech cases. *Roe,* 543 U.S., at 82–83. **When a public employee petitions as a citizen on a matter of public concern, the employee's First Amendment interest must be balanced against the countervailing interest of the government in the effective and efficient management of its internal affairs.** *Pickering, supra,* **at 568. If that balance favors the public employee, the employee's First Amendment claim will be sustained. If the interference with the government's operations is such that the balance favors the employer, the employee's First Amendment claim will fail even though the petition is on a matter of public concern.**
> As under the Speech Clause, whether an employee's petition relates to a matter of public concern will depend on "the content, form, and context of [the petition], as revealed by the whole record." *Connick,* 461 U.S., at 147–148, and n. 7. The forum in which a petition is lodged will be relevant

to the determination of whether the petition relates to a matter of public concern. *See Snyder v. Phelps,* 562 U.S. ——, —— (2011) (slip op., at 8–9).

(Emphasis added).

Defendants concede that "[Plaintiff] Kimmett's retaliation-for-filing-this-lawsuit claim ... survives the first two elements of the *Garcetti-Connick-Pickering* analysis ... ." (Doc. 80, p. 25). However, Defendants contend that Plaintiff's retaliation claim "cannot surmount the third [element of the *Garcetti-Connick-Pickering* analysis]," and they state that "there can be no serious question that, under the *Pickering* balancing test, Kimmett's interest in filing this lawsuit is outweighed by the OAG's countervailing interest as an employer in promoting workplace efficiency and avoiding workplace disruption." (*Id.*). Defendants state that "government attorneys ... occupy positions for which, in *Pickering*'s words, 'personal loyalty and confidence' and 'close working relationships' are 'necessary to their proper functioning.'" (*Id.*).

We agree with Defendants that Plaintiff, in his position with the OAG as a Senior Deputy Attorney General in charge of the FES, occupied a sensitive, confidential "policymaking" position, which was exempt from the *Elrod/Branti* rule and, that "[w]hen such employees publicly challenge the integrity or judgment of their superiors, the *Pickering* balance almost invariably favors the government." (*Id.*, p. 26 and Doc. 168, pp. 12-17). Defendants cite to *Eddy v. Corbett*, 2010 WL 1999017 (3d Cir. 2010)(Non-Precedential) and to *Tomalis v.Office of PA Attorney General*, 45 Fed.Appx. 139 (3d Cir. 2002)(Non-Precedential). (*Id.*, p. 27 and Doc. 168, pp. 18-24).

As Defendants explain:

Kimmett supervised a unit through which flowed millions of dollars, charged with carrying out the Attorney General's statutory responsibility to collect debts due the Commonwealth. *See* Pa. Stat. Ann., tit. 71 § 732-204(c). He directed the entire administrative collections process, had constant access to confidential taxpayer information, supervised other employees who also had constant access to confidential taxpayer information, and represented the Attorney General to virtually every other state agency, private contractors and the general public.

In carrying out these responsibilities, Kimmett addressed both legal and policy issues. He developed procedures and criteria for compromising debtor liability; and he reviewed and approved compromises within the dollar limits of his authority. Kimmett Dep. 151-152. He redrafted and managed that OAG's contracts with PCA's. Kimmett Dep. 153. He addressed a wide variety of legal issues relating to his unit's collections work, Kimmett Dep. 143-144, for example:

- Pl. SMOF ¶¶ 58-59, 62 (Kimmett claims that commissions had been "wrongly paid" to PCA's under the terms of their contracts);

- Pl. SOMF ¶ 61 (Kimmett claims that PCA's violated their contracts by not paying interest on their collections)'

- Rovelli Dep. Ex. 2 (Kimmett discusses statutory requirements mandating confidentiality of tax information;

- Roman Dep. Ex. 5 (Kimmett advises PCA's of statutory confidentiality provisions)'

- Roman Dep. Ex. 11 (Kimmett discusses limits placed o PCA's by Fair Debt Collections Practices Act);

- Roman Dep. Ex. 24 (Kimmett discusses whether PCA employee violated state and federal law).

- And despite what he suggests, *See* Pl. Br. in Opp. at 14, Kimmett's annual performance reviews did in fact include evaluations of his Legal Skills." [FN11]. In short, Kimmett's job, as he himself said, was to "examine and restructure  the entire FES operation in all aspects; *legal*, accounting, auditing,

170

administrative and out-reach."  Kimmett Dep.  Ex. 32, p. 2 (emphasis added).

Thus, whether examined in terms of the duties that inhere in the position of Senior Deputy Attorney General, or of the duties that Kimmett actually performed, Kimmett occupied a position that was exempt from the *Elroy/Branti* rule.

FN11.  Under the "Legal Skills" category, Kimmett was evaluated on whether he "[comprehends the law relevant to work assignments; thoroughly researches relevant legal issues; effectively formulates legal theory"; whether he "[t]horoughly and efficiently investigates and assembles relevant facts and factual materials"; and whether he "[o]therwise exercises sound judgment in litigation, settlement, document approval, and other decisions relevant to work assignments." *See* Kimmett Dep. Ex. 45, p. 1249 (Kimmett evaluation form).

(Doc. 168, pp. 22-24).

We find that the above detailed record shows that Plaintiff had a position as the supervisor of the FES that was sensitive and "highly responsible," that involved policy making decisions on how to properly run the FES, that required confidentiality and a close working relationship with Defendants and other state agencies to effectively implement the OAG's policies.  Plaintiff's Senior Deputy Attorney General position was such that he was expected to provide "legal services and advice on matters of significant scope, importance, and complexity." *See Tomalis v. Office of PA Attorney General,* 45 Fed.Appx. at 141.  Also, Plaintiff's position was that of supervisor of the FES.

Since we find Plaintiff was a policymaker with the OAG, "the *Pickering/Connick* balancing becomes less difficult."  *Eddy v. Corbett*, 2009 WL 2982643, *6.  As the District Court in *Eddy* stated:

171

The Court outlined three factors to be considered in balancing the relevant interests: (1) the degree to which the speech disrupts close working relationships; (2) the time, place, and manner of the speech; and (3) the context in which the dispute arose. *Connick v. Myers,* 461 U.S. at 151-154. In analyzing Eddy's remarks in conjunction with his sensitive, confidential position representing the AG, it is clear to this Court that the *Pickering/Connick* balancing test falls decidedly on the side of Defendants. Eddy's speech in this instance was critical of the AG and arose out of an employment dispute regarding office policies as they applied to Eddy. Clearly, the AG in this instance "has a reasonably greater cause for concern when direct public criticism of him comes from one in a confidential position." *Tomalis,* 45 Fed. Appx. at 145. Therefore, because Eddy was a policymaker, and because the *Pickering/Connick* balancing of interests weighs significantly in favor of the Defendants, Eddy's First Amendment claim fails as a matter of law.

*Id*.

We agree with Defendants that Plaintiff has failed to demonstrate that his interest in the speech did not outweigh "any potential disruption of the work environment and decreased efficiency of the [OAG]". *Curinga,* 357 F. 3d at 312. We find the *Eddy* case to be very similar to our case.

Defendants state as follows:

In this case, Kimmett's lawsuit publicly accused his entire chain of command, from the Attorney General on down, of complicity in "pervasive wrongdoing" in collections (*e.g.,* Complaint ¶1, p. 2), and of conspiring to cover it up. The defendants could reasonably conclude that these accusations would impair the efficient operation of the office, both by underminding Kimmett's ability credibly to speak and act in the Attorney General's name, *see, e.g., Shahar v. Bowers,* 114 F.3d 1097, 1103-1104 (11th Cir. 1997) (Deputy Attorney General who publicly disputed Attorney General's policies could not prevail in *Pickering* balance) and by harming necessary working relationships between Kimmett and others. When close working relationships are essential to fulfilling public responsibilities, there is no need for an employer "to allow events to unfold to the extent that the disruption of the office and destruction of working relationships is manifest before taking action." *Connick,* 461 U.S. at 151-152. Nevertheless, in this case we have the clearest possible evidence - Kimmett's

172

own words - of the actual disruption that his lawsuit caused in the operation of the OAG.   When he received his annual performance evaluation, Kimmett responded that the "entire evaluation" was simply an "orchestrated and deliberate effort on the part of the Office to discredit" him.  He went on to explain his belief that, *as a direct result of his lawsuit*, he could not be fairly evaluated:

> It is surreal to believe that *individuals...that I have sued*...would be fair and unbiased in their evaluation...I think it is equally inappropriate for the Attorney General's Office to allow *individuals that have been identified by me in a lawsuit*...as acting inappropriately and with possible misfeasance and malfeasance to draft this evaluation...[T]o that that it can be drafted by individuals with such a direct and sole interest to discredit me is silly and just plain wrong.

Kimmett Ex. 46, p. 1253. [FN15]  Since Kimmett had sued not only his immediate supervisors but his entire chain of command, this meant that, in his view, *no one* in the OAG could be "fair and unbaised" in supervising him.  It is difficult to imagine a more complete destruction of essential working relationships.  No organization can function normally when one employee - and a supervisor at that - considers himself exempt from ordinary supervision, evaluation and correction.

    For all these reason, the defendants' interest in the effective and efficient performance of the duties of the PAG outweighed whatever interests Kimmett had in filing his lawsuit.  It is therefore unnecessary to consider whether the lawsuit was in fact the case of his termination.

> FN 15.  As we explained above, in writing this document Kimmett was certainly speaking as an employee rather than as a citizen for *Garcetti* purposes.  But the tone and content of this document show that, even if Kimmett spoke as a citizen, the defendants were fully justified under *Pickering* in terminating Kimmett in response.  Not only did Kimmett reject out of hand every criticism of his performance; the hostility and distrust that he directed at all of his superiors – particularly at Roman, his immediate supervisor – made it plain that any normal working relationship was impossible, that he was not amenable to the defendants' authority and that he could not be expected to cooperate in any plan to remedy his deficient performance. *See, e.g., id.* at 1253 (Roman created "toxic environment of division and strife"; was put in his position to "trump up charges"

> against Kimmett); 1256 (propriety of compromises could only
> be reviewed by "independent third party"); 1259 (Roman
> deliberately acted to "make [Kimmett] look bad").

(Doc. 80, pp. 27-29).

We concur entirely with Defendants, that Plaintiff has not established that his interest in his speech outweighed the government's interest in efficiency.  We find the *Eddy* and *Tomalis* cases cited to by Defendants to be persuasive and directly on point with our case.  Plaintiff's relentless campaign against alleged fraud, mismanagement and wrongdoing in the OAG undisputedly impaired the OAG's interests in efficient operations and in maintaining good relations both within the different sections in its office and with the governmental agencies whose debts it collected.  Indeed, the evidence shows that DOR officials requested from the OAG that communications from Plaintiff be channeled through Furlong and his staff.  (Doc. 81, ¶ 170).[5]  Also, as Defendants' ¶ 168 of their SMF (Doc. 81) states, "Defendant Roman received various complaints about plaintiff's communications  with Revenue personnel and with his own staff."  In ¶ 169 (Doc. 81), Defendants state that DOR "officials complained that Plaintiff's interactions with Revenue personnel and demands for compliance with his requests violated established interagency protocol."  Further, DOR "officials viewed Plaintiff's demands as inappropriate and overreaching."  (Doc. 81, ¶ 171).  In short, the evidence shows that Plaintiff became an active adversary and constant critic of the OAG and Defendants.

In the present case, we find that  balance does not favor Plaintiff Kimmett, and that his First Amendment claim fails under both the Speech Clause and the Petition Clause.  We find

---

5.   Since the evidence to which Defendants cite to support their SMF is stated in Doc. 81, we do not repeat Defendants' evidence herein.

174

that the interference with the OAG's operations was such that the balance favors Defendants, and that Plaintiff's First Amendment claim fails even though his petition and speech were on a matter of public concern.

Thus, we find as a question of law, based on the record cited to by the parties in their respective SMF and in their responses to the other party's SMF, that Plaintiff's interest in the speech at issue and in the filing of his lawsuit, alleging fraud and wrongdoing by state agencies, did not outweigh the OAG's interest in promoting workplace efficiency. Therefore, we agree with Defendants that it is not necessary to consider whether Plaintiff's lawsuit caused his termination.

Since we find that Defendants are entitled to summary judgment with respect to Plaintiff Kimmett's federal claim under §1983, we will recommend that the Court decline to exercise pendent jurisdiction over his state law Whistleblower claim under 43 P.S.A. §1421, *et seq.   See* 28 U.S.C. §1367(c)(3);  *McKnight v. Baker*, 415 F.Supp. 2d 559, 564-65 (E.D. Pa. 2006), affirmed, 244 Fed.Appx. 442 (3d Cir. 2007)(Court declined to exercise jurisdiction over Plaintiff's state law claims since it was entering judgment against Plaintiff on all of his federal claims).

Accordingly, we shall recommend that the Court grant Defendants' Summary Judgment Motion **(Doc. 79)** with respect to Plaintiff's First Amendment claim, and that the Court deny Plaintiff's partial Summary Judgment Motion **(Doc. 86)** on liability with respect to his First Amendment claim.  We shall also recommend that the Court decline to exercise pendent jurisdiction over Plaintiff's state law Whistleblower claim.

**VII.  Recommendation.**

       Based on the foregoing, it is respectfully recommended that the Court grant Defendants' Summary Judgment Motion **(Doc. 79)** with respect to Plaintiff's First Amendment claim, and that the Court deny Plaintiff's Partial Summary Judgment Motion **(Doc. 86)** on liability with respect to his First Amendment claim.  It is also recommended that the Court decline to exercise pendent jurisdiction over Plaintiff's state law Whistleblower claim.  Further, it is recommended that the Court enter Judgment in favor of Defendants and against Plaintiff with respect to Plaintiff's First Amendment claim, and that the Court close this case.

 

                               <u>s/ Thomas M. Blewitt</u>
                               **THOMAS M. BLEWITT**
                               **United States Magistrate Judge**

**Dated: June 24, 2011**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS D. KIMMETT, | : | CIVIL ACTION NO. **4:CV-08-1496** |
| | : | |
| Plaintiff | : | (Judge Caldwell) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| THOMAS CORBETT, et al., | : | |
| | : | |
| Defendants | : | |

## **NOTICE**

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **June 24, 2011.**

Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter described in
> 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
> disposition of a prisoner case or a habeas corpus petition within ten (10)
> days after being served with a copy thereof.  Such party shall file
> with the clerk of court, and serve on the magistrate judge and all
> parties, written objections which shall specifically identify the
> portions of the proposed findings, recommendations or report to which
> objection is made and the basis for such objections.  The briefing
> requirements set forth in Local Rule 72.2 shall apply.  A judge shall
> make a *de novo* determination of those portions of the report or
> specified proposed findings or recommendations to which objection
> is made and may accept, reject, or modify, in whole or in part, the findings
> or recommendations made by the magistrate judge.  The judge, however,
> need conduct a new hearing only in his or her discretion or where
> required by law, and may consider the record developed before the

magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.


                                        s/ Thomas M. Blewitt
    _____        THOMAS M. BLEWITT
                                        United States Magistrate Judge


**Dated: June 24, 2011**