IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS D. KIMMETT, | : | Civil Action No. 4:08-CV-1496 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| TOM CORBETT, *et. al.,* | : | |
| | : | (Magistrate Judge Blewitt) |
| Defendants. | : | |

**MEMORANDUM**

April 22, 2013

## I. BACKGROUND:

### A. Procedural History[1]

On August 11, 2008, plaintiff, Thomas D. Kimmett, instituted the instant

action by filing a complaint. Complaint, ECF No. 1.  Kimmett amended his

complaint; then on March 5, 2009, Kimmett filed a second amended complaint.

Second Amended Complaint, ECF No. 35.  Kimmett had been employed as a

Senior Deputy Attorney General in the Financial Enforcement Section (hereinafter

"FES") of the Pennsylvania Office of the Attorney General.

The second amended complaint names as defendants the Pennsylvania

---

[1]The procedural history of this case is long and convoluted, thus the court
only discusses only the salient portions of the history of this case.

1

Office of the Attorney General (hereinafter "OAG"), plaintiff's employer; Thomas Corbett, who, at the time of the matters referenced in the complaint, was Pennsylvania's Attorney General, and now, at the time of the filing of the instant Memorandum, is Pennsylvania's Governor; Brian Nutt, William Ryan, Lou Rovelli, Mike Roman and Jill Keiser, all employees of the OAG; Steve Brandwene, the Chief of the FES until his retirement in the spring of 2007; and Does 1-10, Does 1-5 are all employees of the OAG and Does 6-10 are employees of other agencies in the Pennsylvania state government. All of the aforementioned individuals were sued in their official and individual capacities. All defendants are represented by the OAG, thus in the instant memorandum, the undersigned will refer to all defendants jointly as "the defendants."

The second amended complaint contains three counts. Count I is brought pursuant to 42 U.S.C. § 1983 against defendants Corbett, Nutt, Ryan, Rovelli, Brandwene, Roman, Keiser and Does 1-10. It is a *First Amendment* retaliation claim. Kimmett asserts that the defendants violated his *First Amendment* rights of freedom of speech and to petition the Government for redress of grievances for failure to promote and, ultimately, terminating Kimmett. Count II is brought pursuant to the Pennsylvania Whistleblower Law, 43 P.S. § 1421, *et. seq.* against all defendants. Count III is a defamation claim against all defendants.

On March 17, 2009, the defendants filed a partial motion to dismiss. Defendants' Motion to Dismiss, ECF No. 39. On September 29, 2009, Magistrate Judge Thomas M. Blewitt filed a report and recommendation, recommending that the motion be granted in its entirely. Report and Recommendation, ECF No. 52. Both plaintiff and defendant filed objections to the 2009 report and recommendation. The Honorable John E. Jones III issued an order on December 1, 2009, adopting the report and recommendation in part and rejecting in part. Order, ECF No. 61.

Specifically, Judge Jones dismissed the OAG; plaintiff's claims seeking monetary damages from the defendants in their official capacities were dismissed; plaintiff's claims in Counts II and III seeking equitable relief, including a prospective injunction, against the defendants in their official and individual capacities were dismissed; plaintiff's claims for equitable relief in Count I against defendants in their individual capacities were dismissed; Count III was dismissed as to defendants Corbett, Ryan, Nutt, Rovelli and Roman; Counts II and III were dismissed as to Brandwene; and John Does 1-10 were dismissed without prejudice.

At this point in time, the remaining causes of action are, as follows: Count I

is proceeding as to defendants Corbett, Nutt, Ryan, Rovelli, Brandwene[2], Roman and Keiser.  Count II is proceeding as to defendants Corbett, Nutt, Ryan, Roman, Keiser and Rovelli.  Count III is proceeding as to defendant Keiser.

## B. Report & Recommendation

The defendants filed a motion for summary judgment on July 16, 2010. Defendant's Motion for Summary Judgment, ECF No. 79. The plaintiff filed a motion for partial summary judgment on July 16, 2010.  Plaintiff's Motion for Partial Summary Judgment, ECF No. 86. Accordingly, Judge Blewitt prepared an one-hundred-seventy-eight page report and recommendation on June 24, 2011. Report and Recommendation, ECF No. 177. Defendant filed objections, an opposing brief and a reply brief. Defendant Objections, Opposing Brief and Reply Brief, ECF Nos. 182, 183, 185, 186 and 188. Plaintiff filed objections, an opposing brief and a reply brief. Plaintiff's Objections, Opposing Brief and Reply Brief, ECF Nos. 184, 187 and 189.

The action was transferred to the undersigned on January 17, 2013, and is now ripe for disposition.

---

[2]For reasons that are unclear to the undersigned, Brandwene was terminated from the docket on June 14, 2011.  This is an error. Brandwene is still a defendant as to Count I in this case and should not have been terminated on the docket. However, the court will not direct the clerk to correct the error, as the court is dismissing the case as of today's date.

The magistrate judge recommended

> that the Court grant Defendants' Summary Judgment Motion (Doc. 79)
> with respect to Plaintiff's First Amendment claim, and that the Court
> deny Plaintiff's Partial Summary Judgment Motion (Doc. 86) on liability
> with respect to his First Amendment claim. It is also recommended that
> the Court decline to exercise pendent jurisdiction over Plaintiff's state
> law Whistleblower claim. Further it is recommended that the Court enter
> Judgment in favor of Defendants and against Plaintiff with respect to
> Plaintiff's First Amendment claim, and that the Court close this case.

Report and Recommendation, ECF No. 177 at 176.

For reasons unbeknownst to the court, the magistrate judge neglected to include defendants Brandwene and Keiser and the defamation count in his analysis that formed the basis for his recommendation. Additionally, the magistrate judge did not set forth the correct standard for summary judgment motions. As discussed below, the standard changes slightly when there are cross-motions for summary judgment. The court notes that for these reasons and others discussed later in the instant memorandum, the undersigned is unable to adopt the report and recommendation of the magistrate judge in full. The instant memorandum and order takes into consideration all defendants and counts, as discussed in the final paragraph of the procedural history section above.

## C. Objections to the Report & Recommendation

When objections are filed to the report and recommendation of a magistrate

judge, the district court makes "a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objections are made." 28 U.S.C. § 636(b)(1)(C); *United States v Raddatz,* 447 U.S. 667, 674-75; 100 S.Ct. 2406; 65 L. Ed. 2d 424 (1980). The court may accept, reject or modify, in whole or in part, the magistrate judge's findings or recommendations. *Id.* Although the standard of review is *de novo*, 28 U.S.C. § 636(b)(1) permits whatever reliance the district court, in the exercise of sound discretion, chooses to place on a magistrate judge's proposed findings and recommendations. *Raddatz*, 447 U.S. at 675; *see also Mathews v Weber*, 423 U.S. 261, 275 (1976); *Goney v. Clark*, 749 F.2d 5, 7 (3d Cir. 1984).

The defendants object to the report and recommendation of Judge Blewitt as follows. Defendants assert that the magistrate judge erred in concluding that all of Kimmett's speech was "citizen" speech; by concluding that there is a triable issue of fact as to whether defendants knew of Kimmett's conversations with Rich Hudic, Mike Kane and Assistant United States Attorney Brandler; in how he applied the *Pickering, infra,* balancing test; in rejecting paragraphs 59, 67, 138, 139, 141, 142, 169, 170, 171, 185, 186, 189 of defendants statement of material facts; in failing to recommend that summary judgment be granted on the First Amendment claim to Brandwene and Keiser; and in failing to recommend that the

court decline to exercise pendant jurisdiction as to the defamation claim against Keiser.

The plaintiff objects to the report and recommendation of Magistrate Judge Blewitt as follows. Kimmett asserts that the magistrate judge erred in using *Elrod* and *Branti, infra,* to determine if Kimmet was a government "policymaker," as both of those cases are political affiliation cases, not speech/petition clause cases; by not determining the correct test for a "policymaker" and applying it to Kimmet; in viewing the facts in the light most favorable to the defendant as opposed to plaintiff; and in his application of the *Pickering* balancing test.

## II. DISCUSSION:

### A. Facts

The court is adopting, and incorporating by reference the facts as stated by the magistrate judge, with the exception of those paragraphs specifically objected to by defendants, as noted above. Report and Recommendation, ECF No. 177 at 5-152.

To summarize, the material, undisputed facts, are as follows. Plaintiff, Thomas D. Kimmett, an attorney and accountant, was hired in November 2006 as a Senior Deputy Attorney General in the Financial Enforcement Section (hereinafter "FES") of the Commonwealth of Pennsylvania's Office of the

Attorney General. The other parties to this lawsuit, the defendants, and their positions, are as follows. Thomas W. Corbett, Jr., at the relevant time, Pennsylvania's Attorney General, now Governor of the Commonwealth of Pennsylvania; William H. Ryan, Jr, First Deputy Attorney General; Brian Nutt, former Chief of Staff; Louis J. Rovelli, Executive Deputy Attorney General; Michael Roman, FES Chief; Stephen Brandwene, a former FES Chief; and Jill Keiser a FES Administrative Officer.

The FES is a civil law division of the OAG. The FES was responsible for collecting debts, taxes and accounts due to the Commonwealth of Pennsylvania. State agencies, boards, commissions and universities would refer debts owed to them to the FES for collection. The responsibility for the collection of debts was split. FES would attempt to collect some debts itself, and the OAG contracted with private collection agencies (hereinafter "PCAs") for collection of other debts.

As part of their contract with the OAG, the PCAs would receive a commission on the amounts they collect.[3] Regarding accounts that the PCA was

---

[3] The parties dispute whether or not the PCAs are always entitled to a commission. Report and Recommendation, ECF No. 177 at 13, ¶ 17. The disputed facts would be an issue for a jury to decide, and as the disposition of instant summary judgment motions and report and recommendation turn on an issue of law not related to this point it is immaterial for the purposes of this memorandum.

responsible for collecting, sometimes the debtor would pay the debt to the PCA, and sometimes it would bypass the PCA and pay the FES/OAG directly. When the latter occurred, if the PCA was entitled to a commission, the FES/OAG would pay the commission to the PCA.[4]

When Kimmett was hired as a Senior Deputy General in the FES he was placed in charge of the administrate collections unit. Kimmett reported to Brandwene, who, in turn, reported to Rovelli. Kimmett was responsible for, *inter alia*, managing the PCA contracts, including redrafting the contacts and developing procedures for review and approval of commission payments, including "pay directs," which are situations where the debtor pays the FES/OAG directly, bypassing the PCA. Prior to hiring Kimmett, the FES was aware that the PCAs were not paying interest on collections they held for the Commonwealth. Kimmett was put in charge of the collections unit because the FES was aware that the collections unit had not been managed properly previously. Kimmett developed procedures for the review and approval of commission payments for

_____

[4]Again, it is disputed whether or not the PCAs are always entitled to a commission. Report and Recommendation, ECF No. 177 at 14, ¶ 20. The disputed facts would be an issue for a jury to decide, and as the disposition of instant summary judgment motions and report and recommendation turn on an issue of law not related to this point it is immaterial for the purposes of this memorandum.

pay directs, and signed off on those payments. He also developed criteria and procedures for the review and approval of compromises. Kimmett eventually spoke with an Assistant United States Attorney, who, at some point (when, exactly, is a disputed fact), sent an FBI agent to speak with Kimmett and his counsel.

The four prior paragraphs complete the salient, agreed upon facts. The penultimate paragraph of this section includes plaintiff's alleged facts. Although there are cross-motions for summary judgment, thus rendering plaintiff both a moving and non-moving party, any disputed facts will be taken in the light most favorable to plaintiff, as this court is granting summary judgment on defendants' motion, and the plaintiff is the non-moving party with respect to defendants' motion.

Although defendants assert that Kimmett was hired as collections unit supervisor to identify and fix the problems with the collections unit, Kimmett disagrees; he asserts that he was hired solely because he had a financial background as an accountant. Kimmett was responsible for managing contracts with the PCAs to ensure that the PCAs were complying with the contracts. Kimmett redrafted PCA contracts to tighten various provisions. Kimmett discovered alleged waste, fraud and wrongdoing within the FES, OAG and

Pennsylvania's Department of Revenue. According to Kimmett, commissions were being paid to PCAs inappropriately, the FES was paying the PCAs excessive and unearned commissions. According to Kimmett, he discovered at least $300,000 in commissions that had been wrongly paid to PCAs, and other contract violations by the PCAs, such as failure to pay interest on Commonwealth funds, that were costing the Commonwealth, and therefore the taxpayers in the Commonwealth, millions of dollars. According to Kimmett, whenever he reported these issues to the defendants, he was met with resistance and defendants would, figuratively, attempt to sweep the issues under the rug. Kimmett reported the alleged wrongdoing within and outside his chain of command, to the defendants, and also to other state employees. Kimmett also alleged that he spoke to Mike Kane, an employee at the Department of Revenue (hereinafter "DOR"), about the alleged waste he found within the DOR, a department outside the scope of Kimmett's responsibility. Kimmett also spoke to Rich Hudic, the Executive Director of the Team Pennsylvania Foundation, about the problems he was discovering.

As noted above, Kimmett filed the instant action on August 11, 2008. Kimmett was terminated from the FES/OAG on November 21, 2008.

**B. Standard of Review:**

1. *Cross motions for summary judgment:*

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather its response must … set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a

genuine issue for trial." *Jones v. United Parcel Service*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985). However, the facts and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a genuine issue of material fact to preclude summary judgment." *Anderson*, 477 U.S. at 247-48.

The concurrent resolution of cross-motions for summary judgment, as are presented here, "can present a formidable task." *Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown*, 318 F. Supp. 2d 230, 235 (M.D. Pa. 2004) (Conner, J.) (citing 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (3d ed. 1998)). On cross-motions for summary judgment, the standard of review does

not change. Each moving party must independently show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; *Rains v. Cascade Indus., Inc*., 402 F.2d 241, 245 (3d Cir. 1968). However, the mandate of Rule 56 that the court view all facts in the light most favorable to the non-moving party may be difficult to apply where all parties are both moving and non-moving parties. "Inferences to which a party is entitled with respect to the opponent's motion may not be granted with respect to its own." *Interbusiness Bank, N.A.*, 318 F. Supp. 2d at 236 (citing *United States v. Hall*, 730 F. Supp. 646, 648 (M.D. Pa. 1990) (Nealon, J.). Such circumstances may require separate opinions on the respective motions. *See Rains*, 402 F.2d at 245; and *Hall*, 730 F. Supp. at 648.

In this case, however, the facts the undersigned finds to be material are substantially undisputed and are wholly supported by the evidence submitted by all parties. Whether the facts are viewed in the light most favorable to the plaintiff or the defendant, the same essential narrative unfolds. The present cross-motions for summary judgment will therefore both be decided in one Memorandum and one Order. *See Interbusiness Bank*, 318 F. Supp. 2d at 236 (relying on the mandate of Fed. R. Civ. P. 1 that the Federal Rules of Civil Procedure "shall be construed and administered to secure the just, speedy, and inexpensive determination of

every action" in concurrently deciding cross-motions for summary judgment in a single opinion).

2. *42 U.S.C. § 1983:*

In order for plaintiffs to prevail under § 1983 they must establish two elements: first, that the conduct complained of was committed by a person acting under color of state law; and second, that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993). Defendants do not dispute that the conduct complained of was committed by persons acting under color of state law. Defendants dispute the second element that establishes a claim under §1983, namely, they argue that plaintiff was not deprived of the rights, privileges or immunities secured by the Constitution or laws of the United States.

**C. Analysis:**

The issue at hand for the court to determine is: Whether Kimmett may pursue a claim for deprivation of constitutional rights secured by the *First Amendment's* speech and petition clauses based on his filing of the instant action along with a failure to promote, and ultimately, his termination for speaking out on the alleged frauds committed by coworkers of his employer, the Office of Attorney General of the Commonwealth of Pennsylvania?

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,* 391 U.S. 563; 88 S.

Ct. 1731; 20 L. Ed. 2d 811 (1968) is the seminal case on public employee *First*

*Amendment* speech rights.   Between 1961 and 1964, the Board of Education of

Township High School District 205, in Will County, Illinois, put forth several

bond proposals for local voters to approve bonds to raise money for the school

district. *Id.* At 566. The first bond proposal was defeated by the voters, the second

was approved, the third and fourth were defeated.  *Id.* As a response to this final

board proposal, and also in response to two letters published in the local

newspaper  from the local teacher's organization and the superintendent of schools

supporting the proposal, Marvin L. Pickering, a teacher in the district, wrote a

letter to the editor of the local newspaper criticizing the proposal. *Id.*

> The letter constituted, basically, an attack on the School Board's
> handling of the 1961 bond issue proposals and its subsequent allocation
> of financial resources between the schools' educational and athletic
> programs.  It also charged the superintendent of schools with attempting
> to prevent teachers in the district from opposing or criticizing the
> proposed bond issue.

*Pickering*, 391 U.S. at 566. The Board held a hearing and dismissed Pickering for

the letter. *Id* 566-567.

Typically, when one thinks of an infringement on an individual's free

speech rights, one thinks of the state, as sovereign, infringing on the rights of the

citizens.  *Pickering* set forth a different issue.  Governments are not merely governing bodies, but are also employers. The question then became, what latitude do governments, as employers, have to regulate the speech of its citizen employees?  "The problem in any case is to arrive at a balance between the interest of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 569.

"Because of the enormous variety of fact situations in which critical statements by. . . public employees may be thought by their superiors, against whom the statements are directed, to furnish grounds for dismissal, [the court does] not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged." *Pickering,* 391 U.S. at 569. "However, in the course of evaluating the conflicting claims of *First Amendment* protection and the need for orderly school administration in the context of this case, we shall indicate some of the general lines along with an analysis of how the controlling interest should run." *Id.*

The Supreme Court began by examining the statements in the letter, and determined that the statements were not directed toward individuals with whom Pickering would normally be in contact with in the course of his daily work as a

teacher. *Pickering*, 391 U.S. at 569-570. The Court determined that Pickering's "employment relationships with the Board, and to a somewhat lesser extent the superintendent, were not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Id.* at 570. The Court then considered the statements in the letter and determined that the statements were false, but reflected "a difference of opinion between Pickering and the Board as to the preferable manner of operating the school system, a difference of opinion that clearly concerns an issue of general public interest." *Id.* at 571. Additionally, the court determined that because the question of whether additional funds was needed was a question left to popular vote, it is conclusively an issue of public concern. *Id.*

Thus, the court determined that

[w]hat we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to the public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public.

*Pickering,* 391 U.S. at 572-573.

The Court then went on to state that "the threat of dismissal from public employment is [] a potent means of inhibiting speech." *Pickering,* 391U.S. at 574. "This Court has also indicated, in more general terms, that statements by public officials on matters of public concern must be accorded *First Amendment* protection despite the fact that the statements are directed at their nominal superiors." *Id. citing Garrison v. Louisiana*, 379 U.S. 64 (1964); *Wood v. Georgia*, 370 U.S. 375 (1962).

> We have already noted our disinclination to make an across-the-board equation of dismissal from public employment for remarks critical of superiors with awarding damages in a libel suit by a public official for similar criticism. However, in a case such as the present one, in which the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher, we conclude that it is necessary to regard the teacher as the member of the general public he seeks to be.
>
> In sum, we hold that, in a case such as this, absent proof of false statements knowing or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment.

*Pickering*, 391 U.S. at 574-575.

The takeaway from *Pickering* is that employees do not lose their rights to *First Amendment* freedom of speech protections simply by virtue of their public employment. However, *Pickering* directs us to first determine if the speech is a matter of public concern. If it is not, the speech is not protected by the *First*

*Amendment.* On the other hand, if the speech is on a subject that is a matter of

public concern, then the court must balance the interest of the employee as a

citizen with the interests of the State as employer in promoting the efficiency of

the public services it performs through its employees.

This court will next examine the progeny of *Pickering*, beginning with

*Connick v. Myers*, 461 U.S. 138; 13 S. Ct. 1684 ; 75 L. Ed. 2d 708 (1982).

*Connick* illustrates when the opposite result of *Pickering* may be reached, that is to

say a public employee may be discharged for her speech without the retaliative

discharge violating the *First Amendment*. Sheila Myers was an Assistant District

Attorney in New Orleans. *Connick*, 461 U.S. at 140. Myers was told she was

being transferred to a different section of the criminal court. *Id.* She was strongly

opposed to the transfer and expressed her view to her supervisors. *Id.* At 140-141.

Myers then "prepared a questionnaire soliciting the views of her fellow staff

members concerning office transfer policy, office morale, the need for a grievance

committee, the level of confidence in supervisors, and whether employees felt

pressured to work in political campaigns," which she distributed to 15 other

Assistant District Attorneys. *Id.* at 141. Her supervisors felt that she was creating

a "mini-insurrection" within the office and terminated her for refusing to accept

the transfer. *Id.* Myers was also told that her distribution of the questionnaire was

considered an act of insubordination. *Id.*

The Supreme Court began by stating that "[t]he repeated emphasis in *Pickering* on the right of a public employee "as a citizen, in commenting upon matters of public concern," was not accidental." *Connick*, 461 U.S. at 143. "This language, reiterated in all of *Pickering's* progeny, reflects both the historical evolvement of the rights of public employees, and the common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Id.* However, "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the *First Amendment*." *Id.* at 146. "Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." *Id.*

The court held that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstance, a federal court is not the

appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick,* 461 U.S. at 147. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." *Id.* at 147-148. In *Connick*, the Supreme Court found that all but one of the questions did not fall into the rubric of matters of public concern. *Id.* at 148. Myers was not seeking "to bring to light actual or potential wrongdoing or breach of public trust. . . the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." *Id.*

However, the Court did find that one question did touch on a matter of public concern. *Id.* at 149. Myers asked if her co-workers ever felt pressured to work in political campaigns on behalf of supported candidates. Thus, the Court turned to the next question, whether her supervisor was justified in discharging her. *Id.* at 149-150. The burden on the State to justify a particular discharge varies depending upon the nature of the employee's expression. *Id.* at 150. "The *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Id.* "To this end, the Government, as an employer, must have wide discretion and control over

the management of its personnel and internal affairs." *Id.* at 151. "This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." *Id.* "Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency." *Id.* The balancing test led the Supreme Court to determine that Myers could be terminated without violating her *First Amendment* rights. *Id.* at 154. However, the Court cautioned "that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Id.*

This leads us to *Garcetti v. Ceballos*, 547 U.S. 410; 126 S. Ct. 1951; 164 L. Ed. 2d 689 (2006), the case with a fact pattern, though not identical to, most similar to Kimmett's. Richard Ceballos was a deputy district attorney, with some supervisory responsibility, in the Los Angeles County District Attorney's Office. *Id.* at 413. After some research, Ceballos found serious misrepresentations in an affidavit that provided the basis for the issuance of a search warrant. *Id.* 413-415. He relayed his concerns to his supervisors, first orally, then followed up with two written memorandum. *Id.* at 414. After a meeting on the issue, Ceballos' supervisor decided to continue with the prosecution. *Id.* The defense attorney filed a motion to challenge the warrant, and Cebellos was called by the defense to

testify. *Id.* at 414-415. The trial court rejected the challenge to the warrant. *Id.* at 415. Ceballos alleged that he was then retaliated against by his supervisors. *Id.* His position was reassigned, he was transferred to another courthouse and he was denied a promotion. *Id.* Ceballos filed an employee grievance, which was denied. *Id.* He then sued in the United States District Court for the Central District of California. *Id.*

"That Ceballos expressed his views inside his office, rather than publicly, is not dispositive." *Garcetti*, 547 U.S. at 420. "Employees in some cases may receive *First Amendment* protection for expressions made at work...[m]any citizens do much of their talking inside their respective workplaces." *Id.* (Internal citations omitted). "The memo concerned the subject matter of Ceballos' employment, but this, too, is nondispositive." *Id.* at 421. "The *First Amendment* protects some expressions related to the speaker's job." *Id.* "The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy." *Id.* "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for *First Amendment* purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

The Court went on to say that "Ceballos wrote his disposition memo

because that is part of what he, as a calendar deputy, was employed to do."
*Garcetti*, 547 U.S. at 421. "The significant point is that the memo was written
pursuant to Ceballos' official duties." *Id.* "Restricting speech that owes its
existence to a public employee's professional responsibilities does not infringe on
any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-
422. "It simply reflects the exercise of employer control over what the employer
itself has commissioned or created." *Id.*

"Ceballos did not act as a citizen when he went about conducting his daily
professional activities, such as supervising attorneys, investigating charges, and
preparing filings." *Garcetti*, 547 U.S. at 422. "In the same way he did not speak as
a citizen by writing a memo that addressed the proper disposition of a pending
criminal case." *Id.* "When he went to work and performed the tasks he was paid
to perform, Ceballos acted as a government employee." *Id.* "The fact that his
duties sometimes required him to speak or write does not mean his supervisors
were prohibited from evaluating his performance." *Id.*

"This result is consistent with our precedents' attention to the potential
societal value of employee speech." *Garcetti*, 547 U.S. at 422 (internal citations
omitted). "Refusing to recognize First Amendment claims based on government
employees' work product does not prevent them from participating in public

debate." *Id.* "The employees retain the prospect of constitutional protection for their contributions to the civic discourse." *Id.* "This prospect of protection, however, does not invest them with a right to perform their jobs however they see fit." *Id.*

"Employers have heightened interests in controlling speech made by an employee in his or her professional capacity." *Garcetti,* 547 U.S. at 422. "Official communications have official consequences, creating a need for substantive consistency and clarity." *Id.* "Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Id.* at 423. "Ceballos' memo is illustrative." *Id.* "It demanded the attention of his supervisors and led to a heated meeting with employees from the sheriff's department." *Id.* "If Ceballos' superiors thought his memo was inflammatory or misguided, they had the authority to take proper corrective action."

Although *Garcetti* may seem to some to lead to a different outcome than *Pickering* and *Connick*, it in fact, does not. "The perceived anomaly, it should be noted, is limited in scope: It relates only to the expressions an employee makes pursuant to his or her official responsibilities, not to statements or complaints (such as those at issue in cases like *Pickering* and *Connick*) that are made outside

the duties of employment." *Garcetti*, 547 U.S. at 424. "If, moreover, a government employer is troubled by the perceived anomaly, it has the means at hand to avoid it." *Id.* "A public employer that wishes to encourage its employees to voice concerns privately retains the option of instituting internal policies and procedures that are receptive to employee criticism." *Id.* "Giving employees an internal forum for their speech will discourage them from concluding that the safest avenue of expression is to state their views in public." *Id.*

Lest the public be concerned that the outcome of *Garcetti* would lead to public employees no longer disclosing alleged malfeasance or fraud, etc. in the public workplace, the Supreme Court noted that "[t]he dictates of sound judgment are reinforced by the powerful network of legislative enactments – such as whistle-blower protection laws and labor codes – available to those who seek to expose wrongdoing." *Garcetti*, 547 U.S. at 425 (internal citations omitted). "Cases involving government attorneys implicate additional safeguards in the form of, for example, rules of conduct and constitutional obligations apart from the First Amendment." *Id.*

"We reject, however, the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties." *Garcetti*, 547 U.S. at 426. "Our precedents do not support the existence of a

constitutional cause of action behind every statement a public employee makes in the course of doing his or her job." *Id.*

The test to determine whether the FES/OAG interfered with Kimmett's *Petition Clause* rights is the same as the *Speech Clause. Borough of Duryea v. Guarnieri*, __ U.S. __; 131 S. Ct. 2488; 180 L. Ed. 2d 408 (2011). The rights are not "identical in their mandate or their purpose and effect to acknowledge that the rights of speech and petition share substantial common ground." *Id.* At 2494. "[T]he right to speak and the right to petition are "cognate rights." *Id.* (Internal citations omitted). "Courts should not presume there is always an essential equivalence in the two Clauses or that the *Speech Clause* precedents necessarily and in every case resolve *Petition Clause* claims." *Id.* at 2495. "There may arise cases where the special concerns of the *Petition Clause* would provide a sound basis for a distinct analysis..." *Id.* "[H]owever, claims of retaliation by public employees do not call for this divergence." *Id.* As a result, the undersigned is satisfied that both Kimmett's *Speech Clause* and *Petition Clause* claims may be analyzed together.

The undersigned may also dispose of this case on summary judgment motions as "[t]he inquiry into the protected status of speech is one of law, not fact." *Connick, supra,* at 148, fn 7. The tests the court must utilize to analyze

28

Kimmett's retaliation claims have been succinctly set forth by the Third Circuit

Court of Appeals.

> To state a First Amendment retaliation claim, a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). "The first factor is a question of law; the second factor is a question of fact." *Id.* A public employee's statement is protected activity only where (1) the employee spoke as a citizen (2) about a matter of public concern and (3) "the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Id.* at 241-42 (*quoting Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)). When assessing whether the government employer's justification is adequate, "[c]ourts balance the *First Amendment* interest of the employee against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2493, 180 L. Ed. 2d 408 (2011) (*quoting Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)). Taking "into account the extent of authority entailed in the employee's position," this "balancing test considers 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004) (*quoting Rankin v. McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987)). Actual disruption is not necessary provided that the speech "has some potential to affect the entity's operations." *Garcetti*, 547 U.S. at 418.

*Hara v. Pa. Dep't of Educ.*, 492 Fed. Appx. 266, 267-268 (3d Cir. Pa. 2012)

(unpublished).

With the facts of the cases discussed above and their differing outcomes in mind, the first step for the undersigned is to determine whether the Kimmett spoke as a citizen on a matter of public concern. If the court answers that question affirmative, the second question is whether the FES/OAG had adequate justification for treating Kimmett differently than the general public.

At least some of Kimmett's speech went beyond the scope of his job. Most of Kimmett's speech was, like *Garcetti*, made pursuant to his duties as supervisor of the collections unit. "When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee." *Garcetti,* 547 U.S. at 430. As supervisor of the collections unit, Kimmett was paid to manage collections correctly, so his speech on the PCAs and coworkers alleged fraud is not citizen speech. However, at least some of Kimmett's speech, particularly his speech about the operations of the DOR, a department outside the scope of Kimmett's responsibilities, was citizen speech. The undersigned need not determine which portions of Kimmetts speech was not citizen speech, because I find, at a minimum, that at least some of his speech, namely the speech about the DOR, was citizen speech. Consequently, the court must move to the remainder of the *Pickering* test, and the disposition of the instant motion for summary judgment

turns on the third part of the test.

Additionally, the court also agrees with the magistrate judge and finds that Kimmett spoke on a matter of public concern. This point is undisputable. The alleged waste and mismanagement of Commonwealth funds, i.e. taxpayer money, is of concern to all taxpayers in the Commonwealth. "To bring to light actual or potential wrongdoing or breach of public trust" is public concern. *See Connick*, 461 U.S. at 168.

It is in the analysis of the third part of the test that the court finds in favor of the defendants on their motion for summary judgment. The FES of the OAG had adequate justification for treating Kimmett differently from any other member of the general public as a result of the statements he made and the lawsuit he filed. With respect to the failure to promote, the defendants argued that "Kimmett should not handle litigation in the name of the Attorney General after he publicly accused the Attorney General and his staff of tolerating and covering-up illegal activity, and should not represent [the DOR] in court after he publicly accused [DOR] officials of complicity in such actions."[5] Defendants' Brief in Support of Summary Judgment Motion, ECF No. 80 at 16 (internal citations omitted).

As to his termination claim, Kimmett accused his supervisors, underlings

---

[5]The Court uses the argument as argument only, not as fact or evidence.

and others of serious fraud. Kimmett was a supervisor in his department. His employment relationship with those he accused is exactly the "kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Pickering, supra*. Kimmett's allegations may or may not be true and, as of the date of the instant memorandum and accompanying order, the veracity of his allegations will be left for a jury in the Court of Common Pleas to determine pursuant to Kimmett's whistleblower and defamation claims. As a matter of law, however, one cannot dispute that accusing ones co-workers publicly of fraud would impair discipline by superiors or harmony among co-workers and would have a detrimental impact on the close working relationships for which personal loyalty and confidence are necessary. Furthermore, these accusations may impede the performance of Kimmett's duties or may interfere with the regular operation of the FES.

Moreover, Kimmett himself, in his response to his employee performance evaluation wrote:

> I believe the entire evaluation is inappropriate because it is part of an orchestrated and deliberate effort on the part of the Office to discredit me...It is surreal to believe that individuals, Michael Roman and Lou Rovelli, that I have sued directly as a part of [this] lawsuit filed in August 2008, would be fair and unbiased in their evaluation and remarks

when it serves their interest to discredit me as much as possible. . . In my opinion [Michael Roman] was placed in [the position of Chief of FES] to stifle and curtail any further investigations and follow-up of FES transgressions and to fabricate and trump up charges against me. . . I welcome an examination of the past and current practices in the compromise area. . .To preclude the appearance of impropriety, I believe the Attorney General's Office is obligated to have this review conducted by an independent third party.. . I object to having an evaluation drafted by individuals that I have a current lawsuit against and who are aware that I met with their superiors regarding them and their actions. To think they can be fair and unbiased is surreal. It not only creates the appearance of impropriety, it is a clear conflict of interest.

(Doc. No. 177 at 75-77). Despite the fact that he now suggests otherwise, Kimmett himself felt that his speech and the instant complaint "impair[ed] discipline by superiors or harmony among co-workers, [and had] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *See, Curinga v. City of Clairton*, 357 F.3d 305,310 (3d. Cir. 2004)*.* In his comments in response to his performance evaluation he wrote that even he does not believe that his supervisors can be fair and unbiased toward him now that he has sued them.

Although Kimmett's speech is distinguishable from Myers' speech in *Connick, supra,* the Supreme Court did consider the one portion of her speech that did touch on a matter of public concern and stated, in utilizing the *Pickering*

33

balancing test, that "the Government, as an employer must have wide discretion and control over the management of its personnel and internal affairs. . . [t]his includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. . [p]rolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the workplace, foster disharmony, and ultimately impair the efficiency of an office or agency." *Connick*, 461 U.S. at 151. Kimmett himself did not believe that his supervisors could fairly evaluate him.

Part of the operation of the OAG was regular employee evaluations. Kimmett's response to his evaluation shows that given the now contentious nature between Kimmett and defendants, he could no longer even participate in an employment evaluation. It is undisputable then that the FES/OAG could not function efficiently with the disharmony created by Kimmett. Accordingly, I find that Kimmett's § 1983 claim cannot survive the final prong of *Pickering*, and will consequently be dismissed.

Although the court finds that the magistrate judge generally decided the summary judgment motions correctly, the undersigned has come to another point as to which the court cannot adopt the report and recommendation in its entirety. In applying the balancing test to determine whether Kimmett's interest in speaking

outweighs the OAG's interest in workplace efficiency, the magistrate judge looked

to whether or not Kimmett was a "policymaker." In making this determination, the

magistrate judge considered  two cases, *Elrod v. Burns*, 427 U.S. 347; 96 S. Ct.

2673; 49 L. Ed. 2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507; 100 S. Ct.

1287; 63 L. Ed. 2d 574 (1980).

Although *Elrod* and *Branti* are *First Amendment* cases, they are also

political patronage cases, e.g. association cases.  The line of analysis from these

political patronage cases determine when it is not violative of the *First*

*Amendment* to discharge public employees for partisan reasons.  The

"policymaker" test in these cases, and their progeny, was designed to explain why

it would be acceptable for a government employer to discharge an employee for

his political beliefs; e.g., when one is a "policymaker" and the political beliefs of

the employer and the employee would need to align in order to effectively make

policy decisions.  The "policymaker" test is inapplicable to a standard *Speech* and

*Petition Clause* case, such as the case at bar, where political patronage has no

bearing on the employment.  Freedom of speech and freedom of association are

"two separate *First Amendment* doctrines." *Curinga*, 357 at 309.[6] "[T]he Supreme

---

[6]*Curinga* explained when *Pickering* and *Elrod/Branti* intersect, as was the
case in *Curinga*, where a high-level government employee spoke out against his
public employer during an election campaign. This is not the case here.

Court set forth a separate analysis for politically motivated discharges of public employees." *Id.* at 310. As such, the undersigned cannot adopt the portion of the magistrate judge's report and recommendation in which he uses political patronage cases to determine if Kimmett is a policymaker.

## III. CONCLUSION:

The court holds that Kimmett's employer was able to terminate him without violating his Constitutional rights. As a result, the court will dismiss Count I of the complaint, Kimmett's 42 U.S.C.§ 1983 claim. However, Kimmett may still have viable whistleblower and defamation claims (Counts II and III of the complaint respectively). As the court is dismissing the only claim that gives the court federal question jurisdiction, the undersigned will decline to exercise pendant jurisdiction over Counts II and III of Kimmett's complaint and will dismiss Counts II and III without prejudice so that Kimmett may proceed with these claims in the appropriate state trial court.

An appropriate Order in accordance with this Memorandum will follow.


 s/ Matthew W. Brann
Matthew W. Brann
United States District Judge